USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 22, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                       :

PHOENIX LIGHT SF LIMITED et al.,       :
                                         :

            Plaintiffs,         :        14-cv-10116 (KBF)
                                         :

              -v-             :        OPINION & ORDER
                                         :

U.S. BANK NATIONAL ASSOCIATION and :
BANK OF AMERICA, NA,            :
                                         :

            Defendants.       :
                                         :

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Plaintiffs, eight issuers of collateralized debt obligations ("CDO") who allegedly suffered losses from their investments in 67 residential mortgage-backed securities ("RMBS") trusts, filed their initial Complaint in this action on December 24, 2014 and a First Amended Complaint on February 2, 2015. The Court dismissed the Amended Complaint on May 18, 2015 for failing to adequately plead or establish that any plaintiff had standing to bring suit either derivatively or directly; the Court allowed plaintiffs an opportunity to re-plead. (ECF No. 71.) After obtaining express assignments, plaintiffs filed a Second Amended Complaint on July 2, 2015. Defendants have again moved to dismiss the suit based on lack of standing and failure to state a claim. The bulk of the briefing, and the most difficult question for the Court on this motion, is, as it had been in the first round of motion practice, standing. Having spent considerable time on the parties' submissions, including the extensive record of corporate transactions that effected conveyances, the Court concludes that, at

this stage, plaintiffs have sufficiently alleged standing.  However, several non-contract claims are subject to dismissal.

For the reasons set forth below, the motion is GRANTED IN PART AND DENIED IN PART.

I.      FACTS[1]

Plaintiffs, Phoenix Light SF Ltd. ("Phoenix Light"), Blue Heron Funding VI Ltd. ("Blue Heron VI"), Blue Heron Funding VII Ltd. ("Blue Heron VII"), C-BASS CBO XIV Ltd. ("C-BASS XIV"), C-BASS CBO XVII Ltd. ("C-BASS XVII"), Kleros Preferred Funding V PLC ("Kleros"), Silver Elms CDO PLC ("Silver Elms"), and Silver Elms CDO II Ltd. ("Silver Elms II"), are foreign entities incorporated in the Ireland or the Cayman Islands.  (Second Am. Compl. ("SAC") ¶¶ 16-23.)  Each plaintiff is an issuer of collateralized debt obligations ("CDOs"), which are securities backed by other assets. In this case, the relevant CDOs issued by plaintiffs were backed at least in part by RMBS certificates.  Those certificates were issued by 67 trusts ("Covered Trusts") for which defendants serve as Indenture Trustee.[2]  (Id. at 17.)

Plaintiffs allege that they purchased over $775 million of RMBS certificates issued by the Covered Trusts.  (SAC ¶ 3.)  Plaintiffs claim that they continue to hold these certificates, and have suffered over $525 million in damages due to various breaches and misconduct by defendants.  (SAC ¶¶ 3, 15.)

---

[1]      The following facts are drawn from the Second Amended Complaint ("SAC") and the documents incorporated by reference.  The Court assumes the truth of the allegations in the SAC for purposes of this motion only.

[2]      In December 2010, defendant U.S. Bank acquired Bank of America's securitization trust business and succeeded Bank of America as trustee for all relevant trusts.  Plaintiffs only assert claims against Bank of America for its alleged breaches and misconduct (or that of its predecessors) prior to December 2010.

Plaintiffs, however, were not the original purchasers of the RMBS certificates, and came to acquire them after a series of transactions summarized in the chart below:[3]



In short, plaintiffs purchased the RMBS certificates from third parties from late 2005 to 2009.  Plaintiffs then re-securitized these RMBS assets by using them as collateral

---

[3]     On February 11, 2016, the Court sent a version of this chart to parties and invited comment as to its accuracy.  (ECF No. 102.)  The parties submitted responses that reflected general agreement with the chart's representation of events; the Court made some adjustments to account for issues raised by parties, and a revised version of the chart is reflected in this Opinion & Order.

for CDOs that plaintiffs issued.  The trustees of the CDO Indentures then assigned

any rights they had to bring suit to plaintiffs in 2015.

The Court provides a more thorough overview of the relevant transactions

below.

A.   The PSAs

The RMBS certificates that underlie the CDOs issued by plaintiffs are created

through a process known as mortgage loan securitization.  First, mortgage loans on

residential properties are acquired from mortgage loan originators by a sponsor or

seller.  The sponsor / seller then sells a pool of such loans to a depositor, which is

usually a special-purpose affiliate of the sponsor / seller.  (SAC ¶¶ 50-51.)  The

depositor and a trustee—such as defendants here—then enter into a Trust Agreement

that holds the loans.  (Decl. of Jacob Kreilkamp ("Kreilkamp Decl."), ECF No. 86, Ex.

