**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

PHOENIX LIGHT SF DAC, BLUE HERON
FUNDING VI LTD., BLUE HERON FUNDING VII
LTD., KLEROS PREFERRED FUNDING V PLC,
SILVER ELMS CDO PLC, SILVER ELMS CDO II
LIMITED, C-BASS CBO XIV LTD. and C-BASS
CBO XVII LTD.,

                            Plaintiffs,

            -against-

U.S. BANK NATIONAL ASSOCIATION and BANK
OF AMERICA, NA,

                            Defendants.

------------------------------------------------------------- x

Index No. 14-cv-10116 (VSB)

Hon. Vernon S. Broderick

**THIRD AMENDED**
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

NATURE OF ACTION ...................................................................................................1

PARTIES ......................................................................................................................4

PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE .....................6

JURISDICTION AND VENUE .......................................................................................12

FACTUAL ALLEGATIONS ...........................................................................................13

I.      THE SECURITIZATION PROCESS.............................................................................13

II.     DEFENDANTS' DUTIES AND OBLIGATIONS .........................................................15

      A.     Defendants' Duties Pertaining to the Delivery of Mortgage Files .......................18

      B.     Defendants Had a Duty to Provide Notice of Defaults and
                Enforce Repurchase Obligations Triggered by Such Notice ...............................25

      C.     Defendants' Duty to Act Prudently to Enforce Repurchase Obligations .............27

      D.     Defendants Had a Duty to Address the Master Servicer's
                and Servicers' Failure to Meet Prudent Servicing Standards ...............................28

III.    DEFENDANTS BREACHED THEIR DUTIES.................................................................31

      A.     Defendants Were Aware of but Failed to
                Provide Notice of Defaults Relating to the Sponsors'
                and Originators' Pervasive Representation and Warranty Breaches ....................31

             1.     The Originators' and Sponsors' Pervasive
                      Breaches of Representations and Warranties............................................41

      B.     Defendants Failed to Act Prudently to Enforce Repurchase Obligations.............49

             1.     Events of Default Under the PSAs Relating to
                      Document Delivery Failures in the Covered Trusts .................................50

              2.     U.S. Bank Received Written Notice of Representation and
                      Warranty Violations Which Ripened into Events of Default ...................54

              3.     Events of Default Concerning False Servicer Certifications ...................56

4.    Other Events of Default ......................................................58

C.    Defendants Failed to Address the Master
Servicer's and Servicers' Looting of Trust Assets ................................59

IV.    DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST ..............................60

V.    DEFENDANTS' CONDUCT INJURED PLAINTIFFS ...................................................62

CAUSE OF ACTION (Breach of Contract) .............................................................64

PRAYER FOR RELIEF ....................................................................................65

Phoenix Light SF DAC, Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd.,

Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-BASS

CBO XIV Ltd. and C-BASS CBO XVII Ltd., as holders of residential mortgage-backed

securities ("RMBS") issued by certain Covered Trusts (defined below) (collectively,

"Plaintiffs"), by and through their attorneys, bring this action against Defendants U.S. Bank

National Association ("U.S. Bank") and Bank of America, NA ("Bank of America" and,

together, "Defendants" or "Trustees"), and allege as follows:

## NATURE OF ACTION

1.      This action arises out of Defendants' roles as trustees for 53 securitization trusts

(the "Covered Trusts"), identified in Exhibit A, and asserts claims against U.S. Bank and

Bank of America for breaches of their duties.

2.      The Covered Trusts were created to facilitate RMBS transactions introduced

to investors from 2005 to 2007.  Nine of the RMBS transactions were sponsored by Merrill

Lynch Mortgage Lending, Inc. (the "Merrill Lynch Trusts"), nine were sponsored by Morgan

Stanley Mortgage Capital Inc. (the "Morgan Stanley Trusts"), eight were sponsored by DLJ

Mortgage Capital, Inc. (the "DLJ Trusts"), eight were sponsored by UBS Real Estate

Securities, Inc. (the "UBS Trusts"), seven were sponsored by Washington Mutual Bank and

Washington Mutual Mortgage Securities Corporation (the "WaMu Trusts"), six were sponsored

by CitiMortgage, Inc. and Citigroup Global Markets Realty Corporation (the "CitiMortgage

Trusts"),  two were sponsored by Chevy Chase Funding LLC (the "Chevy Chase Trusts"),

two were sponsored by Credit-Based Asset Servicing and Securitization LLC (the "C-BASS

Trusts"), one was sponsored by Bayview Financial, L.P. (the "Bayview Trust"), and one was

sponsored by Taylor, Bean & Whitaker Mortgage Corporation (the "TBW Trust") (Merrill

Lynch Mortgage Lending, Inc., Morgan Stanley Mortgage Capital Inc., Credit-Based Asset Servicing and Securitization LLC, DLJ Mortgage Capital, Inc., Washington Mutual Bank and Washington Mutual Mortgage Securities Corporation, Citi Mortgage, Inc. and Citigroup Global Markets Realty Corporation, UBS Real Estate Securities, Inc., Chevy Chase Funding LLC, Bayview Financial, L.P., and Taylor, Bean & Whitaker Mortgage Corporation are referred to collectively as the "Sponsors").

3.      Plaintiffs purchased RMBS certificates with an original face value in excess of $665 million issued by the Covered Trusts identified in Exhibit B (the "Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The Certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustees.

5.      The Certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected.  Rather, such investors were dependent upon their trustee representatives, U.S. Bank and Bank of America, to police the deal and protect their contractual and other legal rights.

6.      As trustees for the Covered Trusts, Defendants owe Plaintiffs and the other

Certificateholders certain contractual and common law duties with respect to the mortgage loans owned by the Covered Trusts.  Defendants, the Master Servicer and Servicers were required to provide notice of breaches of representation and warranties provided by the Sponsors and Originators concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending.  Defendants had a duty to enforce the obligation of the responsible parties (typically the Sponsors, affiliates that served as the depositors (the "Depositors"), or the party who originated the mortgage loans (the "Originators")) to repurchase loans that breached representation and warranty provisions or were missing required documentation.  And Defendants were required to address defaults by the Servicers and Master Servicer who were required to engage in prudent loss mitigation practices.

7.     Defendants were actively involved in the origination and servicing of mortgage loans and typically had very close business relationships with the Sponsors, Originators and Depositors.  Nevertheless, as trustees, Defendants were obligated to act against the financial interest of the Sponsors when demanded by the circumstances. Defendants, however, abandoned their obligations to protect the rights of investors.

8.     Defendants' contractual duties are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").  Defendants breached the PSAs by failing to: (i) enforce the Sponsors' or Originators' obligation to repurchase loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; (ii) provide notice of representation and warranty violations by the Sponsors and Originators; (iii) provide notice of the Servicers' and Master Servicer's failure to give notice of those same representation and warranty violations; and

(iv) exercise all rights and remedies available to the Trustees under the PSAs upon the

occurrence of an Event of Default in the same manner that a prudent person would.

      9.      By failing to perform their duties, Defendants have caused Plaintiffs to suffer

hundreds of millions of dollars in damages.

## PARTIES

      10.      Plaintiff Phoenix Light SF DAC ("Phoenix Light") is a designated activity

company incorporated and existing under the laws of Ireland, with its principal place of

business and registered office in Dublin, Ireland.[1]  Phoenix Light brings this action in its

own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered

Trusts and pursuant to rights assigned to Phoenix Light by the Indenture Trustee to bring

claims in the name of Kleros Preferred Funding V PLC and Silver Elms CDO PLC.

      11.      Plaintiff Blue Heron Funding VI Ltd. is an exempted limited liability

company incorporated and existing under the laws of the Cayman Islands, with its principal

place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding VI Ltd. brings

this action in its own right as a CDO Issuer that holds Certificates that were issued by

certain of the Covered Trusts.

      12.      Plaintiff Blue Heron Funding VII Ltd. is an exempted limited liability

company incorporated and existing under the laws of the Cayman Islands, with its principal

place of business in Grand Cayman, Cayman Islands.  Blue Heron Funding VII Ltd. brings

this action in its own right as a CDO Issuer that holds Certificates that were issued by

certain of the Covered Trusts.

      13.      Plaintiff C-BASS CBO XIV Ltd. is an exempted limited liability company

---

[1] The original complaint in this action was filed by Phoenix Light SF Ltd.  On September 20, 2016, Phoenix Light SF Ltd. changed its name to Phoenix Light SF DAC.

incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XIV Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

14.     Plaintiff C-BASS CBO XVII Ltd. is an exempted limited liability company incorporated and existing under the laws of the Cayman Islands, with its principal place of business in Grand Cayman, Cayman Islands.  C-BASS CBO XVII Ltd. brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

15.     Plaintiff Kleros Preferred Funding V PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Kleros Preferred Funding V PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

16.     Plaintiff Silver Elms CDO PLC is a special purpose public limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO PLC brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

17.     Plaintiff Silver Elms CDO II Limited is a special purpose private limited company incorporated and existing under the laws of Ireland, with its principal place of business in Dublin, Ireland.  Silver Elms CDO II Limited brings this action in its own right as a CDO Issuer that holds Certificates that were issued by certain of the Covered Trusts.

18.     Each Plaintiff is a corporate entity with separate legal existence and with a board

of directors that controls its operations, akin to a corporation formed under U.S. law.  Each
Plaintiff entity was organized for the purpose of investing in RMBS and other securities and has
investors holding debt and income securities.

19.     Defendant Bank of America is a national banking association organized and
existing under the laws of the United States.  Bank of America does business throughout the
United States, with its main office located in North Carolina.  In or about October 2007, Bank of
America acquired LaSalle Bank National Corporation ("LaSalle"), which was serving as trustee
for six of the Merrill Lynch Trusts, the Morgan Stanley Trusts, and the WaMu Trusts.  Bank of
America became successor trustee by merger to LaSalle.  Subsequently, in December 2010,
Defendant U.S. Bank acquired Bank of America's securitization trust business and succeeded
Bank of America as trustee for those Covered Trusts.

20.     Defendant U.S. Bank is a national banking association organized and existing
under the laws of the United States.  U.S. Bank does business throughout the United States, with
its main office located in Ohio.  It serves as the trustee for the Covered Trusts.  For each of the
Covered Trusts, Defendants (or LaSalle, as predecessor trustee to Bank of America) signed
Certificates incorporating the PSAs.  As the trustees for the Covered Trusts, Defendants owed
Certificateholders certain duties with respect to the mortgage loans owned by the Covered
Trusts, which they violated.

### PLAINTIFFS' ACQUISITION OF CERTIFICATES AND STANDING TO SUE

21.     Plaintiffs acquired the Certificates identified on Exhibit B and suffered damages
as a result of Defendants' breaches during the period that Plaintiffs held such Certificates.

22.     Plaintiffs acquired ownership to the Certificates in multiple ways.

23.     Each of the Plaintiffs, with the exception of Blue Heron Funding VI Ltd. and Blue

Heron Funding VII Ltd., acquired Certificates pursuant to an asset purchase agreement or similar agreement with third-parties, including WestLB AG ("WestLB"), Harrier Finance Limited ("Harrier"), Kestrel Funding PLC ("Kestrel") and Greyhawk Funding, LLC ("Greyhawk"), and have held these Certificates continuously since the date of acquisition identified on Exhibit B.

24.     These asset purchase agreements or similar agreements contain express New York law choice of law provisions, except for two agreements pursuant to which Phoenix Light acquired seven Certificates from either WestLB or Greyhawk. The WestLB agreement relating to six of these seven Certificates contains a choice of law provision that incorporates German law and the Greyhawk agreement relating to one of these seven Certificates contains a choice of law provision that incorporates German law except for certain severability provisions which are governed by New York law.

25.     Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC and Silver Elms CDO II Limited also acquired Certificates through direct purchases made after the CDO closing.  Exhibit B identifies which Certificates were acquired through such market purchases.  Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC and Silver Elms CDO II Limited have held these Certificates continuously since the date of acquisition identified on Exhibit B.

26.     Plaintiffs have suffered an injury in fact because they are Certificateholders and were damaged as a result of Defendants' breaches as described herein or were Certificateholders and continue to hold the legal claims relating to the Certificates.  Accordingly, they have standing to sue under Article III of the Constitution of the United States.

27.     Plaintiffs also have contractual standing to pursue the claims set forth herein.

28.     Each of the Plaintiffs other than Phoenix Light (*i.e.*, Blue Heron Funding VI

Ltd., Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO

PLC, Silver Elms CDO II Limited, C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.)

entered into Indentures (the "CDO Indentures") with a CDO Trustee.  The CDO Trustees are:

(i) Deutsche Bank Trust Company Americas ("Deutsche Bank") for Kleros Preferred Funding V

PLC and Silver Elms CDO PLC; (ii) The Bank of New York Trust Company, National

Association ("BNY Trust Co."), in its own right or as successor trustee to JPMorgan Chase

Bank, for Blue Heron Funding VI Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII

Ltd.; (iii) and Wells Fargo Bank, N.A. ("Wells Fargo Bank") for Silver Elms CDO II Limited

and Blue Heron Funding VII Ltd.