16 (WMALT Series 2006-AR9 PSA), ("WMALT 2006-AR9 PSA"), at 1, 8.)  The

depositor conveys the pool of loans to the trustee via a pooling and servicing

agreement ("PSA").

The PSA establishes tiered tranches of interest in payments made by borrowers

on the loans.  (SAC ¶¶ 50-51.)  Each tranche has a different level of risk and reward,

and its own ratings issued by a nationally-recognized credit-rating agency.  Higher-

rated senior tranches are entitled to payments ahead of lower rated, junior tranches;

shortfalls in payments on interest or principal are allocated generally first to junior

tranches.  (SAC ¶ 54.)  The trust issues certificates representing the tranches of loans,

which eventually are sold to investors.  (SAC ¶ 51.)

Pursuant to the PSA, a servicer is appointed to manage the collection of payments on the mortgage loans and to monitor delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentations, and managing and selling foreclosed properties.  (SAC ¶ 52.)

The Trustee's duties are limited to those set forth in the PSAs.  Each PSA provides that the Trustee has certain duties and responsibilities including, inter alia, to take title to the mortgage loans conveyed to the trusts, provide notice of incomplete or defective mortgage files, and to provide notice of breaches of representations and warranties of sponsors or loan originators.  (SAC ¶¶ 60-68.)  The PSAs further provide that the Trustee has specific duties in an "Event of Default."  (Id. ¶ 71.)  An "Event of Default" generally requires (1) a breach of a representation, warranty or covenant of the servicer or master servicer; (2) notice to certain defined parties; and (3) a cure period.  (See WMALT 2006-AR9 PSA § 7.01.)  The PSAs provide that in an Event of Default, the Trustee must exercise the rights vested in it by the PSA and to act under a prudent person standard.  (Id. § 8.01; SAC ¶ 75.)  Under such circumstances, the Trustee can and in some circumstances must terminate the Servicer.  (WMALT 2006-AR9 PSA § 7.01.)  Each PSA also provides that the Trustee is not charged with notice of an Event of Default unless the Trustee has actual knowledge or has been provided with written notice of such.  (Id. § 8.02 (vi).)

B.   Initial Acquisition

A number of entities not party to this action (including WestLB AG, a failed German bank, Harrier Finance Limited, Kestrel Funding PLC, and Greyhawk

5

Funding LLC) purchased some of the RMBS certificates described above.  (SAC ¶ 29; id. Ex. B.)  These third-party entities eventually entered into asset purchase agreements ("APAs") with plaintiffs (except the two Blue Heron entities).  (SAC ¶ 29.)

Pursuant to these agreements, the original holders of certificates agreed to sell and plaintiffs agreed to purchase the RMBS certificates along with "all of [seller's] rights, title, interest, and benefit."  (APA Compendium Tab 9, Phoenix Light / WestLB AG Collateral Acquisition Agreement, ("Phoenix Light APA") § 2.1.)[4]  Some of the APAs are governed by New York law, and some are governed by German law.  (See id. § 8.1; APA Compendium Tab 11, Phoenix Light/ Harrier Standby APA §§ 9-10.)[5]

Certain plaintiffs—the two Blue Heron entities, Kleros, and Silver Elms II— also purchased RMBS certificates via direct purchases in the RMBS market.  (SAC ¶ 31; id. Ex. B; APA Compendium Tab 1, Ex. G; APA Compendium Tab 7.)

C.   The CDOs

Each of the plaintiffs other than Phoenix Light entered into Indentures ("CDO Indentures") in order to issue CDOs.  The CDO Indenture Trustees are as follows:

---

[4]      On February 11, 2016, the Court ordered that plaintiffs provide copies of the APAs, which are explicitly referenced in paragraphs 29 and 30 of the Second Amended Complaint and are critical to plaintiffs' claims.  (ECF No. 102.)  Plaintiffs provided a compendium of such documents ("APA Compendium").  Those documents, as well as the other documents provided on this motion, are relied on by plaintiffs in the SAC and incorporated by reference into the pleadings.  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

[5]      The documentation for the APA transactions are not complete.  First, the APAs related to two acquisitions by the two Silver Elms entities have apparently been lost.  (See Decl. of Peter Collins, APA Compendium Tab 1, ¶ 4-5.)  However, the Silver Elms entities also entered into deeds of assignment with the seller, which reflect the explicit assignment of all claims by the assignors pursuant to a prior warehouse agreement or APA.  (Id. Exs. A, C.)  Second, the APAs relating to C-Bass XIV and Kleros contain reference to an exhibit that lists the certificates subject to the agreements; plaintiffs aver that these exhibits were never prepared and instead the parties understood the schedules of certificates in the related CDO indentures were controlling.  (See Cover Letter to APA Compendium.)