29.     The Granting Clause of the CDO Indentures conveys to the CDO Trustee a

security interest in the underlying collateral for the benefit of Secured Parties (defined below).

For example, the CDO Indenture for Silver Elms CDO II Limited provides:

> The Issuer hereby Grants to the Trustee, for the benefit and security
> of the Secured Parties, all of its right, title and interest in, to and
> under, in each case, whether now owned or existing, or hereafter
> acquired or arising, all accounts, chattel paper, commercial tort
> claims, deposit accounts, documents, general intangibles, goods,
> instruments, investment property and letter-of-credit rights,
> including but not limited to the . . . the Collateral Debt Securities . .
> . . Such Grants are made to the Trustee to hold in trust, to secure the
> Secured Notes.

The other CDO Indentures contain substantially similar grants.

30.     The "Secured Parties" under each of the CDO Indentures include the senior

noteholders.  Phoenix Light holds more than 50% of the senior notes and, thus, is the Controlling

Party and/or the Majority for, each of (i) Blue Heron Funding VI Ltd.; (ii) Blue Heron Funding

VII Ltd.; (iii) Kleros Preferred Funding V PLC; (iv) Silver Elms CDO PLC; (v) Silver Elms

CDO II Limited; (vi) C-BASS CBO XIV Ltd.; and (vii) C-BASS CBO XVII Ltd. under the CDO

Indentures.

31.     Because only a security interest was conveyed to the CDO Trustees for the benefit of the CDO senior noteholders and other Secured Parties, neither the CDO Issuers nor Phoenix Light were divested of their right to bring claims.

32.     Nevertheless, the CDO Trustees have each assigned any right they have to bring the claims herein to Plaintiffs to the extent that such an assignment is deemed necessary. Phoenix Light directed them to do so on December 12, 2014.  Because these entities suffer from conflicts of interest by virtue of the fact that they are being sued by Plaintiffs, the CDO Trustees wrongfully refused to act until recently.

33.     On April 16, 2015, Deutsche Bank and Phoenix Light entered into a written assignment agreement whereby Deutsche Bank assigned to Phoenix Light as controlling noteholder "any and all rights that the Trustee may have to pursue and enforce the claims set forth" in this action on behalf of Kleros Preferred Funding V PLC and Silver Elms CDO PLC "including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise."  Accordingly, if Deutsche Bank as CDO Trustee was the only party that could bring claims on behalf of, and in the name of, Kleros Preferred Funding V PLC and Silver Elms CDO PLC, Phoenix Light now has such authority.  Alternatively, if Kleros Preferred Funding V PLC and Silver Elms CDO PLC retained the ability to bring claims, they do so in their own right here as they are parties to this action.

34.     On June 19, 2015, BNY Trust Co., Phoenix Light, C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd. and Blue Heron Funding VI Ltd. (among others) entered into a written assignment agreement whereby BNY Trust Co. assigned to Blue Heron Funding VI Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. "all right, title and interest in, to

and under, in each case, that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf" of these entities in this action.  Accordingly, to the extent BNY Trust Co. as CDO Trustee obtained the exclusive right to assert claims on behalf of Blue Heron Funding VI Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd., that right has been assigned back to Blue Heron Funding VI Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd.  Alternatively, if Blue Heron Funding VI Ltd., C-BASS CBO XIV Ltd. and C-BASS CBO XVII Ltd. retained the ability to bring claims, they do so in their own right here as they are parties to this action.

35.     On June 26, Wells Fargo Bank, Phoenix Light, Blue Heron Funding VII Ltd. and Silver Elms CDO II Limited (among others) entered into a written assignment agreement whereby Wells Fargo Bank assigned to Silver Elms CDO II Limited and Blue Heron Funding VII Ltd.  "all right, title and interest that [Wells Fargo] may have, if any, with respect to the claims asserted by each CDO Issuer or which may hereafter be asserted by each CDO Issuer" in this action.  Accordingly, to the extent that Wells Fargo Bank as CDO Trustee obtained the exclusive right to assert claims on behalf of Silver Elms CDO II Limited and Blue Heron Funding VII Ltd., that right has been assigned back to Silver Elms CDO II Limited and Blue Heron Funding VII Ltd.  Alternatively, if Silver Elms CDO II Limited and Blue Heron Funding VII Ltd. retained the ability to bring claims, they do so in their own right here as they are parties to this action.

36.     Phoenix Light is structured differently than the other Plaintiffs and did not enter into an Indenture with a CDO trustee.  Instead, Phoenix Light entered into a Trust Agreement that provided to Deutsche Bank as Phoenix Light's Trustee a security interest in the collateral by pledging in Section 3.2 of the Trust Agreement "all its present and future,

actual and contingent claims and rights" with respect to the collateral.  Section 3.5 provides that the "pledges pursuant to Clause 3.2 are granted for the purpose of securing the Trustee Claim."

37.     Section 3.7 of the Phoenix Light Trust Agreement expressly authorizes the Issuer (*i.e.,* Phoenix Light) to take actions with respect to the pledged collateral as that section provides: "The Issuer shall be authorised (*ermächtigt*) to collect or have collected in the ordinary course of business or otherwise exercise or deal with (which terms shall, for the avoidance of doubt, include the enforcement of any security) the rights pledged under Clause 3.2."

38.     Phoenix Light also entered into an Amended Security Agreement with Deutsche Bank as Phoenix Light's Trustee, which applies only to assets acquired from Harrier and Kestrel, including the RMBS conveyed to Phoenix Light pursuant to the asset purchase agreements identified on Exhibit B.  Section 2.1 of that agreement provides for a "Grant of Security Interest" providing "the Issuer hereby Grants to the Trustee, for the benefit of the Transaction Creditors, all of the Issuer's right, title and interest in and to the" assets acquired from Harrier and Kestrel.   The term "grant" is defined as not including any of the "obligations" of the Issuer with respect to the collateral, including those obligations set forth in the Phoenix Light Trust Agreement.  The "obligations" of the Issuer include the obligation to protect the collateral found in Section 9.8 of the Phoenix Light Trust Agreement.  This provision expressly contemplates that Phoenix Light will act if there are breaches of covenants or obligations with respect to the collateral, including by enforcing rights as it is authorized to do under Section 3.7.   Accordingly, Phoenix Light clearly has contractual standing to bring claims with respect to the RMBS it holds directly as identified

in Exhibit B.

39.     To the extent Deutsche Bank as Phoenix Light's Trustee obtained any rights

to bring the claims asserted herein, on June 17, 2015, Deutsche Bank assigned "all rights

that [Deutsche Bank] may have to pursue and enforce the claims set forth in" this action

"including any claims which may be added to the [action] by virtue of an amendment to the"

complaints or otherwise.  As a result, to the extent that Deutsche Bank as Phoenix Light's

Trustee obtained the exclusive right to assert claims on behalf of Phoenix Light, that right has

been assigned back to Phoenix Light.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is

complete diversity of citizenship between the parties and the amount in controversy, exclusive of

interest and costs, exceeds $75,000.

41.     Venue is proper pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as

Defendants reside and transact business in this District and a substantial part of the events

and omissions giving rise to the claims asserted herein occurred in this District.

42.     This Court has personal jurisdiction over Defendants because a substantial

part of the administration of the Covered Trusts, out of which the claims asserted herein

arise, is performed in New York.  Additionally, the majority of the Covered Trusts are New

York trusts, the majority of the PSAs at issue in this litigation are governed by New York

law and, in certain of the PSAs, Defendants expressly consented to this Court's jurisdiction.

## FACTUAL ALLEGATIONS

## I.       THE SECURITIZATION PROCESS

43.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flow from principal and interest payments on the pool of loans after certain costs and fees are deducted.

44.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as WaMu, and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

45.     The depositor then conveys the pool of loans to a trustee, such as U.S. Bank or Bank of America, pursuant to a "pooling and servicing agreement" that establishes various prioritized "tranches" of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, Defendants acted as the trustees in connection with the relevant RMBS transactions.

46.     Pursuant to the PSA for each trust, a "servicer" is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation and managing and selling foreclosed properties.

47.     The trustee delivers monthly remittance reports to holders of certificates

describing the performance of underlying loans and compliance with the PSA.  The contents

of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17

C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance

reports.

48.     Each tranche in a loan securitization has a different level of risk and reward,

and its own rating issued by a nationally recognized credit-rating agency such as Standard &

Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or

AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior

tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in

principal and interest payments are generally allocated first to junior tranches.  This division

of cash flows and losses is referred to as the "waterfall."

49.     Because the cash flow from payments made by mortgage borrowers on the

underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed

security, the credit quality of the security turns on the credit quality of, and the trust assets

securing, the underlying loans, which often number in the thousands.

50.     Defendants earned fees in connection with their roles as trustee, typically an

annual fee based on the percentage of principal outstanding on the loans underlying the

RMBS.  Defendants also received significant benefits from the interest-free deposits maintained

in their accounts when the servicing payments were remitted to their accounts.  Defendants

maintained accounts for thousands of trusts and earned enormous sums from the aggregate

balances on these accounts.  The RMBS trustee engagements further deepened Defendants'

business relationships with the sponsors and underwriters of the RMBS, leading to more

lucrative future engagements.

II.   **DEFENDANTS' DUTIES AND OBLIGATIONS**

51.   Defendants' duties and obligations as the trustees for the Covered Trusts are

spelled out in the PSAs and under applicable state and federal laws.  These agreements

govern the parties' respective rights and responsibilities in connection with the Covered

Trusts.  U.S. Bank entered into PSAs with:

>   (A) For the Bayview Trust: (i) Bayview Financial Securities Company, LLC, as
>   Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer;
>
>   (B) For one C-BASS Trust (CBASS 2005-CB3): (i) Merrill Lynch Mortgage
>   Investors, Inc., as Depositor; (ii) Credit Based Asset Servicing and
>   Securitization LLC, as Seller; and (iii) Litton Loan Servicing, LP, as Servicer;
>
>   (C) For one C-BASS Trust (CBASS 2006-CB2): (i) Bond Securitization,
>   LLC, as Depositor; (ii) Credit Based Asset Servicing and Securitization LLC,
>   as Seller; and (iii) Litton Loan Servicing, LP, as Servicer;
>
>   (D) For the Chevy Chase Trusts: (i) Chevy Chase Funding LLC, as Depositor;
>   and (ii) Chevy Chase Bank F.S.B., as Seller and Servicer;
>
>   (E) For three CitiMortgage Trusts (CMLTI 2006-NC2, CMLTI 2006-WF2,
>   and CMLTI 2007-WFHE2): (i) Citigroup Mortgage Loan Trust Inc., as
>   Depositor; (ii) Wells Fargo Bank, N.A., as Servicer; and (iii) Citibank, N.A.,
>   as Trust Administrator;
>
>   (F) For one CitiMortgage Trust (CMALT 2006-A7): (i) Citicorp Mortgage
>   Securities, Inc., as Depositor; (ii) CitiMortgage, Inc., as Servicer and Master
>   Servicer; and (iii) Citibank, N.A., as Paying Agent, Certificate Registrar and
>   Authenticating Agent;
>
>   (G) For one CitiMortgage Trust (CMLTI 2006-AMC1): (i) Citigroup
>   Mortgage Loan Trust Inc., as Depositor; (ii) Ameriquest Mortgage Company,
>   as Servicer; and (iii) Citibank, N.A., as Trust Administrator;
>
>   (H) For one CitiMortgage Trust (CMLTI 2007-AMC1): (i) Citigroup
>   Mortgage Loan Trust Inc., as Depositor; (ii) Countrywide Home Loans
>   Servicing LP, as Servicer; and (iii) Citibank, N.A., as Trust Administrator;
>
>   (I) For two DLJ Trusts (ABSHE 2006-HE4 and ABSHE 2006-HE7): (i) Asset
>   Backed Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc.,
>   as Seller; (iii) Select Portfolio Servicing, Inc., as Servicer; and (iv) Office
>   Tiger Global Real Estate Services Inc. (f/k/a MortgageRamp, Inc.), as Loan

Performance Advisor;

(J) For one DLJ Trust (CSAB 2006-1): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; and (iii) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

(K) For one DLJ Trust (ABSHE 2006-HE1): (i) Asset Backed Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Select Portfolio Servicing, Inc., as Servicer; and (iv) MortgageRamp, Inc., as Loan Performance Advisor;

(L) For one DLJ Trust (ABSHE 2006-HE2): (i) Asset Backed Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) HomEq Servicing Corporation, as Servicer; and (iv) MortgageRamp, Inc., as Loan Performance Advisor;

(M) For one DLJ Trust (CSMC 2006-3): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A., as Servicer, Master Servicer and Trust Administrator; (iv) Washington Mutual Mortgage Securities Corporation and Bank of America, National Association, as Servicers; and (v) Select Portfolio Servicing, Inc., as Servicer and Special Servicer;