- Deutsche Bank Trust Company Americas ("DB"), for the Kleros and Silver Elms CDO Indentures;

- Bank of New York Trust Company, National Association ("BNY"), for the Blue Heron VI, C-BASS XIV and C-BASS XVII CDO Indentures; and

- Wells Fargo Bank, N.A. ("Wells Fargo"), for the Silver Elms II and Blue Heron VII CDO Indentures.

(SAC ¶ 34.)  Under the CDO Indentures, plaintiffs as issuer convey to the CDO Indenture Trustees a total grant of "all of its right, title, and interest" in the underlying certificates "for the benefit and security of the Secured Parties."  (See Kreilkamp Decl. Ex. 2 ("Blue Heron VII CDO Indenture"), at 1.)  "Secured Parties" is defined as including "[c]ollectively, the Noteholders, any Hedge Counterparty and the Indenture Trustee."  (Id. at 44.)  For each of the seven CDO-issuing plaintiffs, Phoenix Light holds more than 50% of the senior notes.  (SAC ¶ 36.)[6]

As for Phoenix Light, it entered into a Trust Agreement on March 31, 2008 with DB, whereby Phoenix Light as Issuer pledged to DB as Trustee "all its present and future, actual and contingent claims and rights" with respect to certain collateral assets.  (SAC ¶ 43; Kreilkamp Decl. Ex. 10 ("Phoenix Light Trust Agreement"), §§ 2.2, 3.2.)  However, unlike the CDO Indentures for the other plaintiffs, the Trust Agreement for Phoenix Light expressly authorizes the Issuer to "collect or have collected in the ordinary course of business or otherwise exercise or deal with (which

---

[6]    Plaintiffs stated in a letter to the Court that "only Plaintiff Phoenix Light SF Limited holds CDO notes issued by" the other seven plaintiffs.  (Feb. 17, 2016 Ltr. in Response to Court Order, ECF No. 104, at 2, n.1.)

terms shall, for the avoidance of doubt, include the enforcement of any security) the rights pledged [to the trustee] under Clause 3.2."  (Phoenix Light Trust Agreement § 3.7.)  On December 31, 2008, Phoenix Light and DB also entered into an Amended and Restated U.S. Security Agreement whereby "all right, title, and interest in and to" collateral assets were granted to DB as Trustee.  (SAC ¶ 44; Kreilkamp Decl. Ex. 9 ("Phoenix Light Security Agreement") § 2.1.)[7]

        D.   <u>The 2015 Assignment</u>

On December 12, 2014, Phoenix Light directed each of the CDO Indenture Trustees to assign to plaintiffs any rights the Trustees have to bring the claims herein. (SAC ¶ 38.)  The Trustees eventually did so.  (SAC ¶¶ 39-41, 45.)  On April 16, 2015, DB and Phoenix Light entered into a written assignment agreement whereby DB assigned to Phoenix Light "any and all rights that the Trustee may have to pursue and enforce the claims as set forth [in this action]" that DB may have as CDO Indenture Trustee under the Silver Elms and Kleros CDO Indentures.  (Decl. of Steven S. Fitzgerald ("Fitzgerald Decl."), (ECF No. 88), Ex. 12, at 1-2.)  On June 17, 2016, DB and Phoenix Light entered into a second assignment agreement, whereby DB—as Trustee pursuant to the Phoenix Light Trust Agreement and U.S. Security Agreement—assigned Phoenix Light rights under those instruments to enforce claims in this action.  (<u>Id.</u> Ex. 13, at 1-2.)  On June 19, 2015, BNY assigned its rights to pursue claims under the C-Bass XIV and XVII and the Blue Heron VI CDO Indentures to the corresponding plaintiff entities C-BASS XVII and XIV and Blue Heron VI.  (<u>Id.</u>

---

[7]     According to plaintiffs, all notes issued by Phoenix Light are owned by an agency of the German government, created in connection with the failure of WestLB AG.  (<u>See</u> Feb. 17, 2016 Ltr., at 2, n.1.)

Ex. 11, at 1, 3.)  On June 26, 2015, Wells Fargo assigned the rights to pursue claims under the Silver Elms II and Blue Heron VII CDO Indentures back to the corresponding plaintiff entities Silver Elms II and Blue Heron VII.  (Id. Ex. 14, at 1-2.)