(N) For one DLJ Trust (HEAT 2006-4): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A. and JPMorgan Chase Bank, National Association, as Servicers; (iv) Select Portfolio Servicing, Inc., as Servicer and Special Servicer; and (v) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(O) For one DLJ Trust (HEAT 2006-7): (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A. and Select Portfolio Servicing, Inc., as Servicers; and (iv) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(P) For three Merrill Lynch Trusts (SURF 2006-AB2, SURF 2006-BC2 and SURF 2006-BC5): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; and (ii) Wilshire Credit Corporation, as Servicer;

(Q) For the TBW Trust: (i) Credit Suisse First Boston Mortgage Securities Corporation, as Depositor; (ii) DLJ Mortgage Capital, Inc., as Seller; (iii) Wells Fargo Bank, N.A., as Master Servicer and Trust Administrator; and (iv) Taylor, Bean & Whitaker Mortgage Corporation, as Servicer;

(R) For two UBS Trusts (MABS 2006-WMC3 and MABS 2006-WMC4): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) JPMorgan Chase Bank, National Association, as Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Custodian;

(S) For two UBS Trusts (MABS 2006-HE4 and MABS 2006-NC3): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) Barclays Capital Real Estate Inc. d/b/a HomEq Servicing and Wells Fargo Bank, N.A., as Servicers; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Custodian;

(T) For one UBS Trust (MABS 2006-FRE1): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; and (ii) Wells Fargo Bank, N.A. as Servicer, Master Servicer, Trust Administrator and Custodian;

(U) For one UBS Trust (MABS 2005-NC1): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; and (ii) Ocwen Federal Bank FSB, as Servicer;

(V) For one UBS Trust (MABS 2006-HE1): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) Wells Fargo Bank, N.A. and JPMorgan Chase Bank, National Association, as Servicers; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Custodian;

(W) For one UBS Trust (MARM 2006-OA1): (i) Mortgage Asset Securitization Transactions, Inc., as Depositor; (ii) UBS Real Estate Securities Inc., as Transferor; (iii) Wells Fargo Bank, N.A., as Master Servicer, Trust Administrator and Custodian; and (iv) Clayton Fixed Income Services Inc., as Credit Risk Manager.

52.   Bank of America (or LaSalle) entered into PSAs with:

(A) For four Merrill Lynch Trusts (MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4 and MLMI 2005-WMC2): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; and (ii) Wilshire Credit Corporation, as Servicer;

(B) For two Merrill Lynch Trusts (OWNIT 2006-3 and OWNIT 2006-4): (i) Merrill Lynch Mortgage Investors, Inc., as Depositor; and (ii) Litton Loan Servicing LP, as Servicer;

(C) For the Morgan Stanley Trusts: (i) Morgan Stanley Capital I Inc., as Depositor; and (ii) Wells Fargo Bank, N.A., as the Master Servicer and Securities Administrator; and

(D) For the WaMu Trusts: (i) various affiliates of Washington Mutual Bank and Washington Mutual Mortgage Securities Corporation, as the Depositors; and (ii) Washington Mutual Bank, as Servicer.

17

53.     As set forth above, in or about October 2007, Bank of America acquired LaSalle, which was serving as trustee for six of the Merrill Lynch Trusts, the Morgan Stanley Trusts and the WaMu Trusts.  Bank of America became successor trustee by merger to LaSalle, succeeding to LaSalle's duties and obligations under the PSAs referenced directly above.  By December 2010, U.S. Bank succeeded Bank of America as trustee for those Covered Trusts either after Bank of America or LaSalle's resignation or U.S. Bank's acquisition of Bank of America's corporate trust business. Accordingly, Plaintiffs assert claims herein as against Bank of America for LaSalle's and/or Bank of America's breaches and misconduct prior to US Bank's assumption of the trustee role for those Covered Trusts.  Plaintiffs assert claims as against U.S. Bank for its breaches and misconduct as to the Covered Trusts set forth above for which it entered into PSAs as trustee, as well as for its continued breaches and misconduct for the Covered Trusts for which it became successor trustee.  Plaintiffs further assert claims against U.S. Bank to the extent that U.S. Bank assumed liability for LaSalle and Bank of America's conduct with respect to the Covered Trusts.

**A.     Defendants' Duties Pertaining to the Delivery of Mortgage Files**

54.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsors conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to Defendants in their capacity as trustees for the Covered Trusts to hold for the benefit of the Certificateholders. This process is set forth in Section 2.04 ("Conveyance of Mortgage Pool Assets") and 2.05 ("Delivery of Mortgage Files") of the WaMu PSA,[2] which provides in relevant part:

---

[2] Quotations to the WaMu PSA herein are to the PSA executed in connection with the WMALT 2007-OA2 securitization.  WMABS 2006-HE1, WAMU 2006-AR17, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8

The Company does hereby irrevocably sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, all the Company's right, title and interest in and to the Mortgage Pool Assets.  In addition, the Company does hereby assign to the Trust, without recourse, the Company's rights (as assignee of the rights of Washington Mutual Mortgage Securities Corp.) under the Countrywide Agreement with respect to the servicing of the Countrywide Loans. . . . It is the express intent of the parties hereto that the conveyance of the Mortgage Pool Assets to the Trust by the Company as provided in this Section 2.04 be, and be construed as, an absolute sale of the Mortgage Pool Assets. . . .

On the Closing Date, the Company shall deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee the Mortgage Files, which shall at all times be identified in the records of the Trustee as being held by or on behalf of the Trust. . . . The Trustee is authorized, with the Servicer's consent, to appoint on behalf of the Trust any bank or trust company approved by each of the Company and the Servicer as Custodian of the documents or instruments referred to in this Section 2.05 or in Section 2.12, and to enter into a Custodial Agreement for such purpose; *provided, however,* that the Trustee shall be and remain liable for the acts and omissions of any such Custodian to the extent (and only to the extent) that it would have been liable for such acts and omissions hereunder had such acts and omissions been its own acts and omissions.  Any documents delivered by the Company or the Servicer to the Custodian, if any, shall be deemed to have been delivered to the Trustee for all purposes hereunder; and any documents held by the Custodian, if any, shall be deemed to be held by the Trustee for all purposes hereunder. . . . There shall be a written Custodial Agreement between the Trustee and each Custodian.  Each Custodial Agreement shall contain an acknowledgment by the Custodian that all Mortgage Pool Assets, Mortgage Files, and other documents and property held by it at any time are held by it for the benefit of the Trust.

The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts set forth a substantially similar process.  *See* Exhibit C § I.

55.     In addition, Section 2.07 of the WaMu PSA ("Acceptance by Trustee")

---

and WMALT 2006-AR9 were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Third Amended Complaint.

provides that the Trustee is required to take physical possession of the mortgage loans and

the accompanying mortgage files for the exclusive use and benefit of all current and future

Certificateholders.  It provides:

> The Trustee **acknowledges receipt** (or with respect to any Mortgage
> Loan subject to a Custodial Agreement, receipt by the Custodian
> thereunder) *on behalf of the Trust of the documents referred to in
> Section 2.05 above*, but without having made the review required to
> be made within 45 days pursuant to this Section 2.07.  *The Trustee
> acknowledges that all Mortgage Pool Assets, Mortgage Files and
> related documents and property held by it at any time are held by it
> as Trustee of the Trust for the benefit of the holders of the
> Certificates.*

(Emphasis added.)  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ,

Merrill Lynch, Morgan Stanley, TBW and UBS Trusts set forth a substantially similar

process.  *See* Ex. C § II.

56.    Section 1.01 of the WaMu PSA also specifically sets forth the operative

documents that must be contained in the Mortgage File for the mortgage loans.  It provides:

> The following documents or instruments with respect to each
> Mortgage Loan. . .
>
> (i) The **original Mortgage Note endorsed** (A) in blank, without
> recourse, (B) to the Trustee, without recourse, or (C) to the Trust,
> without recourse, and all intervening endorsements evidencing a
> complete chain of endorsements from the originator to the endorser
> last endorsing the Mortgage Note. . . .;
>
> (ii) The Buydown Agreement, if applicable;
>
> (iii) (1) (x) the **original recorded Mortgage with evidence of
> recording thereon** for the jurisdiction in which the Mortgaged
> Property is located . . . (y) unless the Mortgage Loan is a MERS
> Loan, **an original assignment of the Mortgage duly executed and
> acknowledged in recordable form** (A) in blank, (B) to the Trustee
> or (C) to the Trust, and (z) unless the Mortgage Loan is a MOM
> Loan, **recorded originals of all intervening assignments
> evidencing a complete chain of assignment from the originator to
> the person executing the assignment described in clause (y)**; or (2)

20

(x) a copy (which may be in electronic form) of the Mortgage . . . which represents a true and correct reproduction of the original Mortgage and which has either been certified (i) on the face thereof by the public recording office in the appropriate jurisdiction in which the Mortgaged Property is located, or (ii) by the originator, the Seller, the Servicer, Countrywide or the escrow or title company which provided closing services in connection with such Mortgage Loan as a true and correct copy the original of which has been sent for recordation, (y) unless the Mortgage Loan is a MERS Loan, *an original assignment of the Mortgage duly executed and acknowledged in recordable form* (A) in blank, (B) to the Trustee or (C) to the Trust, and (z) unless the Mortgage Loan is a MOM Loan, true and correct copies, certified by the applicable county recorder or by the originator, the Seller, the Servicer or Countrywide as described above, of all intervening assignments evidencing a complete chain of assignment from the originator to the person executing the assignment described in clause (y); and

(iv) For any Mortgage Loan that has been modified or amended, *the original instrument or instruments effecting such modification or amendment*.

(Emphasis added.)  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts set forth a substantially similar process.  *See* Ex. C § III.

57.    Physical possession of these documents by Defendants was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

58.    After a designated period, Defendants, or a Custodian on their behalf, were required to issue a final certification and Exception Report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § IV.  When a Custodian fulfilled this role, it acted as an agent of the Trustee.  For example, the WaMu PSA provides "[a]ny Custodian shall act as agent on behalf of the Trustee" and Section 2.05 provides that "the Trustee shall be and remain liable for the acts and omissions of any such Custodian to

21

the extent (and only to the extent) that it would have been liable for such acts and omissions

hereunder had such acts and omissions been its own acts and omissions." The PSAs for the

Bayview, C-BASS, CitiMortgage, DLJ, Morgan Stanley and UBS Trusts contain language

that similarly makes clear that the Custodian is an agent of the Trustee and that if the

Trustee chooses to act through a Custodian it remains liable for the acts of the Custodian.

*See* Ex. C § XIII.

59.     The "Form of Final Certification of the Trustee," which was attached to the

WaMu PSA as Exhibit M, provides:

> Ladies and Gentlemen:
>
> In accordance with Section 2.07 of the above-captioned Pooling and
> Servicing Agreement, the undersigned, ***as [Trustee] [Initial
> Custodian], hereby certifies that, except as noted on the
> attachment hereto, as to each Mortgage Loan listed in the
> Mortgage Loan Schedule (other than any Mortgage Loan paid in
> full or listed on the attachment hereto) it has reviewed the
> documents delivered to it pursuant to Section 2.05 of the Pooling
> and Servicing Agreement and has determined that (i) all
> documents required*** (in the case of instruments described in clauses
> (X)(ii), (X)(iv) and (Y)(ix) of the definition of "Mortgage File,"
> known by it to be required) ***pursuant to the definition of "Mortgage
> File" and Section 2.05 of the Pooling and Servicing Agreement to
> have been executed and received as of the date hereof are in its
> possession*** and  (ii) ***all such documents have been executed and
> relate to the Mortgage Loans identified in the Mortgage Loan
> Schedule***.   The [Trustee] [Initial Custodian] has made no
> independent examination of such documents beyond the review
> specifically required in the above referenced Pooling and Servicing
> Agreement and has relied upon the purported genuineness and due
> execution of any such documents and upon the purported
> genuineness of any signature thereon.   The [Trustee] [Initial
> Custodian] makes no representations as to: (i) the validity, legality,
> enforceability or genuineness of any of the documents contained in
> each Mortgage File or any of the Mortgage Loans identified on the
> Mortgage Loan Schedule, or (ii) the collectability, insurability,
> effectiveness or suitability of any such Mortgage Loan.

(Emphasis added.)  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ,

Merrill Lynch, Morgan Stanley, TBW and UBS Trusts contain a substantially similar form of final certification.  *See* Ex. C § V.