     E.   Plaintiffs' Claims

The Court's May 18, 2015 Opinion and Order dismissed the Amended Complaint.  The Court found that plaintiffs had failed to clearly plead what rights they have as Certificateholders under the initial APAs, and that in any event, plaintiffs are contractually barred from bringing a direct suit because the CDO Indentures appear to give the CDO Indenture Trustees the right to commence any action.  The Court also held that Phoenix Light did not have standing to sue derivatively because it had neither met the Fed. R. Civ. P. 23.1 requirements for making a demand nor pled that demand would have been futile.

In the SAC, plaintiffs' re-pled allegations contain the following relevant differences:

- Plaintiffs do not assert derivative standing but rather bring all claims directly;

- Plaintiffs only assert claims arising out of the period it holds the Certificates, and no longer assert claims that may have accrued under prior ownership;

- Plaintiffs have provided some of the documentation regarding their acquisition of the RMBS certificates at issue; and

- Plaintiffs received assignments from each of the CDO Indenture Trustees to pursue their claims.

Each of the plaintiffs brings the action in its own right as issuers of CDOs that hold certificates issued by the Covered Trusts.  (SAC ¶¶ 16-23.)  Plaintiff Phoenix Light also brings this action pursuant to rights assigned to it by DB to bring claims in the name of Kleros and Silver Elms.  (Id. ¶ 16.)

The claims in this action relate to various alleged breaches and failures by the Trustees on PSAs pursuant to which the initial RMBS notes held by plaintiffs were issued.

Count One alleges violations of the Trust Indenture Act ("TIA") of 1939.  Section 315 of the TIA sets forth certain trustee duties, which plaintiffs allege defendants failed to meet.  (SAC ¶¶ 11, 160-69.)  Plaintiffs only allege violations of the TIA with respect to the RMBS PSAs.

Count Two asserts breach of contract relating to the PSAs.  According to plaintiffs, defendants breached several of their obligations under the PSAs, including failure to provide notice of violations of representations and warranties by mortgage loan sponsors and originators, failure to provide notice of Servicer and Master Servicers' failures to give notice of those same representation and warranty violations, failure to cause responsible parties to repurchase or substitute loans that were subject to breaches of representations and warranties or missing required documentation, and failure to exercise all rights and remedies available under the PSAs pursuant to an Event of Default.  (SAC ¶¶ 9, 170-78.)

Count Three asserts a claim for breach of fiduciary duty after Events of Default. Plaintiffs assert that defendants owed Certificateholders a fiduciary duty to act as a

prudent person would in the exercise of his or her own affairs to protect Certificateholder rights.  (SAC ¶¶ 10, 179-82.)

Count Four asserts that defendants acted negligently by failing to provide notices of defaults and by acting under a conflict of interest. (SAC ¶¶ 13, 183-85.)

Counts Five alleges violations of the Streit Act, N.Y. Real Prop. Law § 124 et seq.  The Streit Act was established "to provide for the regulation and supervision of . . . trustees" and others administering the interests of real estate mortgages.  N.Y. Real Prop. Law § 124.  Plaintiffs allege that defendants, as trustees under the Streit Act, failed to discharge their pre-default duties and failed to act as a prudent person would have after event of default under N.Y. Real Prop. Law § 126.   (SAC ¶¶ 12, 186-92.)

Count Six asserts a breach of the covenant of good faith and fair dealing by failing to take certain actions under the PSAs, including giving notices of default and causing loan repurchase provisions to be enforced.  (SAC ¶¶ 14, 193-97.)

## II.   STANDARD OF REVIEW

In connection with a motion to dismiss, the Court accepts as true all material allegations of the complaint and construes all facts pled in favor of plaintiffs.  W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008).

The Court reviews plaintiffs' standing pursuant to the standards set forth in Fed. R. Civ. P. 12(b)(1) and interpreting case law.  Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006).  "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of

fact by reference to evidence outside the pleadings . . . " <u>Tandon v. Captain's Cove Marina of Bridgeport, Inc.</u>, 752 F.3d 239, 243 (2d Cir. 2014) (quoting <u>APWU v. Potter</u>, 343 F.3d 619, 627 (2d Cir. 2003)).  Accordingly, any necessary factual determinations in connection with the Rule 12(b)(1) motion are by a preponderance of the evidence.

The Court reviews questions regarding the adequacy of the pleadings under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a Rule 12(b)(6) motion, a plaintiff must provide grounds upon which his claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." <u>Starr v. Sony BMG Music Entm't</u>, 592 F.3d 314, 321 (2d Cir. 2010) (quoting <u>Twombly</u>, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).