60.     The final certification is the key certification that Defendants (or a Custodian on their behalf) were required to prepare for the Covered Trusts.  In this document, Defendants certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) Defendants had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then Defendants were obligated to demand that the Sponsor cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans.  This is set forth in Section 2.07 of the WaMu PSA, which provides:

> *If the Trustee finds any document or documents required to be included in the Mortgage File for a Mortgage Loan pursuant to the definition of "Mortgage File" not to have been executed and received, the Trustee shall promptly so notify the Servicer. An exception report delivered by the Custodian to the Servicer pursuant to the Custodial Agreement shall be deemed to constitute such notice.*  Upon notice from the Trustee or the Custodian that any document required to be included in the Mortgage File for a Mortgage Loan has not been executed and received, *the Servicer shall promptly notify the Seller of such defect and take appropriate steps on behalf of the Trust to enforce the Seller's obligation, pursuant to Section 2.4 of the Mortgage Loan Purchase Agreement, to correct or cure such defect or repurchase or substitute for such Mortgage Loan, in accordance with and subject to the time limitations set forth in such Section 2.4*; *provided, however,* that the Servicer shall not require or permit the Seller to repurchase a Mortgage Loan pursuant to such Section 2.4 of the Mortgage Loan Purchase Agreement more than two years after the Closing Date . . . .

(Emphasis added.)  Section 2.4 of the WaMu Mortgage Loan Purchase Agreement ("MLPA") provides:

Upon receipt of notice from the Purchaser that any document, required to be included (pursuant to the definition of 'Mortgage File') in the Mortgage File delivered to the Purchaser or its designee with respect to a Mortgage Loan sold by the Seller hereunder, was not included therein or has not been executed, the ***Seller shall correct or cure such defect within 60 days from the date the Seller receives notice thereof or, if such defect cannot be corrected or cured within such 60-day period, the Seller shall, not later than the expiration of such 60-day period, either (a) repurchase such Mortgage Loan from the Purchaser or its transferee at the Repurchase Price or (b) within the three-month period commencing on the related Closing Date (or within the two-year period commencing on such Closing Date if the related Mortgage Loan is a 'defective obligation' within the meaning of Section 860G(a)(4)(B)(ii) of the Code and Treasury Regulation Section 1.860G-2(f)), substitute for such Mortgage Loan one or more Substitute Mortgage Loans*** each of which is a 'qualified replacement mortgage' (as defined in the Code). . . . If such defect would cause the Mortgage Loan to be other than a 'qualified mortgage' (as defined in the Code), then notwithstanding the previous sentence, the repurchase or substitution must occur within the sooner of (i) 90 days from the date the defect was discovered by the Seller, the Purchaser or any other party to the related Pooling and Servicing Agreement or in the case of substitution, two years from the related Closing Date.

The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts contain substantially similar requirements.  *See* Ex. C § VI.

61.     After the passage of a specified period of time, the Trustees could not seek substitution of loans and could merely demand repurchase.  For example, Section 2.07 of the WaMu PSA and Section 2.4 of the WaMu MLPA provide that substitution is not an available remedy more than two years from closing.  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts have similar cutoffs.  *See* Ex. C § VI.

**B.      Defendants Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

62.     The Trustees had an obligation pursuant to the PSAs to provide notice to all

parties of the Sponsors' or Originators' breaches of representations and warranties under the

PSAs or MLPAs.  For example, Section 2.09 of the WaMu PSA provides:

> Upon discovery by any of the Company, the Servicer or the Trustee
> (in the case of the Trustee, having actual knowledge thereof) of a
> breach of any of the representations and warranties in respect of the
> Mortgage Loan set forth in Section 3.1 of the Mortgage Loan
> Purchase Agreement . . . that materially and adversely affects the
> value of the related Mortgage Loans or the interests of the Trust in
> the related Mortgage Loans, the party discovering such breach shall
> give prompt written notice to the others.  Any breach of the
> representation set forth in clause (xxvii) or clause (xxviii) of such
> Section 3.1 thereof shall be deemed to materially and adversely
> affect the value of the related Mortgage Loans or the interests of the
> Trust in the related Mortgage Loans. The Servicer shall promptly
> notify the Seller of such breach and take appropriate steps on behalf
> of the Trust to enforce the Seller's obligation, pursuant to Section
> 3.3 of the Mortgage Loan Purchase Agreement, to cure such breach
> in all material respects or repurchase or substitute for the affected
> Mortgage Loan or Mortgage Loans or any property acquired in
> respect thereof, in accordance with and subject to the time
> limitations set forth in such Section 3.3.

The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch,

Morgan Stanley, TBW and UBS Trusts contain substantially similar provisions.  *See* Ex. C §

VI.

63.     The PSAs require that the Trustees provide notice of breaches of

representations and warranties or covenants made by the Servicers or the Master Servicer.

For example, Section 7.01(ii) of the WaMu PSA provides that most breaches by the Servicer

ripen into an Event of Default if left unremedied for 60 days after "written notice of such

failure . . . shall have been given to the Servicer by the Trustee."  This provision clearly

contemplates that the Trustee "shall" provide notice of Servicer breaches upon becoming

aware of such breaches, which makes sense as the Trustee was the party required to police

the deal for investors.  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts contain substantially similar provisions.  *See* Ex. C § IX.  Similarly, Article 8 the WaMu PSA requires the Trustee to satisfy certain reporting requirements, including requirements pertaining to reports filed with the SEC on Form 10-D, Form 10-K, or Form 8-K, and annual attestations provided under Regulation AB.  The PSAs for Bayview, C-BASS, certain DLJ, Merrill Lynch, Morgan Stanley, and certain UBS Trusts contain substantially similar provisions.  These provisions require disclosure of party covenant breaches and other matters relating to adherence to provisions of the PSAs.

64.     A number of the PSAs have additional provisions requiring the Trustees to provide notice to all parties of breaches of representations and warranties made by the Servicers or Master Servicer.  For example, Section 2.05 of the C-BASS PSA provides that: "Upon discovery by any of the Depositor, the Servicer, the Seller or the Trustee of a breach of any of the foregoing representation, warranties and covenants which materially and adversely affects the value of any Mortgage Loan or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice . . . to the other parties hereto." Many of the DLJ and UBS PSAs contain substantially similar requirements.[3]

65.     In addition, after the occurrence of an Event of Default or a substantial breach of the PSA by the Trustees, the Trustees assume the same duties as a common law trustee which includes, among other things, to provide beneficiaries notice of all defaults under the

---

[3] *See e.g.*, MABS 2005-NC1, MABS 2006-HE1, MABS 2006-HE4, MABS 2006-NC3, MABS 2006-FRE1, MABS 2006-WMC3, MABS 2006-WMC4, ABSHE 2006-HE1, ABSHE 2006-HE2, ABSHE 2006-HE4, ABSHE 2006-HE7, CSAB 2006-1 and CSMC 2006-3.

operative trust documents, which include the PSAs here.

66.     As set forth in Section III hereof, Defendants failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs and common law.

### C.     Defendants' Duty to Act Prudently to Enforce Repurchase Obligations

67.     Under the PSAs and applicable law, Defendants owed a fiduciary duty to Certificateholders upon the occurrence of an Event of Default.  Defendants' post-default fiduciary duties are described in Section 8.01 of the WaMu PSA, which provides in relevant part, "[i]n case an Event of Default hereunder . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement or the Countrywide Agreement, as applicable, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts impose substantially similar obligations on Defendants.  *See* Ex. C § VII.

68.     The duty to act prudently to protect the interests of Certificateholders is a continuing duty that remains in effect until the Event of Default is cured.

69.     Upon the occurrence of an Event of Default, a prudent trustee would have exercised all of its rights under the PSAs to ensure that defaulted loans that were eligible for repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties.  A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

70.     As set forth below in Section III, Defendants failed to exercise their duties

27

both prior to and after the occurrence of defaults and Events of Default.

        **D.**    **Defendants Had a Duty to Address the Master Servicer's
and Servicers' Failure to Meet Prudent Servicing Standards**

      71.    Each PSA required the Master Servicer or Servicers to service the loans underlying the Covered Trusts prudently.

      72.    For example, Section 3.01 of the WaMu PSA provides: "Washington Mutual Bank shall act as Servicer to service and administer the WMB Loans on behalf of the Trust in accordance with the terms hereof, consistent with prudent mortgage loan servicing practices." The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts contain substantially similar requirements. *See* Ex. C § VIII.

      73.    The PSAs for the Bayview, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW, UBS and WaMu Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default. For example, Section 7.01 of the WaMu PSA provides that an Event of Default is triggered by:

> [a]ny failure by the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer contained in the Certificates or in this Agreement . . . which continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Trustee, or to the Servicer and the Trustee by the Holders of Certificates evidencing Percentage Interests aggregating not less than 25%.

Ex. C § IX.

      74.    Additionally, pursuant to Section 6.14 of the Morgan Stanley PSA, an Event of Default is triggered by any failure of the Master Servicer to perform its covenants under

the PSA (including the duties to meet prudent servicing standards and to notify the Trustee of any default) or any breach by the Master Servicer of a representation or warranty regardless of whether notice is provided if such default occurs within the first year of the trust (the reporting period).  After the initial one-year period, failure by the Master Servicer to perform its duties and obligations under the PSA is an Event of Default if left uncured 60 days after notice of the default.  *See* Ex. C § IX.

75.     Further, the PSAs for the C-BASS Trusts provide that the failure to follow prudent servicing standards is an Event of Default 45 days after a Servicing Officer becomes aware of such breach and the PSAs for the UBS Trusts provide that failure to follow prudent servicing standards is an Event of Default 30 days after a Servicing Officer becomes aware of such breach, each without regard to whether notice was provided.  *See* Ex. C § IX.

76.     Upon a Master Servicer or Servicer default or Event of Default, the Trustees were obligated to act.  As discussed above in Section II(B), the Trustees had a duty to provide notice when they became aware of breaches of the PSA by the Servicers or the Master Servicer.  If the defaults were not cured within the grace period, or if the Trustees failed to give notice, the Trustees were required to take action to address the defaults.  For example, the WaMu PSA provides that once a Master Servicer Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights . . . and obligations of the Servicer," *see* WaMu PSA § 7.01 (*see also* Ex. C § VIII), and "be subject to all the responsibilities, duties and liabilities relating thereto," *see* WaMu PSA § 7.02.  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts impose substantially similar obligations on Defendants.  *See* Ex. C § X.  More generally, Defendants, as trustees, had a duty to exercise all rights available under

the PSAs to protect Certificateholders' interests and do so with due care.

77.     Under the plain language of the PSAs and applicable common law, the

Trustees had a duty to perform their duties under the PSAs competently and are liable for

their failure to do so.  Section 8.01 of the WaMu PSA provides in relevant part:

> ***No provision of this Agreement shall be construed to relieve the
> Trustee or the Delaware Trustee from liability for its own
> negligent action, its own negligent failure to act or its own willful
> misconduct***; provided, however, that:
>
> Prior to the occurrence of an Event of Default hereunder or under
> the Countrywide Agreement and after the curing of all such Events
> of Default which may have occurred, the duties and obligations of
> the Trustee shall be determined solely by the express provisions of
> this Agreement,
>
> Neither the Trustee nor the Delaware Trustee shall be liable except
> for the performance of such duties and obligations as are specifically
> set forth in this Agreement, no implied covenants or obligations
> shall be read into this Agreement against the Trustee or the Delaware
> Trustee, and, in the absence of bad faith on the part of the Trustee or
> the Delaware Trustee, such trustee may conclusively rely, as to the
> truth of the statements and the correctness of the opinions expressed
> therein, upon any certificates or opinions furnished to such trustee
> and conforming to the requirements of this Agreement; and
>
> Neither the Trustee nor the Delaware Trustee shall be personally
> liable with respect to any action taken or omitted to be taken by it in
> good faith in accordance with the direction of the Certificateholders
> holding  Certificates  which  evidence  Percentage  Interests
> aggregating not less than 25% relating to the time, method and place
> of conducting any proceeding for any remedy available to such
> trustee, or relating to the exercise of any trust or power conferred
> upon such trustee under this Agreement.

(Emphasis added.)  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ,

Merrill Lynch, Morgan Stanley, TBW and UBS Trusts contain substantially similar

provisions.  *See* Ex. C § VII.

78.     As set forth below in Section III, Defendants breached their duties by failing

to take actions to address Master Servicer and Servicer defaults and Events of Default.