In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Id.</u>  The Court will give "no effect to legal conclusions couched as factual allegations." <u>Port Dock & Stone Corp. v. Oldcastle Ne., Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555).  A plaintiff may plead facts alleged upon information and belief "where the facts are peculiarly within the possession and control of the defendant." <u>Arista Records, LLC v. Doe 3</u>, 604

F.3d 110, 120 (2d Cir. 2010).  But, if the Court can infer no more than the mere

possibility of misconduct from the factual averments—in other words, if the well-pled

allegations of the complaint have not "nudged [plaintiff's] claims across the line from

conceivable to plausible"—dismissal is appropriate.  Twombly, 550 U.S. at 570; Starr,

592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

A court may properly consider documents and contracts attached to or

incorporated by reference in a complaint on a Rule 12(b)(6) motion to dismiss.  Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Chambers v. Time

Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).  In resolving a challenge to standing

under Rule 12(b)(1), courts may look outside the pleadings to "resolve factual disputes

concerning the existence of jurisdiction."  United States v. Vazquez, 145 F.3d 74, 80

(2d Cir. 1998); Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).

III.    DISCUSSION

    A.    Standing

        1.    Initial acquisitions

A significant issue for the first motion to dismiss was that plaintiffs had failed

to adequately allege how they initially came to acquire the certificates upon which this

action is based.  This time, plaintiffs have pled a sufficient basis to support their

initial acquisition of the RMBS certificates from various third parties.  (See, e.g., SAC

Ex. B.)  In addition and in response to a request from the Court, plaintiffs provided

further documentation of the transaction history referenced in the SAC, including the

original APAs, and certain other records.[8]  In addition, plaintiffs now only seek to bring claims for the period they hold the Certificates, and do not bring claims accruing under the previous owners' holding period.

At this stage in the proceedings, the Court finds that there is a sufficient basis to proceed.  Nothing in the APA and other documents associated with plaintiffs' initial acquisition of the RMBS Certificates appears to prevent plaintiffs from asserting claims that arise in the course of its ownership.  While there may be various issues that arise—such as the legal implications of German law governing APAs—the Court does not resolve those issues at this time.  The Court need only be satisfied that there is a sufficient basis to proceed, and it is.  It leaves for a later day resolution as appropriate of additional contractual interpretations, including as to the APAs.

        2.    <u>The 2015 assignments</u>

        a)    Validity

Without relinquishing their position that assignments were unnecessary, in April and June 2015, plaintiffs acquired from the CDO Indenture Trustees formal assignments of the rights to bring the legal claims at issue in this case.

Such assignments were necessary as the CDO Indenture's Granting Clause makes it clear that plaintiffs, as CDO Issuers, had already "[g]rant[ed] to the Indenture Trustee for the benefit of the Secured Parties, all of its right, title, and

---

[8]    As discussed above, plaintiffs were unable to produce the original APAs for the two Silver Elms transactions, but did produce subsequent deeds of assignment.  The APAs for two other transactions are also missing exhibits listing the certificates, but parties allegedly had an understanding that the certificates were the ones listed in related CDO Indentures.  (See Decl. of Peter Collins, APA Compendium Tab 1, ¶ 4-5; Cover Letter to APA Compendium.)  The Court does not address today whether these lapses will cause issues down the road for plaintiffs.

interest in" the underlying certificates.  (Blue Heron VII CDO Indenture at 1.)  The

Issuers had also

> irrevocably appoint[ed] the Indenture Trustee the true and lawful attorney of
> the Issuer, with full power (in the name of the Issuer or otherwise), to exercise
> all rights of the Issuer with respect to the Collateral held for the benefit and
> security of the Secured Parties and to ask, require, demand, receive, settle,
> compromise, compound and give acquittan[c]e for any and all moneys and
> claims due and to become due under or arising out of any of the Collateral held
> for the benefit and security of the Secured Parties.

(Id. at 3.)  The assignments effectively reverse these grants with regard to the specific

legal claims at issue.

Defendants argue that the assignments are invalid under the CDO Indentures

because they impermissibly release collateral from the trust liens in violation of the

CDO Indentures.  The Court is not persuaded by the arguments made on that point at

this stage.  It is not at all clear that the highly contingent claims constitute a collateral

release.  However, this issue need not be resolved at the pleading stage.  The

development of the factual record and additional understanding of the various

transactions will allow more coherent briefing on this point.  Construing the

allegations in a light most favorable to plaintiffs, the assignments are sufficient to

support the claims at this stage.