## III.   DEFENDANTS BREACHED THEIR DUTIES

### A.   Defendants Were Aware of but Failed to Provide Notice of Defaults Relating the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

79.   Defendants failed to give notice of defaults that occurred when the Sponsors or Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

80.   For example, for the WaMu Trusts, the Seller represented and warranted in the WaMu MLPA[4] that "[t]he Mortgage Loans have been underwritten substantially in accordance with [WaMu's] Underwriting Standards."  WaMu MLPA § 3.1(xx).  WaMu further represented and warranted the following:

> (i) The information set forth in the Mortgage Loan Schedule delivered on the Closing Date was true and correct in all material respects at the date or dates respecting which such information is furnished;
>
> (ii) As of the Closing Date, each Mortgage relating to a Mortgage Loan that is not a Cooperative Loan is a valid and enforceable . . . first lien on an unencumbered estate in fee simple or . . . leasehold estate in the related Mortgaged Property . . . ;
>
> (iii) Immediately upon the transfer and assignment contemplated herein, the Purchaser shall have good title to, and will be the sole legal owner of, each Mortgage Loan, free and clear of any encumbrance or lien . . . ;
>
> (iv) Except as set forth on Schedule III to the Term Sheet, if applicable, as of the day prior to the Cut-Off Date, all payments due on each Mortgage Loan had been made and no Mortgage Loan had

---

[4] Section 2.09 of the WaMu PSA provides that WaMu "hereby assigns to the Trust all of its rights under the [MLPA], to the extent that the [MLPA] relates to the Mortgage Loans."

been delinquent (*i.e.*, was more than 30 days past due) more than once in the preceding 12 months and any such delinquency lasted for no more than 30 days;

(vii) Each Mortgage Loan at the time it was made complied with all applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws, and predatory and abusive lending laws applicable to the originating lender . . . ;

(ix) As of the Closing Date, each Mortgage Loan that is not a Cooperative Loan is covered by an ALTA form or CLTA form of mortgagee title insurance policy, or other form of policy of insurance acceptable to Fannie Mae or Freddie Mac. . . . ;

(xi) The Mortgage Note related to (a) each Mortgage Loan . . . requires the related Mortgagor to maintain a policy of hazard insurance, with extended coverage in an amount which is not less than the original principal balance of such Mortgage Loan. . . ;

(xiv) Each Mortgage (exclusive of any riders thereto) was documented by appropriate Fannie Mae/Freddie Mac mortgage instruments in effect at the time of origination, or other instruments approved by the Seller . . . ;

(xvi) As of the Closing Date, each Mortgage and Mortgage Note is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms . . . ;

(xix) Prior to origination or refinancing, an appraisal of each Mortgaged Property was made by an appraiser on a form satisfactory to Fannie Mae or Freddie Mac . . . ;

(xxii) The Seller used no adverse selection procedures in selecting the Mortgage Loans from among the outstanding mortgage loans of the same type originated or purchased by it which were available for sale to the Purchaser and as to which the representations and warranties in this Section 3.1 could be made . . .;

(xxv) With respect to any Mortgage Loan as to which an affidavit has been delivered by the Seller to the Purchaser or its assignee certifying that the original Mortgage Note is a Destroyed Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage will not be materially adversely affected by the absence of the original Mortgage Note (or portion thereof, as applicable) . . . ;

> (xxvii) No Mortgage Loan is a High Cost/Covered Loan, and no
> Mortgage Loan originated during the period of October 1, 2002
> through March 6, 2003 is governed by the Georgia Fair Lending
> Act;
>
> (xxviii) No Mortgage Loan is subject to the Home Ownership and
> Equity Protection Act of 1994 or Section 226.32 of Regulation Z, is
> a 'high-cost' loan or a 'predatory' loan as defined under any state or
> local law or regulation applicable to the originator of such Mortgage
> Loan or which would result in liability to the purchaser or assignee
> of such Mortgage Loan under any predatory or abusive lending law
> . . . ; and (xxix) No Mortgage Loan has a Closing Date Loan-to-
> Value Ratio greater than 100%.

WaMu MLPA § 3.1.  The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage,

DLJ, Merrill Lynch, Morgan Stanley and TBW Trusts contain substantially similar

provisions.  *See* Ex. C § XI.

81.     As noted above in Section II(B), each party, including the Trustees, had an

obligation to provide notice of breaches of these representations and warranties and such

notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the

defective loan.  *See also* Ex. C § VI.

82.     Defendants knew that the Sponsors and Originators regularly disregarded their

underwriting guidelines and representations and warranties made to securitization trusts long

before Certificateholders learned of such problems.

83.     Defendants served as trustees of hundreds, if not thousands, of RMBS trusts from

2004 to 2007, including many transactions involving the Sponsors and Originators.  In the course

of administering these trusts, Defendants learned that the Sponsors and Originators had departed

from their underwriting guidelines, engaged in predatory lending and failed to ensure mortgage

loans complied with state and federal laws.

84.     For example, while serving as trustee for various RMBS trusts, the Trustees were

presented with a large number of defaulted loans that were originated by the Sponsors and

Originators here, and foreclosures were commenced often in the Trustees' names.

85.     Indeed, U.S. Bank commenced foreclosure actions from 2005 to 2008 for

numerous loans in which the Sponsors or Originators were at issue, including, for example,

foreclosure actions in which:

a.  Argent Mortgage Company as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Schreiner*, No. 12-cv-07565 (C.P. Montgomery Cnty. 2012).

b.  Chase Home Finance, LLC served as Sponsor.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Lemerise*, No. 07-cv-1889 (C.P. Medina Cnty. 2007); *U.S. Bank Nat'l Ass'n v. Pinson*, No. 07-cv-02176 (C.P. Montgomery Cnty. 2007).

c.  Countrywide Home Loans, Inc. served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Weber*, No. 07-cv-01644 (C.P. Montgomery Cnty. 2007); *U.S. Bank Nat'l Ass'n v. Houston*, No. 07-cv-03070 (C.P. Montgomery Cnty. 2007).

d.  Credit Suisse Financial Corporation served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Bratcher*, No. 08-cv-75043 (C.P. Summit Cnty. 2008); *U.S. Bank Nat'l Ass'n v. Knoepfle*, No. 08-cv-0727 (C.P. Montgomery Cnty. 2008).

e.  Fremont Investment & Loan served as Originator.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Brown*, No. 07-cv-1314 (Medina Cnty. 2007).

f.  New Century Mortgage Corporation as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Murphy*, No. 11-cv-04506 (C.P. Montgomery Cnty. 2011).

g.  Wachovia Mortgage Company served as Sponsor.  *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Ibanez*, 11-SJC-10694 (2011); *U.S. Bank Nat'l Ass'n v. Romero*, No. 07-cv-111497 (N.Y. Sup. Ct. 2007).

h.  Wells Fargo Bank served as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Willoughby*, No. 11-cv-00540 (C.P. Montgomery Cnty, 2011); *U.S. Bank Nat'l Ass'n v. Walker*, No. 12-cv-07346 (C.P. Montgomery Cnty. 2012).

i.  WMC Mortgage Corporation as Originator. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Jones*, No. 11-cv-05352 (C.P. Montgomery Cnty. 2011).

86.     Additionally, Bank of America commenced foreclosure actions between 2005 and

2008 for numerous loans in which the Sponsors or Originators were at issue, including, for

example, foreclosure actions in which:

>   a.   Washington Mutual Bank served as Sponsor.  *See, e.g.*, *Bank of Am. v. Lewers*, No. 08-cv-128789 (C.P. Summit Cnty. 2008) (initiating action for loan included in the WMALT 2005-9 Trust); *LaSalle Bank Nat'l Ass'n v. Skeens*, No. 08-cv-117913 (C.P. Summit Cnty. 2008) (initiating action for loan included in the WMALT 2005-9 Trust).  *See also Bank of Am. v. Savage*, No. 07-cv-128902 (C.P. Summit Cnty. 2008); *LaSalle Bank Nat'l Ass'n v. Miller*, No. 08-v-128786 (C.P. Summit Cnty. 2008).
>
>   b.   Ownit Mortgage Solutions, Inc. served as Originator.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Fickers*, No. 08-cv-5977 (C.P. Summit Cnty. 2008); *LaSalle Bank Nat'l Ass'n v. Cundiff*, No. 08-cv-043365 (C.P Summit Cnty. 2008).
>
>   c.   Morgan Stanley Mortgage Capital Inc. served as Sponsor.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Keaton*, No. 08-cv-0173 (C.P. Montgomery Cnty. 2008) (initiating action for loan included in the MSM 2006-12XS Trust); *LaSalle Bank Nat'l Ass'n v. Wilson*, No. 08-cv-9030 (C.P. Montgomery Cnty. 2008) (initiating action for loan included in the MSM 2006-12XS Trust).  *See also LaSalle Bank Nat'l Ass'n v. Kennedy*, No. 08-cv-8377 (C.P. Montgomery Cnty. 2008).
>
>   d.   Fremont Investment & Loan served as Originator.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Harris*, No. 07-cv-010540 (C.P. Summit Cnty. 2007) (initiating action for loan included in the GSAMP 2006-HE3 Trust).
>
>   e.   CIT Group/Consumer Finance served as Originator.  *See, e.g.*, *LaSalle Bank Nat'l Ass'n v. Oden*, No. 07-cv-042588 (C.P. Summit Cnty. 2007) (initiating action for loan included in the GSAMP 2006-HE5 Trust).

87.   Sometimes the defaults and foreclosures occurred just months after the loan was

originated or securitized.  In each foreclosure, the Trustees had a duty to examine foreclosure

filings.  *See, e.g.*, WaMu PSA § 8.01 ("The Trustee, upon receipt of all resolutions, certificates,

statements, opinions, reports, documents, orders or other instruments furnished to it which are

specifically required to be furnished to it pursuant to any provision of this Agreement, shall

examine them to determine whether they are in the form required by this Agreement").  Through

their review of these filings, Defendants knew that the borrowers either (i) did not qualify

for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

88.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit G, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans and failed to meet state and federal lending guidelines.  While investors such as Plaintiffs lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Defendants had knowledge of specific problems with specific loans as well as access to the mortgage loan files.  At a minimum, in their roles as trustees to hundreds of RMBS trusts, Defendants were privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts.  Having caught wind of the problem, Defendants had statutory and common law duties requiring them to "nose to the source."

89.     Defendants also commenced repurchase actions against the same Sponsors or Originators at issue here relating to RMBS trusts other than the Covered Trusts and uncovered evidence that the Sponsors and Originators systemically breached representation and warranty provisions. For example, Defendants, in their role as trustees or securities administrators, commenced actions against, among other entities, DLJ Mortgage Capital Inc. (the Originator of loans for one of the Covered Trusts) and GreenPoint Mortgage Funding, Inc. (the Originator of loans for four of the Covered Trusts) to compel repurchase of loans that breached representations and warranties.  *See, e.g.*, Compl., *U.S. Bank Nat'l*

*Ass'n v. DLJ Mortg. Capital, Inc.*, No. 13-cv-652699 (N.Y. Sup. Ct. Jan 6, 2014); Compl., *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 11-cv-652388 (N.Y. Sup. Ct. Aug. 29, 2011). In each of the repurchase actions brought by Defendants, loan level reviews were conducted which identified breach rates with respect to loans originated during the same period as the loans in the Covered Trust as high as 99%. These lawsuits demonstrate that Defendants were aware of similarly pervasive and system breached of representations and warranties in the Covered Trusts, but failed to exercise due care.

90. While U.S. Bank pursued repurchase actions related to six of the Covered Trusts, including MSM 2007-2AX, MSM 2006-13ARX, ABSHE 2006-HE7, HEAT 2006-7, MLMI 2006-RM4, and MARM 2006-OA1, these actions fell far short of what was required to satisfy the Defendants' duties because they were not handled properly and failed to assert claims available to the Trustee. For example, for three of the actions, U.S. Bank initially refused to join lawsuits despite requests from the Federal Housing Finance Agency ("FHFA"). When U.S. Bank joined, the lawsuits were dismissed as untimely. *See U.S. Bank Nat'l Ass'n v. DLJ Mortg. Capital, Inc.*, No. 654147/2012 (N.Y. Sup. Ct.) (relating to ABSHE 2006-HE7); *Home Equity Asset Trust 2006-5 (HEAT 2006-5) v. DLJ Morg. Capital, Inc.*, No. 652333/2012 (N.Y. Sup. Ct.) (relating to HEAT 2006-5); *U.S. Bank Nat'l Ass'n v. UBS Real Estate Secs. Inc.,* No. 651282/2012 (N.Y. Sup. Ct.) (relating to MARM 2006-OA1). In another action, U.S. Bank brought a repurchase action against Merrill Lynch and Bank of America. *See U.S. Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 654403/2012 (N.Y. Sup. Ct.) (relating to MLMI 2006-RM4). But Merrill Lynch asserted that its affiliate, Bank of America, released all claims against it as the initial trustee of the MLMI 2006-RM4 trust. If this is true, Bank of America is liable here for its conflict of interest. In other actions, U.S. Bank failed to pursue all

37

loan groups or assert claims against the Servicer that should have been asserted.

91.     Defendants also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

92.     Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

93.     Monoline insurers have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain loan files and carry out a forensic loan level review of the loans at issue.