> b)   Champerty

Defendants also argue that the 2015 assignments violate the prohibition on

champerty because they were made for the sole purpose of allowing plaintiffs to

pursue claims.  Champerty is a common law doctrine to "prevent or curtail the

commercialization or trading in litigation."  In New York, the prohibition against

champerty is codified in Judiciary Law § 489:

> (1) No person . . . and no corporation or association . . . shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon;
>
> (2) Except as set forth in subdivision three of this section [regarding inapplicability to indenture trustees], the provisions of subdivision one of this section shall not apply to any assignment, purchase or transfer hereafter made of one or more bonds, promissory notes, bills of exchange, book debts, or other things in action, or any claims or demands, if such assignment, purchase or transfer included bonds, promissory notes, bills of exchange and/or book debts, issued by or enforceable against the same obligor (whether or not also issued by or enforceable against any other obligors), having an aggregate purchase price of at least five hundred thousand dollars, in which event the exemption provided by this subdivision shall apply as well to all other items, including other things in action, claims and demands, included in such assignment, purchase or transfer (but only if such other items are issued by or enforceable against the same obligor, or relate to or arise in connection with such bonds, promissory notes, bills of exchange and/or book debts or the issuance thereof).

N.Y. Judiciary Law § 489.  Champerty is an affirmative defense for which the defendants bears the burden of proof.  See Trust for Certificate Holders of Merrill Lynch Mortgage Inv'rs, Inc. v. Love Funding Corp., 591 F.3d 116, 119 (2d Cir. 2010).  To dismiss a claim on champerty grounds, defendants must demonstrate that "the foundational intent to sue on that claim must at least have been the primary purpose for, if not the sole motivation behind, entering into the transaction. Bluebird Part. L.P. v. First Fidelity Bank N.A. 94, N.Y.2d 726, 736 (2000).  Furthermore, "the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim," such as when a holder of the loan "had a preexisting proprietary interest in the loan" and took assignment "to enforce its rights."  Trust For the Certificate Holders of Merrill Lynch Mortgage Inv'rs, Inc. v. Love Funding Corp., 13 N.Y.3d 190, 202 (2009) (answering certified question from Second Circuit).  Resolution

of a champerty defense is thus often a factual question.  This Court cannot resolve this factually-based defense on a motion to dismiss.

### 3.   Policemen's Annuity settlement

Finally, defendants claim that claims relating to certificates issued by four Washington Mutual RMBS trusts should be dismissed because they were already released in a class settlement in another case, Policemen's Annuity and Benefit Fund of the City of Chicago v. Bank of America, NA et al., 12 Civ. 2865 (KBF).  In Policemen's Annuity, the Court approved a class-wide settlement, but excluded, inter alia, "any person or entity that submits a valid and timely request for exclusion from the Settlement Class in accordance with the requirement set forth in the Notice." (Kreilkamp Decl. Ex. 21 (Policemen's Annuity Preliminary Approval Order, ECF No. 296), ¶¶ 4.)  Defendants now argue that because plaintiffs—and not the Indenture Trustees—requested to opt-out, (see Opt-Out Letter, Kreilkamp Decl. Ex. 22), and because the opt-out request occurred on February 10, 2015, before the April and June 2015 assignments by the Indenture Trustees, the opt-outs must not be valid; and, if the opt-outs are invalid, claims relating to these certificates have been settled and released.

Resolution of this argument requires fact-finding that cannot occur on this motion to dismiss.  The level of fact-finding appropriate to resolve general issues of standing cannot extend this far.  The Court awaits a fuller record.  In addition, the Court notes that this argument may constitute a collateral attack on a final judgment. (See Mar. 16, 2015 Corrected Final Judgment, Policemen's Annuity, 12 Civ. 2865 (KBF), ECF No. 328.)  It is relevant that defendants, who were also defendants in

17

Policemen's Annuity, did not object to plaintiffs' opt-out request.  The settlement then became final, also without objection from defendants.  As the final settlement does not include plaintiffs, their claims regarding the four trusts have not been released in Policeman's Annuity, and may proceed here.  See In re Painewebber Ltd. Partnerships Litig., 147 F.3d 132, 138 (2d Cir. 1998).

     B.   Non-Standing Evaluation Under Rule 8

Defendants also raise a number of additional issues in support of dismissal.

This Court reviews the adequacy of a pleading pursuant to Rule 8 of the Federal Rules of Civil Procedure and Twombly.  Together (and they must be read together and consistently), they do not require a level of proof reserved for summary judgment or trial, nor do they require certainty as ultimate victory.  Rather, they require that plaintiffs' allegations, construed as a whole, put forward sufficient facts to allege a plausible violation of the law.  At this stage, plaintiffs are required to assert plausible claims only; it is not for the Court to determine at this stage whether such claims have a probability of success.

The Court finds that while plaintiffs have sufficiently pled their breach of contract claim, the remaining claims should be dismissed as a matter of law.