94.     For example, in *MBIA Ins. Co. v. Morgan Stanley*, No. 10-cv-29951 (N.Y. Sup. Ct. Dec. 6, 2010), the monoline insurer MBIA Insurance Corporation ("MBIA") sued Morgan Stanley, Morgan Stanley Mortgage Capital Holdings, LLC and Saxon Mortgage Services, Inc., reporting that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Of the 2,957 loan files that were reviewed by MBIA, 2,857 or 96.6% contained one or more breaches of the mortgage loan representations.  *Id*. at 72.  The reviewed mortgage loans included 1,051 that were

selected at random from the securitized pool, of which 982 or 93.4% contained one or more breaches of the mortgage loan representations.  *Id.*  Another 1,906 defaulted loans were reviewed, of which 1,875 or 98.4% contained one or more breaches of the mortgage loan representations.  *Id.*  In May 2011, the court denied a motion to dismiss all but one count of the complaint.  *MBIA Ins. Corp. v. Morgan Stanley*, 42 Misc. 3d 1213(A), 984 N.Y.S.2d 633 (Sup. Ct. 2011).  The parties settled the case in December 2011.

95.     Additionally, in *MBIA Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 09-cv-603751 (N.Y. Sup. Ct. Feb. 11, 2010), MBIA sued Credit Suisse.  *Id.*  MBIA reported that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  *Id.*  Of the 1,798 loan files that were reviewed by MBIA, approximately 85% contained one or more breaches of the mortgage loan representations.  *Id.*

96.     Further, in *Ambac Assurance Corp. v. Capital One, N.A.*, No. 12-cv-07937 (S.D.N.Y. Oct. 24, 2012), Ambac reported that of the 2,399 loans it reviewed, approximately 87% contained breaches of Capital One N.A.'s representations and warranties.  Capital One N.A. acquired Chevy Chase Funding LLC, the Originator of loans in two Covered Trusts. Similarly, in *Ambac Assurance Corp. v. First Franklin Financial Corporation*, No. 12-cv-651217 (N.Y. Sup. Ct. Apr. 15, 2012), Ambac reported that of the 1,750 loans it reviewed, 94% contained breaches of First Franklin Financial Corporation and Merrill Lynch Mortgage Lending, Inc.'s representations and warranties.

97.     Additionally, Assured Guaranty Municipal Corporation brought actions against UBS Real Estate Securities, Inc. and DLJ Mortgage Capital Inc. alleging both defendants

breached their representations and warranties. *See* Compl., *Assured Guaranty Municipal Corp. v. UBS Real Estate Secs. Inc.*, No 12-cv-650327 (N.Y. Sup. Ct. Feb. 2, 2012); Compl., *Assured Guaranty Municipal Corp. v. DLJ Mortgage Capital, Inc.*, No. 11-cv-652837 (N.Y. Sup. Ct. Oct. 17, 2011).

98.     U.S. Bank and LaSalle received notice of the Morgan Stanley, Credit Suisse and DLJ Mortgage Capital monoline actions as they were the trustees for the respective trusts in those actions.

99.     Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan sellers' systemic and pervasive violations of underwriting and securitization guidelines, Defendants discovered that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

100.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both a state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Many of the Certificates acquired by Plaintiffs were triple-A or double-A rated at the time of purchase. *See* Ex. D.  Now most are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic

abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high

default and delinquency rates and enormous cumulative losses is attached as Exhibit E.

Defendants were aware of the high level of defaults and should have carefully investigated these

issues, notified Certificateholders, including Plaintiffs, of the issues, and taken action to address

these issues.

101.    If Defendants had provided the required notices and/or enforced related

repurchase obligations as they were required to do, they would have forced the Sponsors or

Originators to repurchase the relevant loans.  Defendants had a continuing duty to provide

such notice and enforce related repurchase obligations but failed to do so throughout their

tenure as Trustees.  Indeed, Defendants let the statute of limitations to bring repurchase

claims lapse by failing to provide notice or take sufficient action within six years of the

closing of each Covered Trust.

### 1.    The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

102.    Either the Sponsor or Originator, and sometimes both, provided

representations and warranties to the Covered Trusts.

103.    The failure of the parties to the PSAs to provide notice of their breaches of

representations and warranties constituted a default that would have ripened into Events of

Default had Defendants provided notice of the defaults.

104.    The chart below identifies each of the entities disclosed to be the Sponsors,

Originators and obligors of the loans included in the Covered Trusts.

|   | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 1 | ABSHE 2006-HE1 | DLJ Mortgage Capital, Inc. | Aegis Mortgage Corporation | DLJ Mortgage Capital, Inc.; Asset Backed Securities Corporation |

|   | Trust | Sponsor | Originators | Obligors |
|---|-------|---------|-------------|----------|
| 2 | ABSHE 2006-HE2 | DLJ Mortgage Capital, Inc. | New Century Mortgage Corporation | New Century Mortgage Corporation; DLJ Mortgage Capital, Inc.; Asset Backed Securities Corporation |
| 3 | ABSHE 2006-HE4 | DLJ Mortgage Capital, Inc. | New Century Mortgage Corporation | New Century Mortgage Corporation; DLJ Mortgage Capital, Inc.; Asset Backed Securities Corporation |
| 4 | ABSHE 2006-HE7 | DLJ Mortgage Capital, Inc. | Argent Mortgage Company, LLC; Ameriquest Mortgage Company | Ameriquest Mortgage Company; DLJ Mortgage Capital, Inc.; Asset Backed Securities Corporation |
| 5 | BAYV 2006-B | Bayview Financial, L.P. | Bayview Financial, L.P.; Interbay Funding, LLC; Bayview Financial Small Business Funding, LLC | Bayview Financial, L.P. |
| 6 | CBASS 2005-CB3 | Credit-Based Asset Servicing and Securitization LLC | American Business Financial Services Inc.; Lime Financial Services, Inc.; Chase Home Mortgage Corporation of the Southeast; Wilmington Finance, Inc.; First Street Financial, Inc.; South Plains Mortgage LLC; SIB Mortgage Corporation; Chase Home Finance, LLC | Credit-Based Asset Servicing and Securitization LLC |
| 7 | CBASS 2006-CB2 | Credit-Based Asset Servicing and Securitization LLC | New Century Mortgage Corporation; Encore Credit Corporation; Accredited Home Lenders, Inc. | Credit-Based Asset Servicing and Securitization LLC |

|    | Trust | Sponsor | Originators | Obligors |
|----|-------|---------|-------------|----------|
| 8  | CCMFC 2006-1 | Chevy Chase Funding LLC | Chevy Chase Bank F.S.B. | Chevy Chase Funding LLC |
| 9  | CCMFC 2006-2 | Chevy Chase Funding LLC | Chevy Chase Bank F.S.B. | Chevy Chase Funding LLC |
| 10 | CMALT 2006-A7 | CitiMortgage, Inc. | CitiMortgage, Inc.; GreenPoint Mortgage Funding, Inc.; Quicken Loans, Inc. | Citicorp Mortgage Securities, Inc. |
| 11 | CMLTI 2006-AMC1 | Citigroup Global Markets Realty Corporation | Ameriquest Mortgage Company | Citigroup Global Markets Realty Corporation; Citigroup Mortgage Loan Trust Inc. |
| 12 | CMLTI 2006-NC2 | Citigroup Global Markets Realty Corporation | New Century Mortgage Corporation | NC Capital Corporation; Citigroup Global Markets Realty Corporation; Citigroup Mortgage Loan Trust Inc. |
| 13 | CMLTI 2006-WF2 | Citigroup Global Markets Realty Corporation | Wells Fargo Bank, N.A. | Citigroup Global Markets Realty Corporation; Citigroup Mortgage Loan Trust Inc. |
| 14 | CMLTI 2007-AMC1 | Citigroup Global Markets Realty Corporation | Argent Mortgage Company, LLC; Ameriquest Mortgage Company | Citigroup Global Markets Realty Corporation; Citigroup Mortgage Loan Trust Inc. |
| 15 | CMLTI 2007-WFH2 | Citigroup Global Markets Realty Corporation | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A.; Citigroup Global Markets Realty Corporation |
| 16 | CSAB 2006-1 | DLJ Mortgage Capital, Inc. | Credit Suisse Financial Corporation;  DLJ Mortgage Capital, Inc. | DLJ Mortgage Capital, Inc. |
| 17 | CSMC 2006-3 | DLJ Mortgage Capital, Inc. | Credit Suisse Financial Corporation; Bank of America, N.A.; Countrywide Home Loans, Inc.; | DLJ Mortgage Capital, Inc. |

|  | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
|  |  |  | Washington Mutual Bank |  |
| 18 | HEAT 2006-4 | DLJ Mortgage Capital, Inc. | Wells Fargo Bank, N.A.; Finance America, LLC; Aames Capital Corporation; Aegis Mortgage Corporation | DLJ Mortgage Capital, Inc. |
| 19 | HEAT 2006-7 | DLJ Mortgage Capital, Inc. | Encore Credit Corporation; OwnIt Mortgage Solutions, Inc.; Lime Financial Services, Inc. | DLJ Mortgage Capital, Inc. |
| 20 | MABS 2005-NC1 | UBS Real Estate Securities Inc. | New Century Mortgage Corporation | NC Capital Corporation; UBS Real Estate Securities Inc. |
| 21 | MABS 2006-FRE1 | UBS Real Estate Securities Inc. | Fremont Investment & Loan | Fremont Investment & Loan; UBS Real Estate Securities Inc. |
| 22 | MABS 2006-HE1 | UBS Real Estate Securities Inc. | Fremont Investment & Loan; Novelle Financial Services, Inc.; First Street Financial, Inc.; DreamHouse Mortgage Corporation; Equity Financial Inc.; National City Mortgage Company | Fremont Investment & Loan; Novelle Financial Services, Inc.; First Street Financial, Inc.; DreamHouse Mortgage Corporation; Equity Financial Inc.; National City Mortgage Company; UBS Real Estate Securities Inc. |
| 23 | MABS 2006-HE4 | UBS Real Estate Securities Inc. | First NLC Financial Services, LLC; Meritage Mortgage Corporation; Decision One Mortgage Company; EquiFirst Corporation; OwnIt Mortgage Solutions, Inc.; | Morgan Stanley ABS Capital I Inc.; NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
|  |  |  | First Street Financial, Inc; Lime Financial Services, Ltd. |  |
| 24 | MABS 2006-NC3 | UBS Real Estate Securities Inc. | New Century Mortgage Corporation | New Century Mortgage Corporation; UBS Real Estate Securities Inc. |
| 25 | MABS 2006-WMC3 | UBS Real Estate Securities Inc. | WMC Mortgage Corporation | WMC Mortgage Corporation; UBS Real Estate Securities Inc. |
| 26 | MABS 2006-WMC4 | UBS Real Estate Securities Inc. | WMC Mortgage Corporation | WMC Mortgage Corporation; UBS Real Estate Securities Inc. |
| 27 | MARM 2006-OA1 | UBS Real Estate Securities, Inc. | American Home Mortgage Corporation | UBS Real Estate Securities, Inc. |
| 28 | MLMI 2006-AR1 | Merrill Lynch Mortgage Lending, Inc. | Argent Mortgage Company, LLC; Ameriquest Mortgage Company | Merrill Lynch Mortgage Lending, Inc. |
| 29 | MLMI 2006-HE6 | Merrill Lynch Mortgage Lending, Inc. | Novastar Mortgage, Inc.; Accredited Home Lenders, Inc.; Fieldstone Mortgage Company | Merrill Lynch Mortgage Lending, Inc.; Novastar Mortgage, Inc.; Accredited Home Lenders, Inc.; Fieldstone Mortgage Company |
| 30 | MLMI 2006-RM4 | Merrill Lynch Mortgage Lending, Inc. | ResMAE Mortgage Corporation | Merrill Lynch Mortgage Lending, Inc. |
| 31 | MLMI 2006-WMC2 | Merrill Lynch Mortgage Lending, Inc. | WMC Mortgage Corporation | Merrill Lynch Mortgage Lending, Inc.; WMC Mortgage Corporation |
| 32 | MSM 2006-12XS | Morgan Stanley Mortgage Capital Inc. | First National Bank of Nevada; GreenPoint Mortgage Funding, Inc.; Opteum Financial Services LLC | Morgan Stanley Mortgage Capital Inc. and the related originators |