     1.   Breach of contract (Count II)

Plaintiffs' breach of contract claims requires two (broad) steps.  First, plaintiffs must adequately plead breaches under the PSAs and second, that defendants as Indenture Trustee failed to take appropriate action once notified (or acquired knowledge) of such breach.  Defendants do not oppose this claim on the merits.

18

2.      Breach of fiduciary duty (Count Three)

Defendants urge dismissal of the fiduciary duty claim on the basis that it does

no more than duplicate the contract claim.  To the extent that some parts of the claim

duplicate breach of contract claim, it fails.  Clark-Fitzpatrick, Inc. v. Long Isl. Rail

Road Co., 70 N.Y. 2d 382, 389-90 (1987) ("a simple breach of contract is not to be

considered a tort unless a legal duty independent of the contract itself has been

violated."); OP Solutions, Inc. v. Crowell & Moring, 900 N.Y.S. 2d 48, 49 (App. Div.

2010) (same); see also Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14 Civ.

10104 VEC, 2015 WL 5710645, at *7 (S.D.N.Y. Sept. 29, 2015) ("Plaintiffs allege that

an Event of Default triggered heightened duties, including a duty to make prudent

decisions to protect the interests of the certificateholders. These heightened duties,

however, appear to be subsumed within the language of the PSAs and indentures or

else implied within their terms.").

However, plaintiffs also allege that defendants breached their fiduciary duties

by operating under a conflict of interest.  (SAC ¶¶ 180-81.)  Under New York law,

routine duties to avoid conflicts of interest and to perform duties with due care in

connection with performance of contractual responsibilities are not considered

fiduciary duties.  AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co., 11

N.Y.3d 146, 157 (2008).  However, following an Event of Default, a trustee takes on a

special duty to secure the assets of the trust act with undivided loyalty to trust

beneficiaries.  Beck v. Manufacturers Hanover Trust Co., 632 N.Y.S.2d 520, 528 (App.

Div. 1995).

At least part of plaintiffs' fiduciary duty claim is that following the Event of

Default, defendants did not act with undivided loyalty as it was operating under a conflict; this conflict is alleged to have prevented it from performing its enforcement obligations.  (SAC ¶¶ 151-53.)  Such allegations are sufficient to distinguish this claim from the contract claim.

At the next step, however, the claim encounters difficulty.  The <u>damages</u> that plaintiffs allege in connection with the breach of fiduciary duty claims arise entirely from defendants' obligations under the PSAs.  Recovery on these claims is barred by the economic loss doctrine—that "a contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings."  <u>17 Vista Fee Associates v. Teachers Ins. & Annuity Ass'n of Am.</u>, 693 N.Y.S.2d 554, 559 (1999).  Plaintiffs' allegations for damages arising from conflict of interest sound in defendants' failure to undertake "obligations set forth in the PSAs," which led to "impair[ing] Certificateholders' ability to fully collect the principal and interest due on their Certificates and caus[ing] losses in the value of Plaintiffs' Certificates."  (SAC ¶ 180, 182.)  While the cause of action for breach of fiduciary duty may arise from common law duties and not from the PSA, "the injury" and "the manner in which the injury occurred and the damages sought persuade us that plaintiffs' remedy lies in the enforcement of contract obligations," and are barred by the economic loss doctrine.  <u>Bellevue S. Associates v. HRH Const. Corp.</u>, 78 N.Y.2d 282, 293 (1991).  Therefore, the breach of fiduciary duty claim fails.

3.    <u>Negligence and gross negligence (Counts Four)</u>

Plaintiffs' negligence claims are completely duplicative of the breach of contract claims, and to some extent, the breach of fiduciary duty claim.  The SAC asserts, "the

20

Trustees had a duty to perform their duties under the PSAs competently and are liable for their negligent failure to do so." (SAC ¶ 88.)  Although the recitation of Count Four is vague, it is clear that plaintiffs derive their negligence claim from a theory that defendants negligently failed to perform contractual duties.  See Royal Park Investments SA/NV v. HSBC Bank USA, Nat. Ass'n, 109 F. Supp. 3d 587, 609 (S.D.N.Y. 2015).  Furthermore, as discussed above, any damages arising out of the negligence sound in contract damages, and therefore the economic loss doctrine would also bar recovery under the negligence count.  See 17 Vista Fee, 693 N.Y.S.2d at 559.

### 4.   Breach of the covenant of good faith (Count Six)

Every contract is assumed to incorporate a covenant of good faith and fair dealing unless such obligation is expressly disclaimed.  Here, the PSAs expressly disclaim any implied obligations.  (See WMALT 2006-AR9 PSA § 8.01(c)(ii) ("No provision of this Agreement shall be construed to relieve the Trustee . . . from liability for its own negligent action . . . or its own willful misconduct; provided, however, that . . . no implied covenants or obligations shall be read into this Agreement against the Trustee . . . .").)  This disclaimer is binding.