|  | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|---|---|---|---|---|
| 33 | MSM 2006-13ARX | Morgan Stanley Mortgage Capital Inc. | Various all under 10% | Morgan Stanley Mortgage Capital Inc. and the related originators |
| 34 | MSM 2006-16AX | Morgan Stanley Mortgage Capital Inc. | American Home Mortgage Corporation; MortgageIT, Inc. | Morgan Stanley Mortgage Capital Inc.; American Home Mortgage Corporation; MortgageIT, Inc. |
| 35 | MSM 2006-6AR | Morgan Stanley Mortgage Capital Inc. | American Home Mortgage Corporation; MortgageIT, Inc. | Morgan Stanley Mortgage Capital Inc.; American Home Mortgage Corporation; MortgageIT, Inc. |
| 36 | MSM 2006-9AR | Morgan Stanley Mortgage Capital Inc. | First National Bank of Nevada | Morgan Stanley Mortgage Capital Inc. and the related originators |
| 37 | MSM 2007-1XS | Morgan Stanley Mortgage Capital Inc. | First National Bank of Nevada; Lydian Private Bank | Morgan Stanley Mortgage Capital Inc. and the related originators |
| 38 | MSM 2007-2AX | Morgan Stanley Mortgage Capital Inc. | GreenPoint Mortgage Funding, Inc.; Wachovia Mortgage Corporation | Morgan Stanley Mortgage Capital Inc. and the related originators |
| 39 | MSM 2007-5AX | Morgan Stanley Mortgage Capital Inc. | Wilmington Finance Company; IndyMac Bank, F.S.B. | Morgan Stanley Mortgage Capital Inc.; Wilmington Finance Company; IndyMac Bank F.S.B. |
| 40 | MSM 2007-7AX | Morgan Stanley Mortgage Capital Inc. | Wilmington Finance Company | Morgan Stanley Mortgage Capital Inc.; Wilmington Finance Company |
| 41 | OWNIT 2006-3 | Merrill Lynch Mortgage Lending Inc. | Ownit Mortgage Solutions, Inc. | Ownit Mortgage Solutions, Inc.; Merrill Lynch Mortgage Lending Inc. |
| 42 | OWNIT 2006-4 | Merrill Lynch Mortgage Lending Inc. | Ownit Mortgage Solutions, Inc. | Ownit Mortgage Solutions, Inc.; Merrill Lynch Mortgage Lending Inc. |

|    | **Trust** | **Sponsor** | **Originators** | **Obligors** |
|----|-----------|-------------|-----------------|--------------|
| 43 | SURF 2006-AB2 | Merrill Lynch Mortgage Lending Inc. | Various unrelated third party originators | Merrill Lynch Mortgage Lending Inc.; Merrill Lynch Mortgage Investors, Inc. |
| 44 | SURF 2006-BC2 | Merrill Lynch Mortgage Lending Inc. | Various unrelated third party originators | Merrill Lynch Mortgage Lending Inc.; Merrill Lynch Mortgage Investors, Inc. |
| 45 | SURF 2006-BC5 | Merrill Lynch Mortgage Lending Inc. | Various unrelated third party originators | Merrill Lynch Mortgage Lending Inc.; Merrill Lynch Mortgage Investors, Inc. |
| 46 | TBW 2006-4 | Taylor, Bean & Whitaker Mortgage Corporation | Taylor, Bean & Whitaker Mortgage Corporation | DLJ Mortgage Capital, Inc. |
| 47 | WAMU 2006-AR17 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Mortgage Securities Corporation |
| 48 | WMABS 2006-HE1 | Washington Mutual Mortgage Securities Corporation | Long Beach Mortgage Company; Lime Financial Services, Ltd. | WaMu Acceptance Corporation |
| 49 | WMALT 2005-6 | Washington Mutual Bank | Washington Mutual Bank | Washington Mutual Mortgage Securities Corporation |
| 50 | WMALT 2005-9 | Washington Mutual Mortgage Securities Corporation | Various affiliated and unaffiliated originators | Washington Mutual Mortgage Securities Corporation |
| 51 | WMALT 2006-AR8 | Washington Mutual Mortgage Securities Corporation | Alliance Bancorp.; Countrywide Home Loans, Inc. | Washington Mutual Mortgage Securities Corporation |
| 52 | WMALT 2006-AR9 | Washington Mutual Mortgage Securities Corporation | SunTrust Mortgage Inc.; Countrywide Home Loans, Inc.; Alliance Bancorp.; | Washington Mutual Mortgage Securities Corporation |

|  | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
|  |  |  | First Magnus Financial Corporation |  |
| 53 | WMALT 2007-OA2 | Washington Mutual Bank | Alliance Bancorp.; Countrywide Home Loans, Inc.; Virtual Bank | Washington Mutual Bank |

105.     As detailed Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

106.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to U.S. Bank and Bank of America that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans. Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the mortgagor's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

107.     These lawsuits, in conjunction with the poor performance of the underlying loans (which Defendants were aware of as they issued regular reports regarding performance) and the public information concerning widespread issues among originators, were more than sufficient to provide U.S. Bank and Bank of America with notice that large numbers of loans originated and

sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

108.     The Trustees were aware of these reports, investigations and lawsuits and they also had additional information concerning representation and warranty violations that they learned in the course of administering the Covered Trusts.  They also had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if Defendants had conducted even a limited investigation.  Thus, the Trustees were aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

### B.     Defendants Failed to Act Prudently to Enforce Repurchase Obligations

109.     When Defendants learned that the Master Servicer or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, Defendants should have acted like a prudent person would in the exercise of their own affairs and (i) taken action against the Master Servicer or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified Certificateholders of the Master Servicer's or Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in existence, Defendants had a continuing duty to enforce repurchase rights.  As such, they should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans.  Defendants continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

110.     Although certain Events of Default require formal notice and an opportunity

to cure, the Trustees cannot escape their duty of care by failing to provide the required notice.  As set forth in Section III(A) the Trustees were aware (or would have been aware if they had carried out their duties) that the Master Servicer, Servicers, Depositors, Sponsors and the Trustees themselves, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  The Trustees, however, did not provide notice of such defaults as they were required to do.  Because these defaults would have seasoned into Events of Default if notice had been provided, the Trustees had a duty to act prudently to enforce repurchase provisions once they learned of such defaults.

111.    As described below, additional Events of Default occurred under the terms of the PSAs.  Defendants have engaged in repeated breaches of their duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

112.    As discussed above in Section II(A), Defendants, or a Custodian acting on their behalf,  had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically include documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  Defendants knew of numerous instances where they did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded

assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

113.    When Defendants prepared the final exception reports, they provided them to the Sponsors, Depositors and Master Servicer (or Servicers) indicating many of these missing documents.  When the Custodian prepared such reports, it provided them to Defendants, the Sponsors, Depositors and Master Servicer or (Servicers) and the reports similarly showed many documents that were required under the PSAs were not delivered. Defendants were aware that affected loans were not repurchased or substituted because the Trustees themselves were required to take action each time a loan was substituted or repurchased.  For example, Section 2.10 of the WaMu PSA requires the trustee to execute documents, or amend MERS registrations, whenever a loan is substituted for or repurchased. The Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS Trusts provide that it was the Trustee's duty to seek cure, repurchase or substitution remedies and, as a result, the Trustees knew that affected loans were not cured, repurchased, or substituted because they did not seek such remedies.  *See* Ex. C § VI.

114.    Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, Defendants stood by while the Sponsors, Servicers and Master Servicer of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  Defendants and the entities disclosed to be Sponsors, Servicers and Master Servicer of the Covered Trusts have been implicated in numerous governmental reports, court orders and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage

loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and Defendants' knowledge of such failures.  Exhibit G contains a chart of the relevant Sponsors, Servicers and Master Servicer for the Covered Trusts. Defendants' and the relevant Sponsors', Servicers' and Master Servicers' involvement in the robo-signing scandal is summarized in Exhibit H.

115.    Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

116.     First, Section 7.01(c)(i) of the WaMu PSA provides that an Event of Default occurs if the Depositor fails to perform its obligations under the PSA and such breach is not remedied within 60 days of notice of the breach.  As discussed above in Section II(A), the Depositor had an obligation to deliver complete mortgage loan files but failed to do so. Pursuant to Section 2.07 of the WaMu PSA, the final exception report provided notice of the Depositor's breaches.  Sixty days after such notice, the breaches ripened into Events of Default and the Trustee had a duty to exercise due care to protect Certificateholders' interests.

117.     Second, each PSA requires that the Servicers' or Master Servicer's failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice by the Trustee of such breach.  For example, Section 7.01 of the WaMu PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach.  The

Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch, Morgan Stanley, TBW and UBS PSAs contain similar provisions.  *See* Ex. C § IX.

118.    As set forth above and in Exhibit H, when borrowers defaulted and the Servicers or Master Servicer were required to commence foreclosures, they fabricated the documents necessary to foreclose rather than cause the Sponsor, Depositor or Originator to repurchase or substitute the affected loan.  The Trustees were aware of this fact as they were aware of the contents of the document exception reports and that properties with exceptions had defaulted and not been repurchased or substituted.  Beginning by 2010, U.S. Bank began to provide notice to the Servicers concerning their imprudent foreclosure practices.  However, the Trustees did not provide notice that the Servicers were improperly liquidating loans that were eligible for repurchase due to uncured document exceptions or take other action to protect the Trusts' interests.  Both the Servicers and Trustees were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit H, the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent servicer would have insisted that the loans be repurchased.  The Trustees had an obligation to act prudently to address all defaults.

119.    Third, the PSAs for the C-BASS and UBS Trusts provide that the Servicers' failure to perform their covenant to prudently service the mortgage loans ripened into a Servicer Event of Default if left uncured for a specified period after a Servicing Officer learned of such failures.  As also set forth in Section II(D) above, the Morgan Stanley PSA provides that the Master Servicer's failure to perform its covenant to prudently service the mortgage loans within the first year of the trust ripened into an Event of Default immediately.  Because the Servicers failed to act prudently and cause the repurchase or

substitution of loans with incomplete documentation rather than foreclose, Events of Default were triggered under these PSAs without regard to the notice required to be given by the Trustees.

120.    These Events of Default triggered Defendants' duty to act prudently to protect the interests of the Certificateholders in all respects and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  Defendants had a continuing obligation to seek repurchase of loans missing required documentation throughout their tenure as Trustee, including as loans on the final exception report defaulted.  Defendants also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  Defendants have repeatedly breached these duties throughout their tenure as Trustees.

## 2.    U.S. Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

121.    In addition to the Events of Default discussed above, between April and November 2012, law firms representing parties that held 25% of the Voting Rights notified U.S. Bank that Events of Default occurred under Section 7.01 of the ABSHE 2006-HE7, HEAT 2006-4, HEAT 2006-7, MARM 2006-OA1, MSM 2006-12XS, MSM 2006-13ARX, MSM 2006-16AX , MSM 2006-6AR, MSM 2006-9AR, MSM 2007-1XS, MSM 2007-2AX, MSM 2007-5AX, MSM 2007-7AX, OWNIT 2006-3, OWNIT 2006-4, SURF 2006-BC2, SURF 2006-BC5, WMALT 2006-AR8 and WMALT 2006-AR9 PSAs.  Events of Default occurred either 45 or 60 days after this notice, depending on the applicable PSA, triggering U.S. Bank's duty to act prudently.

122.    Similarly, on July 21, 2011, the Association of Mortgage Investors ("AMI")

notified all major RMBS trustees, (including U.S. Bank) that "substantial evidence [] has

emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the

publicly available evidence demonstrating that there was widespread evidence, including some

of the evidence referenced in this Third Amended Complaint, that loan originators had

systemically breached representations and warranties provided to securitization trusts, and that

the parties servicing loans underlying securitization trusts had systemically breached their

obligations under applicable servicing agreements.  The letter cautioned, "[y]ou cannot be

negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon

discovery of representation or warranty breaches, you have to notify the appropriate parties;" and

"you must comply with your obligations . . . to take action to remedy the servicer Events of

Default in the best interests of the Certificateholders."

123.    Beginning in 2011, U.S. Bank commenced lawsuits relating to RMBS trusts other

than the Covered Trusts against certain Sponsors and Originators (including, among others,

DLJ Mortgage Capital Inc., Citigroup Global Markets Realty Corporation and Countrywide

Home Loans, Inc.) alleging:

- The Originators sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of their representations and warranties;

- The Servicers and Master Servicer failed to provide notice of each breach of a representation or warranty with respect to a mortgage loan;  and

- The Master Servicer failed to use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the mortgage loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.

*See, e.g.*, Compl., *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 11-cv-652388

(N.Y. Sup. Ct. Aug. 29, 2011); Compl., *U.S. Bank Nat'l Ass'n v. Citigroup Global Mkts. Realty*

*Corp.*, No. 13-cv-6989 (S.D.N.Y. Oct. 1, 2013); Compl., *U.S. Bank Nat'l Ass'n v. DLJ Mortg.*

*Capital, Inc.*, No. 12-cv-652699 (N.Y. Sup. Ct. Jan 6, 2014); Compl., *U.S. Bank Nat'l Ass'n v.*

*Citigroup Global Mkts. Realty Corp.*, No. 13-cv-653816 (N.Y. Sup. Ct. Apr. 8, 2014).  These

lawsuits, which alleged pervasive and systemic breaches of representations and warranties,

demonstrate that U.S. Bank was aware of similarly pervasive and systemic breaches of

representations and warranties in the Covered Trusts, but failed to exercise due care.