To the extent that it is not, such claims would in any event be duplicative of the breach of contract in Count Two, as plaintiffs' claim is based on the "duty of good faith and fair dealing pursuant to the PSAs." (SAC ¶ 194.)  "Where a claim for a breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract claim, it must be dismissed."  Policemen's Annuity & Benefit Fund of City of Chicago v. Bank of Am., NA, 907 F. Supp. 2d 536, 558 (S.D.N.Y. 2012); Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 869 (2d Cir. 2015) ("[C]laims are

duplicative when both arise from the same facts and seek the identical damages for each alleged breach." (internal quotation marks omitted)).

This Court dismisses this claim for both of these reasons.

### 5. TIA claim (Count One)

Plaintiffs assert a claim under the TIA in order to preserve appellate rights. (SAC ¶ 15, n.2.)  In Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon, 775 F.3d 154, 169 (2d Cir. 2014), the Court of Appeals expressly held that certificates issued in PSA-governed New York trusts are exempt from the TIA.  That precedent is controlling.

### 6. Streit Act claim (Count Five)

Plaintiffs assert claims N.Y. Real Property Law § 126(1), a provision of a New York statute known as the Streit Act.  (SAC ¶¶ 186-192.)  Plaintiffs allege that defendants failed to discharge the prudent-man duties that the Streit Act requires for trustees to undertake in events of default.  However, as defendants point out, Section 126 merely requires that "the instrument creating the trust shall contain the following provisions," and that a trustee shall not "accept a trust" without the provisions.  N.Y. Real Prop. Law § 126.  Plaintiffs do not contend that defendants accepted a trust whose trust instrument lacked any required provision.  See Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *11 (S.D.N.Y. Sept. 29, 2015).[9]

---

[9]    In fact, the PSA clearly states that in the event of an Event of Default, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement or the Countrywide Agreement, as applicable, and use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs." (See WMALT 2006-AR9 PSA § 8.01.)  This provision satisfies—indeed, is nearly identical to—the provision required

Plaintiffs nevertheless claim that the Streit Act allows recovery for trustees' violations of the duties that Section 126 requires that every trust instrument contain. Plaintiffs are incorrect—not only because such an interpretation is unfounded given the unambiguous statutory language, but also because it is unsupported by the very case law cited by plaintiffs.  In Harper v. Larchmont Yacht Club, 38 N.Y.S. 2d 505 (Sup. Ct. 1942), the trial court did not, as plaintiffs contend, rule that once a trust instrument that satisfies Section 126 has been created, that a plaintiff may recover for alleged violations of that trust instrument's requirements.  Instead, the case concerns whether a clause in the trust instrument regarding the definition of event of default violated the requirements of § 126.  See Harper, 38 N.Y.S. 2d at 507-509.  Moreover, in Harper, the trust indenture itself specifically incorporated the underlying contents of Section 126.  Id., 28 N.Y.S.2d at 507 ("Article 4 of the trust indenture . . . provides [in the event of default], then, under section 3, 'unless such event of default shall have been previously cured or waived,' the trustee was to exercise the powers provided by section 126, subdivision 3, of the Real Property Law.").[10]

Because plaintiffs have failed to state a claim under the Streit Act, the Court need not reach the state law questions of whether the Streit Act applies to the RMBS trusts here or whether the Act provides a private right of action under New York law.

---

by the Streit Act, which provides, in relevant part, that the trust instrument must include the provision that "In the case of an event of default (as such term is defined in such instrument), to exercise such of the rights and powers vested in the Trustee by such instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs." N.Y. Real Prop. Law § 126.

[10]     Plaintiffs' citations to Beck v. Manufacturers Hanover Trust Co., 632 N.Y.S.2d 520, 527-28 (App. Div. 1995) and In re Colonial Trust Co., 67 N.Y.S.2d 534, 539 (Sup. Ct. 1946) are also inapposite, as neither case discusses the scope of recovery under § 126 and merely summarize the existence of the Streit Act in dicta.

IV.    CONCLUSION

This Court has considered parties' other arguments in relation to this motion and finds that they are without merit.  For the reasons set forth above, defendants' motion to dismiss is DENIED as to Count II and GRANTED as to Counts I, III, IV, V, and VI.  The Clerk of Court is directed to terminate the motion at ECF No. 84.

SO ORDERED.

Dated:    New York, New York
          March 22, 2016

_____
KATHERINE B. FORREST
United States District Judge