### 3.    Events of Default Concerning False Servicer Certifications

124.    Each PSA obligated the Servicer to certify annually that it met its obligations

under the PSAs and applicable federal regulations.  For example, section 3.13(e) of the WaMu

PSA requires the Servicer to certify, among other things,

> (i)    a review of the Servicer's (or, in the case of a statement from any such other party, such other party's) activities during the preceding calendar year (or the applicable portion thereof in the case of the initial statement) and of its performance under this Agreement (or the servicing agreement applicable to such other party) has been made under such officer's supervision; and

> (ii)    to the best of such officer's knowledge, based on such review, the Servicer (or such other party) has fulfilled all of its obligations under this Agreement (or the servicing agreement applicable to such other party) in all material respects throughout the preceding calendar year (or the applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof;

The PSAs for the Bayview, C-BASS, Chevy Chase, CitiMortgage, DLJ, Merrill Lynch,

Morgan Stanley, TBW and UBS Trusts contain substantially similar requirements.  *See* Ex.

C § XII.

125.    The failure to provide a conforming certification is an Event of Default under

each of the PSAs.  *See* Ex. C §§ IX, XII.  Under the C-BASS and UBS PSAs, the Event of Default is triggered by the breach without regard to whether or not notice is provided. Under the remaining PSAs, the Event of Default is triggered if the Servicer or Master Servicer fails to cure the breach within a designated period of time.

126.    The Trustees received certifications that they knew to be false because the Servicers were not in fact meeting their obligations under the PSAs and failed to disclose numerous representation and warranty violations.  As discussed in Sections III(B)(1) and III(C), the Servicers breached the PSAs in many ways including by attempting to foreclose on defective loans rather than tendering loans for repurchase or substitution and by looting trust assets through multiple servicing scams.  As discussed in Section III(A), the Trustees were aware of numerous representation and warranty violations that were not disclosed in the required servicing certifications.  The Trustees were aware of these breaches and therefore knew the required servicer certifications did not conform because they were false. The PSAs only allowed the Trustees to rely upon the certifications if they had a good faith basis to believe the certifications to be true.  Events of Default were triggered as a result and Defendants had a continuing duty to act prudently to protect the Certificateholders' interests. The Trustees also received notices from Servicers that disclosed some, but not all, instances of their non-compliance with servicing criteria as set forth in the PSAs.  Events of Default were triggered as a result of the Servicers' disclosures and Defendants had a continuing duty to act prudently to protect the Certificateholders' interests.

127.    In addition, under the C-BASS, Bayview, and TBW PSAs, the Servicers or Master Servicer provide a representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and

complete.  For example, Section 2.05(viii) of the C-BASS PSA provides: "Neither this Agreement nor any information, certificate of an officer, statement furnished in writing or report delivered to the Trustee by the Servicer in connection with the transactions contemplated hereby contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading."  The Bayview and TBW PSAs contain substantially similar provisions.  *See* Bayview PSA § 3.01(vi); TBW PSA § 6.01(h).

128.    The Trustees had a duty to provide notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicer's false certifications, but failed to do so despite being aware of them.  Because the Trustees cannot avoid the duty to act prudently by failing to give notice of a default, these breaches ripened into Events of Default triggering the Trustees' duty to act prudently to protect the Certificateholders' interests.

### 4.    Other Events of Default

129.    A number of other Events of Default occurred in connection with the Covered Trusts.  For example, the PSAs for the six of the Covered Trusts (C-BASS 2005-CB3, C-BASS 2006-CB2, CCMFC 2006-1, CCMFC 2006-2, OWNIT 2006-3, and OWNIT 2006-4) provide that an Event of Default occurs when cumulative loss levels exceed specified levels in the PSA. These levels were exceeded in 2008 or 2009 for each of these trusts triggering Defendants' duty to act prudently. Nevertheless, Defendants failed to take actions a prudent person would have taken to address breaches by the Servicers and to mitigate investor losses.

130.    Events of Default were further triggered by actions taken against the Servicers, Sponsors, or Depositors, such as rating downgrades, decertification, and the commencement of insolvency proceedings. For example:

- The PSA for CSMC 2006-3 states that an Event of Default occurs when Moody's rating agency downgrades the Servicer below specified grades. In October 2008, and again in October 2012, Moody's downgraded the Servicer to below the specified levels triggering U.S. Bank's duty to act prudently.

- The PSA for TBW 2006-4 provides the Master Servicer shall terminate the rights and obligations of the Servicer for failing to perform any of its obligations under the Servicing Agreement and assume responsibility for servicing the affected loans. The Master Servicer failed to timely terminate the Servicer and take over the servicing of loans triggering an Event of Default.

- In the WaMu Trusts and other Covered Trusts for which Washington Mutual Bank or its affiliate was either a Sponsor, Depositor or Servicer, the appointment of the Federal Deposit Insurance Company as receiver for Washington Mutual Bank on September 25, 2008 and the ensuing repudiation of repurchase obligations under the PSAs by the transferee of Washington Mutual Bank's assets and liabilities constituted an Event of Default.

Despite the occurrence of these Events of Default, Defendants failed to take actions a prudent person would have taken to mitigate investor losses.

### C. Defendants Failed to Address the Master Servicer's and Servicers' Looting of Trust Assets

131.   In addition to the servicing related defaults and Events of Default described above, the Servicers and Master Servicer have engaged in a variety of schemes to overcharge borrowers in default. These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Plaintiffs' losses.

132.   From 2005 until today, the Servicers and Master Servicer have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including without limitation fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors and procuring insurance policies for properties that were already insured.

133.   When a defaulting borrower's home is foreclosed upon and sold, the Servicers and Master Servicer deduct their fees (which defaulting borrowers are in no position to pay

themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

134.    These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard.  As noted in Sections III(B), servicing related defaults known to the Trustees triggered the Trustees' duty to act prudently.  The Trustees were aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits and press coverage, including articles in banking industry publications like the *American Banker*.

135.    Exhibit I summarizes servicing misconduct involving the relevant Servicers and Master Servicer.  The relevant Servicers and Master Servicer for the Covered Trusts are identified in the chart in Exhibit G.

## IV.    DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

136.    Defendants failed and unreasonably refused to take action to protect the Covered Trusts and Certificateholders against Originator breaches and Servicer violations because it would have exposed that Defendants were engaged in the same misconduct in their role as servicer and originator for other mortgages and RMBS trusts.

137.    During the fourth quarter of 2010, banking regulators reviewed the adequacy of controls and governance over Defendants' foreclosure processes. The reviews uncovered significant problems in Defendants' foreclosure processing, including "critical weaknesses" in Defendants' foreclosure practices and oversight of default services vendors.  *See* Interagency Review of Foreclosure Policies and Practices (Apr. 2011), *available at* http:// www.federalreserve.gov/boarddocs/rptcongress/interagency_review_foreclosures_2011041

3.pdf.

138.    On April 13, 2011, based on the deficiencies in the review and the risk of

additional issues as a result of weak controls and processes, the Federal Reserve Board

initiated formal enforcement actions requiring U.S. Bancorp, the corporate parent of U.S.

Bank, to address its pattern of misconduct and negligence related to deficient practices in

residential mortgage loan servicing and foreclosure processing.  According to the Federal

Reserve Board press release, "[t]hese deficiencies represent significant and pervasive

compliance failures and unsafe and unsound practices at [U.S. Bancorp]."  The enforcement

action required U.S. Bancorp to improve its residential mortgage loan servicing and

foreclosure practices.  As part of the enforcement action, U.S. Bank entered into a consent

order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe

or unsound practices with respect to the manner in which [U.S. Bank] handled various

foreclosure and related activities."

150.    In addition, the Office of the Comptroller of the Currency entered into consent

orders with Defendants and several other servicers (the "OCC Consent Orders").  In the

OCC Consent Order with Bank of America, the government found, among other things, that

beginning in 2009 Bank of America filed false or otherwise defective affidavits in

connection with foreclosure proceedings and failed to exercise adequate oversight, internal

controls, policies, and procedures, compliance risk management, internal audit, third party

management and training for its foreclosure-related services.  *See In re Bank of Am., N.A.*,

Consent Order, AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-

issuances/news-releases/ 2011/nr-occ-2011-47b.pdf.

151.    Because Defendants were engaging in the same illicit and improper acts as

the Servicers for the Covered Trusts, Defendants failed to enforce the Servicer violations, or even alert the Certificateholders to the Servicers' misconduct.

152.    Defendants, as originators for other RMBS trusts, sold billions of dollars of loans, many of which materially breached representations and warranties.  Many of the same banks or their affiliate entities that act as Sponsors to the Covered Trusts, similarly were the parties that sponsored the trusts that included loans originated by Defendants.  Accordingly, because Defendants themselves faced enormous repurchase liability for loans sold in breach of representations and warranties, including loans in RMBS trusts sponsored by the same Sponsors of the Covered Trusts, Defendants were disincentivized to take any action against the Servicers for the Covered Trusts, or even alert the Certificateholders to Servicer misconduct.

153.    Exhibits F, H and I contain additional details concerning Defendants' misconduct in servicing and originating residential mortgage loans.

## V.    DEFENDANTS' CONDUCT INJURED PLAINTIFFS

154.    Defendants' breaches of their duties have caused Plaintiffs hundreds of millions of dollars in damages.

155.    If Defendants had performed their duties as trustees, they would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Plaintiffs' losses.  And if the Trustees had enforced these repurchase or substitution obligations, as they were required to do, the Certificates would have retained their market value as highly rated bonds with similar coupon rates are now trading at a very significant premium.

156.    Defendants' failure to address the Master Servicer's and Servicers' failure to

adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically. The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property tax and utility expenditures which were borne by the Covered Trusts, a decline in value of the underlying properties and ultimately less sale proceeds for the Covered Trusts and Certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

157.    If Defendants had met their duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required and issue accurate certifications, they would have caused the Sponsors or Originators to substitute or repurchase all loans where the Master Servicer, Servicers, Sponsors, Depositors and Originators failed to deliver required documentation to the Trustees or breached representations and warranties regarding the mortgage loans. This would have included numerous loans that had already defaulted or would ultimately default. Moreover, Defendants' failure to accept delivery of note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts that has impacted the market value of the Certificates. And Defendants' failure to commence damages actions against the Master Servicer and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

158.    Defendants' failure to meet their duties once they became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or

Originators further caused harm.  If Defendants had provided notice of representation and warranty violations and defaults and acted with due care as they were required to do upon the occurrence of a default or Event of Default, they would have caused the Sponsors or Originators to repurchase loans and required the Master Servicer and Servicers to replace the assets they have looted from the Covered Trusts.

159.     Many, if not all of, the repurchase or substitution claims described above have lapsed due to Defendants' inaction as New York courts have held that the underlying representation and warranty claims that Defendants failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitization.

### CAUSE OF ACTION[5]
**(Breach of Contract)**

160.     Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

161.     The PSAs are valid and binding contracts entered into between Defendants, each Covered Trust, the Sponsors, the Master Servicer, the Servicers and the Depositors.

162.     The PSAs provide, among other things, the terms under which Defendants act as trustees for the Covered Trusts.

163.     As current holders of Certificates or Notes issued by each Covered Trust, Plaintiffs are express, intended third party beneficiaries under the PSAs entitled to enforce the performance of the Trustees.

164.     Defendants breached several obligations that they undertook on behalf of

---

[5] Plaintiffs acknowledge that the Court in its March 22, 2016 Opinion & Order [ECF No. 105] dismissed Plaintiffs' claims for (i) violation of the TIA, (ii) breach of fiduciary duty, (iii) negligence and gross negligence, (iv) violation of the Streit Act, and (v) breach of the covenant of good faith.  While the Third Amended Complaint does not replead the dismissed claims and factual support there for, Plaintiffs reserve their right to appeal the dismissed claims and reassert them herein to the extent there are any further developments in the law.

Plaintiffs as Certificateholders including, without limitation, to:

> (a) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once they discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;
>
> (c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;
>
> (d) provide notice of and take steps to remedy the Master Servicer's and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and
>
> (e) enforce the repurchase obligations of the Sponsors and/or Originators.

165.    The specific provisions breached by Defendants are further detailed herein and in the Exhibits hereto.

166.    Defendants' breach of their duties set forth in the PSAs, as described above, caused Plaintiffs' losses on their Certificates and diminished their value.

167.    Plaintiffs have performed their obligations under the PSAs.

168.    Defendants are liable to Plaintiffs for the losses they suffered as a direct result of Defendants' failure to perform their contractual obligations under the PSAs.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiffs against Defendants for breaches of their statutory, contractual and fiduciary duties, their gross negligence and their ordinary negligence, in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  January 2, 2018

By:      */s/ David H. Wollmuth* _____

David H. Wollmuth
Randall R. Rainer
Lyndon M. Tretter
Michael C. Ledley
Steven S. Fitzgerald
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
rrainer@wmd-law.com
ltretter@wmd-law.com
mledley@wmd-law.com
sfitzgerald@wmd-law.com
rhallinan@wmd-law.com

George A. Zelcs
John A. Libra
Matthew C. Davies
Max C. Gibbons
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9750
Fax: (312) 641-9760
gzelcs@koreintillery.com
jlibra@koreintillery.com
mdavies@koreintillery.com

mgibbons@koreintillery.com

Stephen M. Tillery
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com

*Attorneys for Plaintiffs*