**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHOENIX LIGHT SF DAC et al., <br><br> Plaintiffs, <br><br> - against - <br><br> U.S. BANK NATIONAL ASSOCIATION and BANK OF AMERICA, N.A., <br><br> Defendants. | Case No. 14-cv-10116-VSB-DCF |

**MEMORANDUM OF LAW IN SUPPORT OF BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT**

MUNGER, TOLLES & OLSON LLP
James C. Rutten
Jacob S. Kreilkamp
Wesley T.L. Burrell
Adam P. Barry
Matthew K. Donohue
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071-3426
(213) 683-9100; (213) 687-3702 (fax)
james.rutten@mto.com
jacob.kreilkamp@mto.com
wesley.burrell@mto.com
adam.barry@mto.com
matthew.donohue@mto.com

SIDLEY AUSTIN LLP
David F. Graham
Mark C. Brown
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000; (312) 853-7036 (fax)
dgraham@sidley.com
mark.brown@sidley.com

SIDLEY AUSTIN LLP
Isaac S. Greaney
Daniel Gimmel
Jon W. Muenz
787 Seventh Avenue
New York, New York  10019
(212) 839-5300; (212) 853-5599 (fax)
igreaney@sidley.com
dgimmel@sidley.com
jmuenz@sidley.com

*Attorneys for Defendant Bank of America, N.A.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

TABLE OF DEFINED TERMS .............................................................................. vii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ......................................................................................................... 4

ARGUMENT .............................................................................................................. 8

    A.    Plaintiffs' Claims Against BANA Are Time-Barred ............................................ 8

        1.    New York's Statute of Limitations Bars Plaintiffs' Claims in Their Entirety as to Nine Trusts, and in Part as to Five Trusts ............................. 8

        2.    Delaware's Statute of Limitations Bars Plaintiffs' Claims in Their Entirety as to Six Trusts .................................................................. 11

    B.    Plaintiffs Lack Standing To Assert Claims Against BANA ................................ 12

        1.    The Assignments Are Champertous and Therefore Unenforceable ........ 12

        2.    The Assignments Violate the Indentures and Therefore Are Self-Defeating ............................................................................................... 14

    C.    Plaintiffs' Claims Fail On The Merits ................................................................ 17

        1.    Plaintiffs' Pre-EOD Claims Relating to Custodial Duties Fail ................ 18

            (a)    The trustee's custodial duties were limited in scope and time ................................................................................................ 19

            (b)    Plaintiffs have no evidence of a breach of custodial duties .......... 21

        2.    Plaintiffs' Pre-EOD Claims Relating to R&Ws Fail ............................... 23

            (a)    Collateral exception reports are not evidence of discovery of material R&W breaches, and could support only a time-barred claim in any event .................................................. 25

            (b)    Notices alleging possible R&W breaches do not constitute trustee discovery of actual breaches .............................................. 26

            (c)    Even under a relaxed standard for discovery of R&W breaches, BANA is entitled to summary judgment on the overwhelming majority of the loans .............................................. 28

i

# TABLE OF CONTENTS
**(continued)**

3. Plaintiff's Post-EOD Claims Fail.................................................................29

    (a) Plaintiffs have no evidence that an EOD occurred while BANA was trustee ....................................................29

    (b) In any event, Plaintiffs have no evidence that a "Responsible Officer" of BANA had "written notice" or "actual knowledge" of an EOD...............................34

        (1) The MLMI and OWNIT trusts.........................................34

        (2) The WaMu, WMABS, WMALT, and MSM Trusts..........35

4. Plaintiffs' Claims Also Fail on Additional Grounds................................35

CONCLUSION.......................................................................................................35

APPENDIX........................................................................................................ A-1

## TABLE OF AUTHORITIES

### CASES

*Aretakis v. Caesars Entertainment*,
  2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018) ...............................................13, 14

*Argonaut P'Ship L.P. v. Bankers Trust Co.*,
  2001 WL 585519 (S.D.N.Y. May 30, 2001) ...........................................................34

*B2X Corp. v. Classic Closeouts LLC*,
  2010 WL 2230198 (S.D.N.Y. May 26, 2010) ...................................................31, 33

*In re Bankers Trust Co.*,
  450 F.3d 121 (2d Cir. 2006) ................................................................3, 4, 32, 33

*Bedden-Hurley v. N.Y. City Bd. of Educ.*,
  385 F. Supp. 2d 274 (S.D.N.Y. 2005) .....................................................................33

*BlackRock Core Bond Portfolio v. U.S. Bank Nat. Ass'n*,
  165 F. Supp. 3d 80 (S.D.N.Y. 2016) ........................................................................1

*Bank of N.Y. Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.*,
  2013 WL 3146824 (S.D.N.Y. June 19, 2013) .........................................................26

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
  738 F. Supp. 2d 450 (S.D.N.Y. 2010) ...............................................................17, 28

*Commerce Bank v. Bank of N.Y. Mellon*,
  141 A.D.3d 413 (2016) ............................................................................... *passim*

*Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am., N.A.*,
  996 A.2d 324 (Del. Ch. 2010) .................................................................................32

*Cornejo v. Bell*,
  592 F.3d 121 (2d Cir. 2010) ....................................................................................32

*Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.a.r.l.*,
  996 N.Y.S.2d 476 (N.Y. Sup. Ct. 2014) .................................................................15

*Craft EM CLO 2006-1, Ltd. v. Deutsche Bank AG*,
  2017 WL 3527488 (N.Y. Sup. Ct. Aug. 14, 2017) ..........................................10, 11

*Eastman Kodak Co. v. Bostic*,
  1991 WL 243378 (S.D.N.Y. Nov. 14, 1991) ...........................................................33

*Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*,
  838 F.2d 66 (2d Cir. 1988) .....................................................................................17

*Ely-Cruikshank Co. v. Bank of Montreal*,
  81 N.Y.2d 399 (1993) .................................................................................................9

*Fixed Income Shares: Series M v. Citibank, N.A.*,
  157 A.D.3d 541 (2018) ...................................................................... *passim*

*Fixed Income Shares: Series M v. Citibank, N.A.*,
  61 N.Y.S.3d 190 (N.Y. Sup. Ct. 2017) ...............................................................33

*Frontier Oil Corp. v. Holly Corp.*,
  2005 WL 1039027 (Del. Ch. Apr. 29, 2005) .......................................................32

*Guaranty Trust Co. v. United States*,
  304 U.S. 126 (1938).............................................................................................11

*Hazzard v. Chase Nat. Bank*,
  287 N.Y.S. 541 (N.Y. Sup. Ct. 1936) ...............................................................15

*Hendry v. Title Guar. & Trust Co.*,
  280 N.Y. 740 (1939) ............................................................................................15

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  23 F. Supp. 3d 203 (S.D.N.Y. 2014)...................................................................11

*In re NXXI Inc.*,
  216 F. Supp. 3d 381 (S.D.N.Y. 2016)..................................................................22

*Justinian Capital SPC v. WestLB AG*,
  28 N.Y.3d 160 (2016) ...............................................................................12, 13, 14

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
  313 U.S. 487 (1941)...............................................................................................8

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985)................................................................................17

*Merryman v. J.P. Morgan Chase Bank, N.A.*,
  319 F.R.D. 468 (S.D.N.Y. 2017) ........................................................................11

*Nat. Credit Union Admin. Bd. v. U.S. Bank N.A.*,
  2015 WL 2359295 (S.D.N.Y. May 18, 2015) .....................................................29

*Nomura Asset Acceptance Corp. Alt. Loan Tr. v. Nomura Credit & Capital, Inc.*,
  139 A.D.3d 519 (2016) .........................................................................................10

*Phoenix Light SF Ltd. (BlackRock) v. HSBC Bank USA, N.A.*,
  2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) .................................................27, 28

*Phoenix Light SF Ltd. (BlackRock) v. Wells Fargo Bank, N.A.*,
2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) ............................................................ *passim*

*Phoenix Light SF Ltd. (BlackRock) v. Wells Fargo Bank, N.A.*,
2017 WL 953550 (S.D.N.Y. Mar. 10, 2017) ..........................................................24

*Phoenix Light SF Ltd. (Royal Park) v. HSBC Bank USA, N.A.*,
109 F. Supp. 3d 587 (S.D.N.Y. 2015)..................................................................27

*Phoenix Light SF Ltd. (Royal Park) v. HSBC Bank USA, N.A.*,
No. 1:14-cv-10101-LGS-SN (S.D.N.Y. Feb. 23, 2018) ..................................23, 24

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017) ........................................................ *passim*

*Phoenix Light SF Ltd. v. Deutsche Bank Nat. Trust Co.*,
172 F. Supp. 3d 700 (S.D.N.Y. 2016)..................................................................23

*Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*,
2015 WL 2359358 (S.D.N.Y. May 18, 2015) ........................................................ *passim*

*Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*,
2016 WL 1169515 (S.D.N.Y. Mar. 2, 2016) ........................................................ *passim*

*Portfolio Recovery Assocs., LLC v. King*,
14 N.Y.3d 410 (2010) ..........................................................................8, 9, 10, 11

*Pulieri v. Boardwalk Props., LLC*,
2015 WL 691449 (Del. Ch. Feb. 18, 2015) ........................................................12

*RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*,
45 A.3d 107 (Del. 2012) ..................................................................................32

*Reliance Ins. Co. v. PolyVision Corp.*,
9 N.Y.3d 52 (2007) ........................................................................................10

*Ret. Bd. of the Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)............................................................................ *passim*

*Royal Park Invs. SA/NV v. Deutsche Bank Nat. Trust Co.*,
2018 WL 1088020 (S.D.N.Y. Feb. 9, 2018)........................................................27

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)..........................................................................32

*Taylor v. Bailey Tool Mfg. Co.*,
744 F.3d 944 (5th Cir. 2014) ..........................................................................11

v

*Trans-Res., Inc. v. Nausch Hogan & Murray,*
    298 A.D.2d 27 (2002) ..................................................................................11

*Trust for Certificate Holders of MLMI 1999-C1 v. Love Funding Corp.,*
    13 N.Y.3d 190 (2009) ................................................................................14

*U.S. Bank. Nat. Ass'n v. UBS Real Estate Sec., Inc.,*
    2017 WL 2437290 (S.D.N.Y. Apr. 21, 2017)..........................................25

*Varga v. McGraw Hill Fin., Inc.,*
    147 A.D.3d 480 (2017) ..............................................................................10

*Veleron Holding, B.V. v. BNP Paribas SA,*
    2014 WL 12699263 (S.D.N.Y. Apr. 16, 2014)........................................22

*Wallace v. Wood,*
    752 A.2d 1175 (Del. Ch. 1999)................................................................22

*Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon,*
    2017 WL 3392855 (Ohio Ct. Common Pleas Aug. 4, 2017)..............24, 25, 26, 33

*Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon,*
    2017 WL 3392856 (Ohio Ct. Common Pleas Aug. 4, 2017)................17, 25, 26

*2138747 Ontario, Inc. v. Samsung C&T Corp.,*
    144 A.D.3d 122 (2016) ..............................................................................11

## STATUTES AND RULES

Federal Rule of Civil Procedure 15 .........................................................9, 11

10 Del. Code § 8106 ...........................................................................................12

N.Y. Judiciary Law § 489 ...........................................................................12, 14

N.Y. CPLR 203 ...................................................................................................10

N.Y. CPLR 205 .............................................................................................10, 11

N.Y. CPLR 213 .....................................................................................................9

## TABLE OF DEFINED TERMS

BANA:                Defendant Bank of America, N.A.

BNYM:               Bank of New York Mellon

C-BASS XVII:    Plaintiff C-BASS CBO XVII Ltd.

CDO:                 Collateralized debt obligation

DPAG:               Deutsche Pfandbriefbank AG

EAA:                 Erste Abwicklungsanstalt

EOD:                 Event of Default

Justinian:          Justinian Capital SPC

Phoenix:           Plaintiff Phoenix Light SF DAC (f/k/a Phoenix Light SF Ltd.)

PSA:                 Pooling and servicing agreement

R&W:                Representation and warranty

RMBS:              Residential mortgage-backed securities

SAC:                 Second Amended Complaint

Sep. Stmt.:       BANA's Separate Statement of Undisputed Facts filed herewith

Silver Elms I:    Plaintiff Silver Elms CDO PLC

Silver Elms II:   Plaintiff Silver Elms CDO II Limited

TAC:                 Third Amended Complaint

U.S. Bank:        Defendant U.S. Bank National Association

WestLB:           WestLB AG

## PRELIMINARY STATEMENT

"At summary judgment, Plaintiffs must prove that they have evidence to support their claims loan-by-loan and trust-by-trust." *Phoenix Light SF Ltd. v. BNYM*, 2017 WL 3973951, at *9 (S.D.N.Y. Sept. 7, 2017) (Caproni, J.) (quoting *Ret. Bd. of the Policemen's Annuity & Benefit Fund v. BNYM*, 775 F.3d 154, 162 (2d Cir. 2014)).[1]  While courts have allowed claims against residential mortgage-backed securities ("RMBS") trustees to proceed past the pleading stage based on generic allegations that are untethered to the specific trusts or mortgages at issue, they have warned that plaintiffs eventually "will be put to their proof," at which point "relying on wrongs elsewhere demonstrated would be insufficient." *BlackRock Core Bond Portfolio v. U.S. Bank Nat. Ass'n*, 165 F. Supp. 3d 80, 100 (S.D.N.Y. 2016) (Forrest, J.).  For this reason, a court in this District recently granted summary judgment against Plaintiffs here on nearly all the claims they alleged against an RMBS trustee.  *See Phoenix v. BNYM*, 2017 WL 3973951.

Plaintiffs' claims against Bank of America, N.A. ("BANA") here also fail as a matter of law and should be dismissed.  Plaintiffs allege that BANA breached the PSAs governing 20 RMBS trusts for which BANA previously served as trustee.[2]  Yet, despite a lengthy factual record, Plaintiffs have no "loan-by-loan and trust-by-trust" specifics regarding the alleged breaches they hypothesize.  Nor is Plaintiffs' failure of proof, dispositive though it is, their only problem, for their claims also suffer from numerous other independently fatal infirmities, each warranting summary judgment.

---

[1] Throughout this brief, any emphasis in quotations is added, and any internal quotation marks, citations, footnotes, brackets, and ellipses are omitted unless otherwise indicated.  For the Court's convenience, the relevant Pooling and Servicing Agreements ("PSAs") are being submitted herewith on a CD.  Other exhibits cited are attached to the Declaration of Adam P. Barry filed herewith.

[2] Plaintiffs' Third Amended Complaint ("TAC") names BANA as a Defendant on 22 trusts, but Plaintiffs recently dropped their claims against BANA as to MSM 2007-7AX and WMALT 2007-OA2.  (*See* Stip. submitted Mar. 29, 2018.)

*First*, the claims against BANA are time-barred in their entirety as to 15 trusts, and in part as to five trusts. BANA resigned as trustee from some trusts in 2008, and from all of them no later than 2010 when it sold its trustee business to Defendant U.S. Bank National Association ("U.S. Bank"). BANA could not possibly have breached contractual duties to Plaintiffs after it resigned, and because that was years before Plaintiffs finally asserted these claims, nearly all the claims are untimely. *See infra*, Part A.

*Second*, Plaintiffs lack standing to assert claims against BANA because the assignments under which they purport to sue are invalid. Plaintiffs, artificial shell entities called collateralized debt obligations ("CDOs"), are structured such that they do not hold any legal claims or other assets; rather, they have indenture trustees that do so for the benefit of their securityholders. Accordingly, Judge Forrest dismissed Plaintiffs' claims on the ground that "such claims belong to the indenture trustees," not Plaintiffs. *Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015) [*hereinafter Phoenix I*]. Plaintiffs reacted by procuring assignments of claims from their indenture trustees under threat of litigation. Though Plaintiffs persuaded Judge Forrest that she could not adjudicate the validity of those assignments on the pleadings, she admonished that whether the assignments "violate the prohibition on champerty because they were made for the sole purpose of allowing [P]laintiffs to pursue claims," and whether they were made "in violation of the CDO Indentures," would be addressed eventually. *Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, 2016 WL 1169515, at *7 (S.D.N.Y. Mar. 22, 2016) [*hereinafter Phoenix II*]. That time is now: Plaintiffs' witnesses have since admitted critical facts establishing that the purported assignments are (i) champertous and therefore unenforceable, and (ii) invalid under the indentures, and thus a nullity by their own terms. *See infra*, Part B.

*Third*, Plaintiffs cannot support their allegations that BANA breached so-called pre-Event of Default ("EOD") duties.  Plaintiffs postulate, among other things, that BANA somehow discovered that the sellers of loans to the trusts had breached representations and warranties ("R&Ws") relating to some of the loans, and that BANA should have forced them to repurchase such loans.  Plaintiffs theorize that BANA "discovered" breaches by dint of letters or other notices it received alleging as much.  Plaintiffs' argument is meritless—learning that a party has *alleged* a breach is not the same as learning that a breach in fact occurred.  But even if this theory were colorable, it scarcely would assist Plaintiffs.  Plaintiffs can point to no more than a smattering of letters alleging R&W breaches that BANA received during the short time it was trustee—letters that collectively relate to just 101 loans out of more than *50,000* backing the trusts on which Plaintiffs are suing BANA.  When Plaintiffs made a similarly meager showing in their case before Judge Caproni, she granted summary judgment on every loan not specifically identified in such letters, holding that "Plaintiffs' lack of loan- or Trust-specific proof relative to [the trustee's] knowledge of any breach is fatal to their claims."  *Phoenix v. BNYM*, 2017 WL 3973951, at *8.  Plaintiffs' failure of proof is equally fatal here.  *See infra*, Parts C.1, C.2.

*Finally*, Plaintiffs cannot support their allegations that BANA breached post-EOD duties.  Plaintiffs contend that an EOD should be deemed to have occurred under the so-called "prevention doctrine."  But Plaintiffs have no evidence that BANA engaged in active conduct to prevent the occurrence of the conditions precedent to an EOD, as required by Second Circuit authority before a plaintiff can invoke the prevention doctrine.  *See In re Bankers Trust Co.*, 450 F.3d 121, 128 (2d Cir. 2006).  Moreover, under recent New York case law, the prevention doctrine does not apply in the EOD context.  *See Fixed Income Shares: Series M v. Citibank, N.A.*, 157 A.D.3d 541 (2018).  Because Plaintiffs cannot rely on the prevention doctrine under

*Bankers Trust* or after *Fixed Income*, both of which are binding authority, Plaintiffs cannot show that an EOD occurred.  *See infra*, Part C.3.a.

Nor do Plaintiffs have evidence that BANA received written notice that an EOD had occurred (as some PSAs require before post-EOD duties can arise), or had actual knowledge of an EOD (as others require).  In Plaintiffs' case before Judge Caproni, she granted summary judgment on every trust where they likewise adduced "no evidence that [the trustee] received written notice or had actual knowledge of any [EOD]."  *Phoenix v. BNYM*, 2017 WL 3973951, at *18.  Plaintiffs' post-EOD claims here fail for the same reason.  *See infra*, Part C.3.b.

A chart listing BANA's arguments and the specific dismissals required by each is attached hereto as Appendix A.  In short, settled case law in this District and the undisputed facts in this case can lead to but one conclusion: Summary judgment should be granted for BANA.

## BACKGROUND

German bank WestLB AG ("WestLB") is the beginning of the story of this lawsuit. WestLB rode the wave of the early 2000s housing boom by creating, structuring, and marketing CDOs, including all the Plaintiffs here besides Phoenix Light SF DAC ("Phoenix").  WestLB did so by depositing a portfolio of RMBS into a CDO structure and simultaneously selling interests in the CDO, divided into tranches based on varying degrees of risk and return, to investors.[3] When WestLB deposited the RMBS into the CDO, the CDO simultaneously transferred the RMBS to an indenture trustee (*e.g.*, Deutsche Bank and BNYM) to be held as collateral for the benefit of the CDO's investors.[4]  WestLB's goal was "at the end of the day every[] [tranche of the CDO] gets sold and the only thing that the bank retains is the fee."[5]

---

[3] *See* Ex. 14 (Tr. of Depo. of Peter Collins) ("Collins Depo.") at 23-24.

[4] *See* Ex. 13 (Tr. of Depo. of Michael Mikolajczak) ("Mikolajczak Depo.") at 44.

[5] *Id.* at 285.

WestLB understood that the at-issue RMBS it deposited in its CDOs were risky. Its personnel testified that management put "pressure [on them] to approve a purchase for a CDO," because if they "said no" too often, "that could impair all the fees that WestLB [stood] to receive from the transaction."[6] For example, one of WestLB's structurers protested that one of the RMBS at issue in this lawsuit (WaMu 2006-AR17 B2) was "a little toxic"[7]—yet that did not stop WestLB from depositing the security into Plaintiff Silver Elms CDO PLC ("Silver Elms I").[8] Another of WestLB's structurers wrote that she "strongly disagree[d]" with including another RMBS at issue (OWNIT 2006-3 M6), because "[i]t doesn't make sense to me to [p]ut assets that are having issues in the deal"[9]—yet WestLB promptly transferred that troubled security to Plaintiff Silver Elms CDO II Limited ("Silver Elms II").[10]

Unfortunately for WestLB, as the market softened and investors began shunning all things housing-related, WestLB was unable to find buyers for many of the CDO tranches it had created, and it got stuck with them.[11] Meanwhile, WestLB suffered catastrophic losses in other areas of its business, and, facing imminent collapse, began casting about for a lifeline.[12]

This is where Phoenix comes into the story. Phoenix is a CDO-like special-purpose vehicle created by WestLB's owners to "ring-fence" risky assets that WestLB still owned.[13] Phoenix (i) took €23 billion (notional value) of distressed assets off WestLB's books, including some of WestLB's direct RMBS holdings and all of WestLB's interests in the other Plaintiffs;

---

[6] *Id.* at 143, 149.

[7] Ex. 15 (Nov. 1, 2006 E-mail from Michael Mikolajczak) at PL_USB000460201.

[8] *See* Ex. 16 (TAC Ex. B) at 6 (alleging that Silver Elms I acquired this RMBS on its launch date).

[9] Ex. 17 (Jan. 24, 2007 E-mail from Nancy Becker) at PL_USB000495297.

[10] *See* Ex. 16 (TAC Ex. B) at 5 (alleging that Silver Elms II acquired this RMBS on its launch date).

[11] *See* Ex. 13 (Mikolajczak Depo.) at 285-86.

[12] *See* Ex. 18 (Tr. of Depo. of Edward Bankole) at 153-54.

[13] *See* Ex. 19 (Tr. of Depo. of Alan Geraghty) ("Geraghty Depo.") at 255.

and (ii) in exchange, issued €23 billion of notes (debt securities) to WestLB, €5 billion of which are backed by a German state guarantee.[14]  Phoenix then transferred the assets it got from WestLB to Phoenix's indenture trustee.[15]  And the Phoenix notes issued to WestLB were transferred to a German bailout agency called Erste Abwicklungsanstalt ("EAA"), whose sole mission is to wind down the assets formerly held by WestLB.[16]

As a result of these complex transactions, the following entities own the following interests that are of relevance to this lawsuit:

- EAA owns all the securities issued by Phoenix.

- Phoenix's indenture trustee owns CDO tranches of the other Plaintiffs, and also directly owns some of the RMBS at issue.

- The other Plaintiffs' indenture trustees (*e.g.*, Deutsche Bank and BNYM) own the remaining RMBS at issue.

- Plaintiffs themselves own nothing.

As the foregoing shows, EAA is the one that ultimately feels any gains or losses in the Phoenix portfolio (subject to the effects of the guarantee), including gains or losses on the positions Phoenix owns in the other Plaintiffs, and gains or losses on the RMBS at issue.[17]

"Part of . . . EAA's strategy" for maximizing gains is to "look for opportunities to make [legal] claims," using Plaintiffs as its proxies in filing lawsuits.[18]  As EAA's managing director overseeing this suit agreed, "if there are losses and there is an entity to be sued, . . . as long as it

---

[14] *See* Ex. 20 (Tr. of Depo. of Enno Balz) ("Balz Depo.") at 35-36.

[15] *See* Ex. 38 (Phoenix Amended and Restated U.S. Security Agreement) at § 2.1; Ex. 39 (Phoenix Trust Agreement) at § 3.2.

[16] *See* Ex. 20 (Balz Depo.) at 20.

[17] *See id.* at 182-83.

[18] Ex. 21 (Tr. of Depo. of Enno Balz in *Phoenix SF Ltd. v. Wells Fargo Bank, N.A.*, No. 14-cv-10102 (S.D.N.Y.)) at 206 (agreeing with this characterization from counsel).

makes economic sense, that is going to be done."[19]  Thus EAA has caused Plaintiffs to sue not

only Defendants here, but also much of the rest of the RMBS trustee industry, seeking to blame

the trustees—which typically did not originate the mortgage loans—for the very losses

WestLB's personnel had warned would result from the quality of those originations.[20]

However, Plaintiffs and EAA faced a threshold problem: Plaintiffs do not own the

litigation claims EAA wants them to pursue.  As noted, Plaintiffs transferred all of their assets,

including the RMBS certificates at issue in this action, to their indenture trustees (*e.g.*, Deutsche

Bank and BNYM), such that "the right to commence suit resides with the indenture trustees,"

and Plaintiffs are "contractually barred from filing claims."  *Phoenix I*, 2015 WL 2359358, at *3.

Plaintiffs tried to surmount this hurdle before filing suit by threatening to sue their own indenture

trustees if they did not fork over the claims:

> As Indenture Trustee subject to a duty to act in good faith, [you have] no prudent
> alternative other than to cooperate with Phoenix Light . . . . Phoenix Light hereby
> requests that . . . [you] execute and return the [enclosed] Assignment of Claims
> Agreement . . . . Phoenix Light hereby reserves . . . the right to seek damages in
> respect of any failure . . . to consider and respond to this request in good faith.[21]

When Plaintiffs failed to obtain the assignments, but nonetheless sued on Christmas Eve of 2014,

Judge Forrest dismissed for lack of standing.  *See Phoenix I*, 2015 WL 2359358, at *4.

Plaintiffs then apparently upped the pressure, managed to extract assignments, and, on

July 2, 2015, filed a Second Amended Complaint ("SAC") asserting claims on the new theory

---

[19] Ex. 20 (Balz Depo.) at 34.

[20] *See Phoenix Light SF Ltd. v. BNYM*, No. 14-cv-10104 (Caproni, J.); *Phoenix Light SF Ltd. v. Deutsche Bank Nat. Trust Co.*, No. 14-cv-10103 (Koeltl, J.); *Phoenix Light SF Ltd. v. Wells Fargo Bank*, *N.A.*, No. 14-cv-10102 (Failla, J.); *Phoenix Light SF Ltd. v. HSBC Bank USA, N.A.*, No. 14-cv-10101 (Schofield, J.).

[21] Ex. 22 (Dec. 12, 2014 Ltr. from David Wollmuth to BNYM ) at 3-5; *see also* Ex. 23 (Dec. 12, 2014 Ltr. from D. Wollmuth to Deutsche Bank) at 3-4; Ex. 24 (Dec. 12, 2014 Ltr. from D. Wollmuth to Wells Fargo) at 3-4; Ex. 25 (Dec. 12, 2014 Ltr. from David Wollmuth to Deutsche Bank) at 3-4.

that the indenture trustees had assigned the claims to Plaintiffs.[22]  BANA and U.S. Bank moved to dismiss again, arguing that the assignments violate New York's statutory prohibition on champerty, and are invalid under the indentures.  Judge Forrest held that the resolution of such issues required "[t]he development of the factual record," and deferred them for a later stage. *Phoenix II*, 2016 WL 1169515, at *7; *see also id.* at *8.  She also dismissed all of Plaintiffs' tort and statutory claims on the merits.  *See id.* at *9-11.

Plaintiffs' Third Amended Complaint, filed January 2, 2018, alleges breach of contract claims relating to 53 RMBS trusts for which U.S. Bank is trustee; of those, BANA formerly was trustee for 22 before resigning on various dates in 2008, 2009, and when it sold its trustee business to U.S. Bank in 2010.[23]  Plaintiffs currently are suing BANA on 20 of those trusts.  As shown below, Plaintiffs' claims against BANA fail on numerous grounds as a matter of law, and on account of Plaintiffs' failure to meet their burden of proffering "loan-by-loan and trust-by-trust" proof.  *Ret. Bd.*, 775 F.3d 154 at 162.

## ARGUMENT

### A.    Plaintiffs' Claims Against BANA Are Time-Barred

#### 1.    New York's Statute of Limitations Bars Plaintiffs' Claims in Their Entirety as to Nine Trusts, and in Part as to Five Trusts

New York's statute of limitations applies to Plaintiffs' claims regarding 14 trusts (the MSM, MLMI, and OWNIT trusts) for which the PSAs do not choose another state's limitations law.[24]  The New York statute of limitations for contract claims is six years from breach.  *See*

---

[22] *See* SAC (ECF No. 77) at ¶¶ 38-45.

[23] *See* TAC (ECF No. 209) at ¶ 19.

[24] *See* Sep. Stmt. of Undisputed Facts ("Sep. Stmt.") at ¶¶ 2-3.  Under New York choice-of-law principles, which apply in this diversity case, *see Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), New York law governs the statute of limitations unless the parties contracted to apply another state's limitations law.  *See Portfolio Recovery Assocs., LLC v. King*, 14 N.Y.3d 410, 415-16 (2010).

N.Y. CPLR 213(2); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993).[25]

Plaintiffs' only surviving claims are those that purportedly were assigned to them by their

indenture trustees.  *See Phoenix II*, 2016 WL 1169515, at *7-11.  Plaintiffs first asserted these

claims when they filed their SAC on July 2, 2015.  *See id.* at *1.  Plaintiffs' claims thus are time-

barred to the extent they allege breaches by BANA before July 2, 2009 (six years earlier).

These principles apply to the 14 trusts subject to New York's limitations law as follows:

- For nine trusts, BANA is entitled to summary judgment on the entirety of
  Plaintiffs' claims, because BANA resigned as trustee of those nine trusts prior to
  July 2, 2009, such that any alleged breach necessarily occurred prior to that date.[26]

- For five trusts, BANA is entitled to summary judgment with respect to alleged
  breaches prior to July 2, 2009, as discussed in Parts C.1.b and C.2.a below.[27]

Plaintiffs presumably will try to avoid this result by contending that New York law

makes the relevant filing date December 24, 2014, when they filed their original Complaint.[28]

Even under that theory, summary judgment would be required on all claims for three trusts from

which BANA resigned prior to December 24, 2008, and with respect to all alleged breaches

occurring prior to that date for the 11 remaining trusts.[29]  But Plaintiffs' argument is foreclosed

in its entirety for two more fundamental reasons.

---

[25] Under New York's borrowing statute, a shorter period applies when the plaintiff is not a New York resident and the limitations law of the jurisdiction where the claim accrued provides a shorter period.  *See Portfolio Recovery*, 14 N.Y.3d at 416-18.  For purposes of this motion only, BANA assumes, charitably for Plaintiffs, that the borrowing statute does not shorten the applicable period.

[26] *See* Sep. Stmt. ¶ 4.  These nine trusts are MSM 2007-2AX, MSM 2007-1XS, MSM 2006-12XS, MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006-WMC2, OWNIT 2006-3, and OWNIT 2006-4.  (*See id.*)

[27] *See id.* ¶ 5.  These five trusts are MSM 2007-5AX, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, and MSM 2006-9AR.  (*See id.*)

[28] *See* FRCP 15(c)(1)(A) (relation back applies when the law that provides the applicable statute of limitations allows relation back).

[29] *See* Sep. Stmt. ¶ 6.  The three trusts are MSM 2007-2AX, MSM 2007-1XS, and MSM 2006-12XS. (*See id.*)

*First*, the original Complaint was filed solely on Plaintiffs' own behalves, *not* as assignees of their indenture trustees, which is precisely why Judge Forrest dismissed it for lack of standing.  *See Phoenix I*, 2015 WL 2359358, at *4.  As a result, any subsequent suit filed by the indenture trustees on their claims would not have related back to Plaintiffs' original Complaint.  *See Reliance Ins. Co. v. PolyVision Corp.*, 9 N.Y.3d 52, 56-58 (2007) (claims by a different plaintiff do not relate back pursuant to CPLR 205(a); *Nomura Asset Acceptance Corp. Alt. Loan Trust v. Nomura Credit & Capital, Inc.*, 139 A.D.3d 519, 520 (2016) (no relation back for indenture trustee under these circumstances pursuant to CPLR 203(f)).  That the indenture trustees subsequently purported to assign their claims to Plaintiffs, instead of filing suit themselves, does not change this result because Plaintiffs are "not entitled to stand in a better position than that of [their] assignor[s]" under New York limitations law.  *Portfolio Recovery*, 14 N.Y.3d at 416; *see also Varga v. McGraw Hill Fin., Inc.*, 147 A.D.3d 480, 481 (2017) (where plaintiff's original complaint dismissed for lack of standing, no relation back pursuant to CPLR 203(f) for subsequent complaint as assignee of person with standing); *Craft EM CLO 2006-1, Ltd. v. Deutsche Bank AG*, 2017 WL 3527488, at *4 (N.Y. Sup. Ct. Aug. 14, 2017) (under the same circumstances as  presented here, no relation back pursuant to CPLR 205(a) because plaintiff was "standing in the Trustee's shoes").  The timeliness of the purportedly assigned claims thus properly is judged as of the date those claims first were asserted—July 2, 2015.

*Second*, and in any event, the claims already were time-barred when the indenture trustees started purportedly assigning them to Plaintiffs in April 2015;[30] by then, more than six years had passed since BANA resigned from the nine trusts identified in footnote 26 above.[31] Because the assigned claims already were time-barred, assignment to Plaintiffs could not revive

---

[30] *See* Sep. Stmt. ¶ 7.

[31] *See id.* ¶¶ 4, 7.

them; "[a]n assignee takes a cause of action subject to all the infirmities, equities and defenses that could have been asserted against the assignor at the time of the assignment." *Trans-Res., Inc. v. Nausch Hogan & Murray*, 298 A.D.2d 27, 30 (2002); *accord Craft*, 2017 WL 3527488, at *4 ("[B]ecause its claims were already time-barred and thus stale at the time of the assignment, the New York Savings Statute [CPLR § 205(a)] is not applicable.").[32]

2. **Delaware's Statute of Limitations Bars Plaintiffs' Claims in Their Entirety as to Six Trusts**

Six at-issue trusts select Delaware limitations law to apply, namely, the WMALT, WAMU, and WMABS trusts. These PSAs provide that they "shall be construed in accordance with the laws of the State of Delaware . . . and the obligations, rights and remedies of the parties . . . shall be determined in accordance with such laws."[33] Because these PSAs select Delaware law to govern the "*remedies* of the parties," and because statutes of limitation "are deemed as pertaining to the remedy," *Portfolio Recovery*, 14 N.Y.3d at 416, Delaware's statute applies. *Cf. 2138747 Ontario, Inc. v. Samsung C&T Corp.*, 144 A.D.3d 122, 126-27 (2016) (holding that a choice-of-law provision that selects the law governing "enforcement" of an agreement selects the law governing the statute of limitations), *leave to appeal granted*, 29 N.Y.3d 913 (2017).

Delaware provides a three-year statute of limitations for breach of contract claims, running from the date of breach. *See* 10 Del. Code § 8106(a); *Pulieri v. Boardwalk Props., LLC*,

---

[32] For a similar reason, Plaintiffs cannot otherwise obtain relation back pursuant to FRCP 15(c). Had the indenture trustees joined the suit, relation back would not apply because there is no evidence that BANA should have understood that their failure to appear as plaintiffs in the original complaint was due to a mistake as to their identities. *See, e.g.*, *Merryman v. J.P. Morgan Chase Bank, N.A.*, 319 F.R.D. 468, 473 (S.D.N.Y. 2017) (Caproni, J.); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 23 F. Supp. 3d 203, 208-09 (S.D.N.Y. 2014) (Swain, J.). Rather, all evidence indicated it was a strategic choice. *See Phoenix I*, 2015 WL 2359358, at *3-4. This again means that the six-year limitations period ran prior to the assignments. Federal tolling doctrines do not revive such claims after assignment. *See, e.g.*, *Guaranty Trust Co. v. United States*, 304 U.S. 126, 141-42 (1938); *cf. Taylor v. Bailey Tool & Mfg. Co.*, 744 F.3d 944, 946-47 (5th Cir. 2014) (FRCP 15(c) does not revive claims barred by state law prior to removal).

[33] Sep. Stmt. ¶ 8.

2015 WL 691449, at *11 (Del. Ch. Feb. 18, 2015).  Accordingly, Plaintiffs' claims as to these six

trusts are barred to the extent Plaintiffs allege breaches occurring before July 2, 2012 (three years

before they first asserted the purportedly assigned claims).  Because BANA resigned as trustee

long before that date,[34] all claims on these six trusts are untimely.

**B.**   **Plaintiffs Lack Standing To Assert Claims Against BANA**

    **1.**   **The Assignments Are Champertous and Therefore Unenforceable**

New York's prohibition on champerty is codified in New York Judiciary Law § 489,

which provides in relevant part that "no corporation or association, directly or indirectly, . . .

shall solicit, buy or take an assignment . . . of . . . any claim or demand, with the intent and for

the purpose of bringing an action or proceeding thereon."  N.Y. Jud. Law § 489(1).[35]  It contains

a "safe harbor" carve-out for bona fide economic transactions "having an aggregate purchase

price of at least five hundred thousand dollars," *id.* § 489(2), which is not relevant here because

Plaintiffs neither promised to pay nor in fact paid their indenture trustees anything for the

assignments.[36]  The leading case is the New York Court of Appeals' 2016 decision in *Justinian*

*Capital SPC v. WestLB AG*, 28 N.Y.3d 160 (2016), which involved some of the very Plaintiffs

here.  The undisputed facts here demonstrate that under *Justinian*, the assignments at issue in this

case are champertous and therefore unenforceable.

In *Justinian*, a German bank called Deutsche Pfandbriefbank AG ("DPAG") invested in

CDO tranches of two of the Plaintiffs here, Blue Heron Funding VI Ltd. and Blue Heron

Funding VII Ltd.  DPAG determined to sue WestLB for dumping inappropriate assets into the

---

[34] *See* Sep. Stmt. ¶¶ 9-10.

[35] The assignments from Plaintiffs' indenture trustees to Plaintiffs provide that they are governed by New York law without regard to its choice-of-law rules.  (*See* Ex. 26 (June 19, 2015 BNYM Ltr.) at 6; Ex. 27 (Apr. 16, 2015 Deutsche Bank Ltr.) at 5; Ex. 28 (June 17, 2015 Deutsche Bank Ltr.) at 4; Ex. 29 (June 26, 2015 Wells Fargo Ltr.) at 6.)

[36] *See* Sep. Stmt. ¶ 14.

Blue Heron portfolios.  *See id.* at 164.  But because DPAG was receiving "substantial support

from the German government" and WestLB was partly owned by the German government,

DPAG wanted to stay behind the scenes.  *See id.*  Accordingly, it assigned its interests in the

Blue Heron CDOs to another entity, Justinian Capital SPC ("Justinian"), in exchange for a

contingent promise from Justinian to pay DPAG a "base purchase price of $1,000,000."  *Id.* at

165.  DPAG then deployed Justinian as its litigation proxy.  The Court of Appeals held that

because "the lawsuit was not merely an incidental or a secondary purpose of the assignment, but

its very essence," the assignment was champertous and therefore unenforceable.  *Id.* at 168.  In

this District, Judge Failla recently followed *Justinian* to hold that "the champerty law applies

with equal force to entities that would not obtain . . . fees by bringing suit," and that an attempted

assignment was champertous and unenforceable because its sole "purpose [was] to allow

Plaintiff to prosecute this case to obtain a money judgment."  *Aretakis v. Caesars Entertainment*,

2018 WL 1069450, at *9 n.8, *10 (S.D.N.Y. Feb. 23, 2018).

 Here, the evidence also is undisputed that the "the lawsuit was not merely an incidental or

secondary purpose of the assignment, but its very essence."  *Justinian*, 28 N.Y.3d. at 168.

Plaintiffs' Rule 30(b)(6) designee admitted that Plaintiffs "sought [the] CDO trustee assignments

for the purpose of bringing this litigation" and for no "other purpose."[37]  Plaintiffs' directors also

testified that "the purpose of [the CDO Trustee] reassignment agreements was to allow

[Plaintiffs] to bring legal claims relating to RMBS," and that they did not believe there was "any

other purpose for which the Plaintiff CDOs entered into the CDO trustee agreements."[38]

---

[37] Ex. 30 (Tr. of Depo. of Pls.) at 324 (agreeing with this characterization from counsel).

[38] Ex. 19 (Geraghty Depo.) at 243, 250.

Plaintiffs further agreed that it was their "view that . . . absent those alleged reassignments, these claims would not be brought against the RMBS trustees."[39]

Just as the parties that held the claims in *Justinian* and *Aretakis* tried to assign the claims (in transactions that were not covered by the "bona fide economic transaction" safe harbor) so as to allow other parties to pursue the claims, so too here. The indenture trustees did not bring these claims, and instead attempted to assign them to Plaintiffs so that Plaintiffs could do so.[40]

Plaintiffs undoubtedly will try to invoke an exception to § 489 that the Court of Appeals previously recognized where an assignment is made to an entity that "holds a preexisting proprietary interest" in the claims. *Love Funding*, 13 N.Y.3d at 195. But Plaintiffs did not hold any interest in these claims when they received the assignments; as Judge Forrest found, each Plaintiff executed a "full assignment" of all "rights, title and interest" to their indenture trustees, which "divest[ed] plaintiffs of *any* rights they otherwise may have had" in those claims. *Phoenix Light I*, 2015 WL 2359358, at *2.

The assignments on which Plaintiffs rely to assert their claims are quintessentially champertous and therefore unenforceable. Summary judgment should be granted.

## 2.   The Assignments Violate the Indentures and Therefore Are Self-Defeating

The assignments also are ineffective for another, independent reason: They contravene the CDO indentures, and each assignment provides that it is self-voiding in that circumstance.

"It is well settled that an indenture trustee's authority is defined by the terms of the trust indenture." *Cortlandt Street Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 996 N.Y.S.2d 476,

---

[39] Ex. 30 (Tr. of Depo. of Pls.) at 325-26.

[40] Further, although this is not a required showing after *Justinian*, these assignments were crafted to allow Plaintiffs to keep for themselves costs and expenses from prosecuting the litigation before remitting any recoveries back to the indenture trustees (*see* Sep. Stmt. ¶ 15)—which prior Court of Appeals cases have recognized is evidence of a champertous assignment. *See Trust for Certificate Holders of MLMI 1999-C1 v. Love Funding Corp.*, 13 N.Y.3d 190, 200 (2009).

494 (N.Y. Sup. Ct. 2014).  For example, "a trustee's power to release or substitute collateral can arise *only from the terms of the indenture itself*.  Apart from the authority contained [t]herein, a trustee concededly has no right to release or substitute any collateral."  *Hazzard v. Chase Nat. Bank*, 287 N.Y.S. 541, 566 (N.Y. Sup. Ct. 1936); *accord Hendry v. Title Guar. & Trust Co.*, 280 N.Y. 740 (1939) (in the absence of a grant of authority from the indenture, an indenture trustee may not release any part of the security in its possession).

Plaintiffs' indentures all broadly define "Collateral" to include the claims purportedly assigned to Plaintiffs.[41]  This is undisputed: EAA's managing director who negotiated the assignments with the indenture trustees agreed during deposition that "any claims . . . formed part of the Collateral."[42]  The indentures also provide that the "[indenture] Trustee shall not, *except in accordance with the provisions of this Indenture*, release any portion of the Collateral from the lien of this Indenture."[43]  Nothing in the indentures permits the indenture trustees to release any part of the Collateral *back* to Plaintiffs—the very entities through which WestLB originally transferred the Collateral *to* the trustees for the protection of Plaintiffs' investors.[44]

Further, the indentures require the indenture trustees to retain "the Collateral intact as a whole" should an "Event of Default" "have occurred and be continuing" within Plaintiffs' structures.[45]  These provisions operate as an additional bar to the assignments to Plaintiffs C-

---

[41] *See* Sep. Statement. ¶ 17.

[42] Ex. 20 (Balz Depo.) at 236-37; *see also* Ex. 14 (Collins Depo.) at 250 (Enno Balz negotiated purported assignments).

[43] Sep. Stmt. ¶¶ 19-21.

[44] This is not surprising: A primary reason WestLB transferred the Collateral, through Plaintiffs, to the indenture trustees in the first place was to create investors' security interest in the Collateral and insulate the Collateral from other potential creditors of Plaintiffs.  (*See, e.g.*, Ex. 32 (Blue Heron VI Indenture) at 3 ("Such Grants are made in trust, to secure the Notes"); *id.* at 23 ("Grant" defined as, *inter alia*, to "create and grant a security interest in and right of set-off against").  Re-conveying the Collateral *back to Plaintiffs* would defeat that purpose, and potentially injure Plaintiffs' investors.

[45] Sep. Stmt. ¶ 24.

BASS CBO XVII Ltd. ("C-BASS XVII"), Kleros Preferred Funding V PLC, Silver Elms I, and Silver Elms II, because Events of Defaults were occurring within these Plaintiffs at the time of the assignments.[46]

Plaintiffs likely will argue that as a non-party to the indentures, BANA cannot ask the Court to give effect to their terms.  But Plaintiffs bear the burden of establishing their standing to sue, and their standing here rests entirely on the assignments—which are invalid by their own terms.  Before Plaintiffs filed this lawsuit, Plaintiffs proposed Assignment of Claims Agreements to their indenture trustees.[47]  Their indenture trustees did not sign them.  Then, after Plaintiffs were held to lack standing, Plaintiffs (somehow) were able to persuade the trustees to execute assignments.  Unlike Plaintiffs' original proposed agreements, these assignments contained the following new and different provision to ensure that the trustees were not doing anything they were not contractually authorized to do: "Nothing in this Letter shall be construed to require the Indenture Trustee to take any action in conflict with applicable law, the Indentures . . . , or any related transaction document."[48]  Because Plaintiffs' assignment agreements include this new term, the agreements accomplish only what is *allowed* by—that is, not "in conflict with"—the indentures.  And because these assignments are, in fact, "in conflict with" the indentures, they are self-voiding and have no effect—with the result that Plaintiffs still cannot establish standing to pursue these claims.  Summary judgment should be granted on this basis.

---

[46] *See id.* ¶¶ 23, 25.

[47] *See* Ex. 22 (Dec. 12, 2014 Ltr. to BNYM ) at Ex. C; Ex. 23 (Dec. 12, 2014 Ltr. to Deutsche Bank) at Ex. C; Ex. 24 (Dec. 12, 2014 Ltr. to Wells Fargo) at Ex. C; Ex. 25 (Dec. 12, 2014 Ltr. to Deutsche Bank) at Ex. C.

[48] Sep. Stmt. ¶ 22.  Because Phoenix is governed by a trust agreement instead of an indenture, the Phoenix assignment letter contains slightly different, but analogous, language: "Nothing in this Letter shall be construed to require the Trustee to take any action in conflict with applicable law, the Governing Agreements or any related transaction document or which would expose the Trustee to liability, financial or otherwise, or which could be construed to be unduly prejudicial to the Holders who are not signatories to this Letter."  (*Id.*)

C.     **Plaintiffs' Claims Fail On The Merits**

Plaintiffs cannot create a triable issue of fact on the merits of their claims in any event. Plaintiffs' allegations about what the PSAs required of BANA, and what the PSAs actually say, are like ships passing in the night.  Under Plaintiffs' view of things—seemingly based on little more than the word "trustee"—an RMBS trustee plays an expansive watchdog role, "polic[ing] the deal for investors," sniffing around for "the scent of a problem with the loans," and, upon catching "wind of [a] problem, . . . nos[ing] to the source [of it]."[49]  Plaintiffs are wrong.  Indeed, their counsel litigated the only RMBS trustee case that has gone to trial to date, and the court found "no merit in any of the claims of the plaintiffs," in part because "the beliefs of the plaintiffs about the PSAs are not supported by the actual language of the PSAs."  *Western & Southern Life Ins. Co. v. BNYM*, 2017 WL 3392856, at *1-2 (Ohio Ct. Common Pleas Aug. 4, 2017), *appeal filed*.  The same is true here.

An RMBS trustee is nothing like an ordinary trustee.  Rather, it is "a stakeholder whose duties . . . are exclusively defined by the terms of the indenture agreement"—duties that "are limited, administrative, and ministerial (rather than substantive) in nature."  *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 472-73 (S.D.N.Y. 2010) (Rakoff, J.); *accord Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (observing that an indenture trustee's duties are "strictly defined and limited to the terms of the indenture").  An RMBS trustee thus does not have "historic common-law duties imposed beyond those in the trust agreement."  *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985).

The PSAs here reflect these principles by providing that, prior to a contractually defined EOD (discussed below), (i) "[t]he Trustee . . . undertakes to perform such duties and *only* such

---

[49] TAC (ECF No. 209) at ¶¶ 63, 88.

duties as are *specifically* set forth in this Agreement"; (ii) "*no implied covenants* or obligations shall be read into this Agreement against the Trustee"; and (iii) of particular importance to this case, "the Trustee . . . *shall [not] be bound to make any investigation* into the facts or matters stated in any . . . paper or document" unless directed and indemnified by a specified percentage of investors.[50]   The PSAs provide that the trustee's duties shift only if an EOD occurs, at which point it "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."[51]   The PSAs also provide that, whether pre- or post-EOD, the trustee shall not be "liable for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within [its] discretion."[52]   The consequence, as shown below, is that Plaintiffs cannot create a triable issue of fact as to any alleged breach of any pre- *or* post-EOD duties.

       1.       **Plaintiffs' Pre-EOD Claims Relating to Custodial Duties Fail**

Plaintiffs allege that BANA breached "custodial" duties that existed near the inception of the trusts.  Plaintiffs' allegations, which ignore what those duties actually were, fail on many grounds—including that BANA did not owe any such duties to Plaintiffs in 16 of the trusts, that the claims are time-barred, and that, in any event, the claims are unsupported by any evidence.

---

[50] Ex. 40 (WaMu 2006-AR17 PSA) at §§ 8.01(a), (c), 8.02(iv); *see also* Ex. 1 (chart quoting PSA provisions concerning no implied duties); Ex. 11 (chart quoting PSA provisions concerning no duty to investigate).

[51] Ex. 40 (WaMu 2006-AR17 PSA) at § 8.01(a); *see also* Ex. 2 (chart quoting PSA provisions concerning post-EOD duties).

[52] Ex. 40 (WaMu 2006-AR17 PSA) at § 8.02(iii); *see also* Ex. 3 (chart quoting PSA provisions concerning good faith actions or omissions).

### (a)   The trustee's custodial duties were limited in scope and time

The PSAs for all trusts set a time period—the "Post-Closing Review Period"—during which the trustee, or a separate entity appointed to act as "custodian" or "initial custodian," was to perform certain "custodial" duties.[53]   Specifically, the PSAs required it to review and assess the completeness of the "Loan Files"—a defined term referring to the file of collateral documents for each loan, such as the mortgage, the note, and any related assignments.[54]   The PSAs provided that at the end of the Post-Closing Review Period—between 45 to 240 days after the closing date of the trust—the trustee, custodian, or initial custodian would send to other deal parties certain reports, including a "final certification" of the contents of the files and an "exception report" listing any missing or facially defective documents.[55]   The PSAs required these reports to be sent to other deal parties because those parties, unlike the trustee, had the expertise to determine which, if any, of the exceptions were material, and the ability to cure exceptions by providing new copies of missing or defective collateral documents.

The PSAs did not require the trustee to monitor whether or when exceptions were cured (whether the trustee was the one performing custodial duties or not).   Most of the PSAs also did not require the trustee to take any affirmative steps to cure exceptions following the Post-Closing Review Period, and those that did imposed this requirement only if the trustee first received written notice of material document exceptions.   The following provides more specifics:

The WaMu, WMABS, and WMALT Trusts: In these trusts, BANA's custodial duties (as to Loan Files for which it performed the custodial function) were limited to reviewing the files

---

[53] For three trusts (MLMI 2006-AR1, MLMI 2006-WMC2, and WaMu 2006-AR17), BANA did not perform custodial duties, so those duties belonged to a different party.   (*See* Sep. Stmt. ¶¶ 26-28.)

[54] The Loan File is *not* the origination file containing documents such as loan applications, credit reports, etc. that were used in originating the loans.   The trustee did not typically possess those files.

[55] *See* Ex. 4 (chart summarizing post-closing review process).

19

within 45 days after the closing of the trust, preparing certifications attaching exception reports, and (i) for most trusts, "promptly . . . notify[ing] the Servicer" of the exceptions; or (ii) for WMALT 2005-6 and WMALT 2005-9, notifying the depositor.[56]  For the trusts where notice was due the servicer, the PSAs specified that "[a]n exception report delivered by the Custodian to the Servicer . . . shall be deemed to constitute such notice,"[57] and that the *servicer* then was obligated to take "appropriate steps" toward getting the exceptions cured, or, if cures were not possible, getting the loans repurchased.[58]  For the two trusts where notice was due the depositor, the PSAs similarly specified that once the depositor received such notice in the form of an exception report, all further responsibility to seek cures or repurchases rested with the depositor.[59]  For all trusts, the PSAs did not impose any further obligation on the trustee with regard to document exceptions or the curing thereof.

The MLMI Trusts: In the MLMI trusts, the trustee or custodian similarly prepared certifications and exception reports.[60]  The PSAs provided that *during* that process—but *not* after the final exception report has been completed—the trustee must notify other deal parties within five business days if it discovers a missing or materially defective collateral document, and "*request* that the Sponsor [of the trust] correct or cure such [defect] . . . within ninety (90) days from the date the Sponsor was notified of such omission or defect and, if the Sponsor does not correct or cure . . . within such period, that the Sponsor [re]purchase such Mortgage Loan . . .

---

[56] *E.g.*, Ex. 40 (WaMu 2006-AR17 PSA) at § 2.07; *see also* Ex. 4 (chart summarizing post-closing review process).

[57] *E.g.*, Ex. 40 (WaMu 2006-AR17 PSA) at § 2.07; *see also* Ex. 4 (chart summarizing post-closing review process).  Plaintiffs have no evidence that such exception reports were not provided, which is a separate basis for summary judgment on their claims for breaches of pre-EOD custodial duties as to the WaMu, WMABS, and WMALT trusts.

[58] *E.g.* Ex. 40 (WaMu 2006-AR17 PSA) at § 2.07; *see also* Ex. 4 (chart summarizing post-closing review process).

[59] *See* Ex. 4 (chart summarizing post-closing review process).

[60] *See id.*

within ninety (90) days from the date the Trustee notified the Sponsor."[61]   The PSAs are clear

that it is the *depositor*, not the trustee, that was obligated to "cause the Sponsor to repurchase any

Mortgage Loan to which a material exception was taken[.]"[62]   The PSAs imposed no further

obligations on the trustee with regard to document exceptions.

The MSM Trusts: The MSM PSAs set forth a similar protocol, and also provided that,

even after the Post-Closing Review Period, "upon [the Trustee's] receipt of written notice" of

"any materially defective document in, or . . . that a document is missing from, a Trustee

Mortgage File," the Trustee must "promptly notify [certain other deal parties] in writing of such

[defect] . . . and request that the [responsible party] deliver such missing document or cure or

cause the cure of such defect or breach . . . , and if the [responsible party does not do so] . . .

enforce the obligations" of the responsible party.[63]   The MSM PSAs thus are the only PSAs at

issue that set forth *any* trustee obligations following the Post-Closing Review Period with regard

to document exceptions—but such obligations could be triggered only upon written notice to the

trustee from another deal party.

      **(b)**      **Plaintiffs have no evidence of a breach of custodial duties**

Against this backdrop, Plaintiffs' claims for breaches of custodial duties fail on at least

three independently dispositive grounds:

No Claim on 16 Trusts: For 16 of the 20 trusts at issue as to BANA, Plaintiffs (or more

accurately, their indenture trustees) did not acquire the certificates until *after* the Post-Closing

---

[61] *E.g.*, Ex. 41 (MLMI 2006-HE6 PSA) at § 2.02; *see also* Ex. 4 (chart summarizing post-closing review process).

[62] *Id.*

[63] *E.g.*, Ex. 42 (MSM 2006-6AR PSA) at § 2.05; *see also* Ex. 5 (chart quoting custodial review process for the MSM trusts).

Review Period.[64]  For these trusts, BANA could not have breached any custodial duties to Plaintiffs.  *See, e.g.*, *Veleron Holding, B.V. v. BNP Paribas SA*, 2014 WL 12699263, at *18 (S.D.N.Y. Apr. 16, 2014) (McMahon, J.) ("It goes without saying that a defendant cannot breach a contract to which he is not a party."); *Wallace v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) (similar).  Nor may Plaintiffs assert the claims of prior holders, assigned upon transfer of the securities or otherwise.  Plaintiffs expressly abandoned any such claims, representing to Judge Forrest that "Plaintiffs no longer assert claims that might have accrued during the period that WestLB (or any other third party) held the Certificates and assert only claims that accrued during Plaintiffs' holding period."[65]  *See also In re NXXI Inc.*, 216 F. Supp. 3d 381, 399 (S.D.N.Y. 2016) (Karas, J.) (holding that express abandonment discontinues claims).

The Claims Are Time-Barred: In each of the trusts other than the MSM trusts, custodial duties existed *only* during the Post-Closing Review Period.  And for *all* trusts, that period ended well over seven years before Plaintiffs first attempted to file this litigation.[66]  Accordingly, with the exception of claims alleging breaches of custodial duties in the MSM trusts *following* the Post-Closing Review Period (discussed immediately below), all claims alleging breaches of custodial duties are necessarily time-barred under Delaware's three-year statute of limitations applicable to the WaMu, WMABS, and WMALT trusts, or New York's six-year statute applicable to the other trusts.  *See supra*, Part A.  Notably, in Plaintiffs' case against another trustee, Judge Koeltl dismissed nearly identical claims as untimely.  *See Phoenix Light SF Ltd. v. Deutsche Bank Nat. Trust Co.*, 172 F. Supp. 3d 700, 709 (S.D.N.Y. 2016).

---

[64] *See* Sep. Stmt. ¶¶ 29-35.  The 16 trusts are all trusts other than MLMI 2006-AR1, MLMI 2006-HE6, MSM 2006-12XS, and MSM 2007-1XS.  (*See id.* ¶ 35.)

[65] Pls.' Mem. of L. in Opp'n to Defs.' Mot. to Dismiss SAC (ECF No. 87) at 5; *see also id.* at 1, 7-8.

[66] *See* Sep. Stmt. ¶¶ 36-37.

No Triable Issue re Post-Closing Review Period Breaches in the MSM Trusts: As noted, the limited Post-Closing Review Period custodial duties in the MSM PSAs could arise *only* if the trustee received written notice.  Because Plaintiffs have no evidence that BANA received such written notice, their claims relating to custodial duties in the MSM trusts also fail.[67]

## 2.   **Plaintiffs' Pre-EOD Claims Relating to R&Ws Fail**

Plaintiffs also allege that BANA discovered that loans materially breached R&Ws made by the sellers of the loans, and that following such purported discovery, BANA should have notified other deal parties and/or compelled the sellers to cure such breaches or to repurchase the affected loans.  But Plaintiffs have no evidence that BANA discovered any such breaches.

Multiple judges in this District have admonished Plaintiffs here that once they are past the pleading stage, including "[a]t summary judgment, Plaintiffs must prove that they have evidence to support their claims 'loan-by-loan and trust-by-trust.'"  *Phoenix v. BNYM*, 2017 WL 3973951, at *9 (Caproni, J.) (quoting *Ret. Bd.*, 775 F.3d at 162).[68]  The reason Plaintiffs must prove discovery of R&W breaches on a loan-by-loan basis is simple: The trustee must "have information on a loan-by-loan basis to trigger its duties," because its duties are loan-specific—so unless Plaintiffs can prove that the trustee discovered loan-specific breaches, Plaintiffs cannot prove the trustee breached a relevant duty.  *Phoenix (Royal Park) v. HSBC*, Case No. 1:14-cv-10101-LGS-SN, ECF No. 302 at *5; *accord Phoenix v. BNYM*, 2017 WL 3973951, at *3

---

[67] *See* Sep. Stmt. ¶ 38.  Some trusts also included loan-level R&Ws relating to delivery of complete Loan Files, and therefore implicated trustee duties arising upon discovery of material R&W breaches.  This is addressed in Part C.2.a below.

[68] *Accord Phoenix Light SF Ltd. (Royal Park) v. HSBC Bank USA, N.A.*, Case No. 1:14-cv-10101-LGS-SN, ECF No. 302 at *7 (S.D.N.Y. Feb. 23, 2018) (Schofield, J.) (holding that "information establishing general [R&W] breach rates . . . cannot prove liability"); *Phoenix Light SF Ltd. (BlackRock) v. Wells Fargo Bank, N.A.*, 2017 WL 3610511, at *7 (S.D.N.Y. Aug. 21, 2017) (Failla, J.) ("[I]t remains the law in RMBS cases of this kind that [to] prevail ultimately on the breach of contract claim, a plaintiff does have to demonstrate breach on a loan-by-loan and trust-by-trust basis."); *Phoenix v. Deutsche*, 172 F. Supp. 3d at 713 (Koeltl, J.) (same).

(holding that the trustee's "obligation to provide prompt notice to the other parties [of a R&W breach] arises only if the trustee discovers a breach of a representation or warranty with respect to *a loan* and *that breach* materially and adversely affects the certificateholder interests in *that loan*.").[69]  This universal feature of RMBS "repurchase protocols" makes perfect sense: Absent specific information regarding specific loans, a trustee is in no position to fulfill its own notice obligations, *i.e.*, the trustee cannot provide actionable information to other deal parties regarding what specifically must be done as to which loans (*e.g.*, if a loan has a specific breach that is curable, or, if the loan instead must be repurchased, what the proper repurchase price is).

There also is another important reason why "[g]eneralized information indicating the trusts with loan defaults or R&W breaches cannot substitute for proof [of] actual knowledge of *loan-specific* R&W breaches."  *Phoenix Light SF Ltd. (BlackRock) v. Wells Fargo Bank, N.A.*, 2017 WL 953550, at *8 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.).  New York's First Appellate Department has held as a matter of controlling New York law that "the trustee of an RMBS . . . trust does not have a duty to 'nose to the source.'"  *Commerce Bank v. BNYM*, 141 A.D.3d 413, 415-16 (2016).  That is, absent direction and indemnity from investors, the trustee does not have a duty to launch an expensive investigation, the costs of which ultimately would be borne by investors, so as to root out R&W breaches.  This is true even if generalized information, such as news articles about third-party mortgage origination practices, or data about the trusts' overall performance, provides reason to suspect such breaches.  *See Western & Southern Life Ins. Co. v. BNYM*, 2017 WL 3392855, at *11 (Ohio Ct. Common Pleas Aug. 4, 2017) (holding that "poor loan performance . . . and other publicly available information do not provide a basis for discovery of a *loan-specific* breach"), *appeal filed*.  Though plaintiffs in various RMBS trustee

---

[69] *See also* Sep. Stmt. ¶¶ 39-42.

cases have proceeded past the pleading stage on the theory that the trustee has a duty to investigate and is charged with knowledge of any breaches it would have discovered had it done so, the theory has not withstood subsequent judicial scrutiny; consistent with the First Department's holding in *Commerce Bank*, the PSAs are clear that the trustee "cannot be required to investigate," and accordingly, the trustee "cannot be held liable for breach on the basis of constructive knowledge." *Phoenix (BlackRock) v. Wells Fargo*, 2017 WL 3610511, at *9.

Once Plaintiffs' pre-EOD claims properly are shorn of their "nose to the source" underpinnings, the claims take on quite a different pallor. Plaintiffs' only evidence that concerns even *potential* loan-specific R&W breaches consists of collateral file exception reports discussed above, and a very limited number of investor letters sent to BANA alleging that a small number of loans breached R&Ws. Neither category raises a triable issue, for the reasons stated below.

### (a) Collateral exception reports are not evidence of discovery of material R&W breaches, and could support only a time-barred claim in any event

Courts in this District and beyond have recognized that collateral exception reports do not constitute discovery of material R&W breaches.[70] This Court need not reinvent that wheel, however, because any claim based on receipt of such reports would be time-barred here anyway. Every PSA obligated BANA to "promptly notify" other deal parties of any discovery of a material loan-level R&W breach,[71] and even under an absurdly broad view of what would be "prompt," any claim for failure to notify due to receipt of exception reports during the Post-

---

[70] Judge Castel, following trial of a repurchase case, found that not even one "missing document-related breach caused a material and adverse effect to the interests of the Certificateholders." *U.S. Bank. Nat. Ass'n v. UBS Real Estate Sec., Inc.*, 2017 WL 2437290, at *3 (S.D.N.Y. Apr. 21, 2017). And in *Western & Southern*, 2017 WL 3392855, at *16, a case brought by Plaintiffs' counsel here, the court likewise found a total failure of proof as to the plaintiffs' theory that any collateral document exceptions were material to the loans' performance.

[71] Sep. Stmt. ¶¶ 39-42.

Closing Review Period is time-barred.  *See BNYM Tr. Co. v. Morgan Stanley Mortg. Capital, Inc.*, 2013 WL 3146824, at *23 (S.D.N.Y. June 19, 2013) ("Eighteen months after discovery of all relevant facts is neither prompt nor diligent.").  Those periods were in 2006 and 2007, many years before Plaintiffs filed this lawsuit or first asserted the claims now at issue, and well outside both New York's and Delaware's limitations periods.[72]

### (b)    Notices alleging possible R&W breaches do not constitute trustee discovery of actual breaches

The few notices BANA received concerning individual loans likewise do not create a triable issue concerning whether BANA discovered a R&W breach within the meaning of the PSAs.  *Western & Southern*—the only case concerning similar claims against an RMBS trustee to have reached a trial—is instructive.  The court there considered the same sort of notices, and found a complete failure of proof as to the trustee's "discovery" of loan-level R&W breaches.  *See Western & Southern*, 2017 WL 3392855, at *11.  The court observed, moreover, that the plaintiffs' own expert (hired and examined by the very same lawyers representing Plaintiffs here) conceded that "*allegations* of breaches of representations by investors or insurers . . . [were not] relevant to whether there *was* a breach on any specific loan."  *Id.*  In other words, the court recognized that when a trustee receives a letter making allegations of breaches, the trustee has discovered only a letter making allegations; absent the sort of investigation that the trustee expressly is not required to undertake, the trustee has not discovered that breaches *in fact occurred*—any more than a court reading a complaint thereby discovers its allegations to be true.  Thus, such notices are insufficient to create a triable issue of fact.

Plaintiffs presumably will point out that some courts have raised, without resolving, the question of whether "discovery" in PSAs means something less than "the acquisition of actual

---

[72] *See* Sep. Stmt. ¶¶ 36-37.

knowledge."[73]  This question is largely irrelevant here, because *all* courts to have considered the issue (including the Second Circuit in *Retirement Board*, 775 F.3d at 162) agree that whatever the standard for "discovery," proof must be *loan-by-loan*.  *See supra*, Part C.2.  In any event, there is "a well-established line of cases, including many from this District, which . . . [hold] that [although] an RMBS investor meets its *pleading* burden by showing that the trustee was generally aware of systemic R&W breaches . . . , [it] must ultimately *prove*, on a loan-by-loan basis, that the trustee had *actual knowledge* of the specific nonconforming loans as to which it allegedly failed in its contractual duty."  *Royal Park Invs. SA/NV v. Deutsche Bank Nat. Trust Co.*, 2018 WL 1088020, at *3 (S.D.N.Y. Feb. 9, 2018) (Moses, M.J.) (first two emphases in original); *accord Phoenix Light SF Ltd. (BlackRock) v. HSBC Bank USA, N.A*, 2017 WL 945099, at *6 (S.D.N.Y. Mar. 10, 2017); *Phoenix Light SF Ltd. (Royal Park) v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 602-03 (S.D.N.Y. 2015).

Moreover, the PSAs for the WaMu and WMABS trusts, and WMALT 2006-AR8 and WMALT 2006-AR9, foreclose any conceivable debate about the matter by *defining* discovery of a R&W breach to mean "in the case of the trustee, having actual knowledge thereof."[74]  And even as to PSAs that do not specify a standard, "discovery" necessarily connotes the acquisition of actual knowledge, at least for the trustee, because any other interpretation would entail a duty to investigate—which would be "inconsistent with the bargained-for terms of the PSAs" that foreclose any duty to investigate, and "with cases that have emphasized the limited role of an indenture RMBS trustee."  *Phoenix (BlackRock) v. HSBC*, 2017 WL 945099, at *14-15.

---

[73] *See Phoenix v. BNYM*, 2017 WL 3973951, at *7; *Phoenix (BlackRock) v. Wells Fargo*, 2017 WL 3610511, at *10; *Fixed Income*, 157 A.D.3d at 542.

[74] *E.g.*, Ex. 40 (WaMu 2006-AR17 PSA) § 2.09(c); *see also* Ex. 6 (chart quoting PSA provisions concerning knowledge requirement for R&W breaches).

In any event, the record is undisputed that BANA believed in good faith that its duties were triggered only upon actual knowledge of a specific loan-level breach.[75]  At her individual deposition, Plaintiffs asked Susan Franklin, a Trust Officer who also was BANA's Rule 30(b)(6) designee, "[W]hat level of proof [of a R&W breach] was required [to trigger any trustee notice obligation], in your determination?," and she responded, "Actual knowledge."[76]  Ms. Franklin further testified that if an investor notified BANA of only a breach "allegation," it had not provided BANA with "actual knowledge" of a breach.[77]  As noted, the PSAs are explicit that the trustee shall not be "liable for any action taken or omitted by it in good faith and reasonably believed by it to be authorized or within [its] discretion."[78]  Particularly given the many judicial decisions holding that BANA's view at the time was and is *correct*, at a minimum there can be no question that BANA's belief was reasonable and in good faith, and that BANA therefore cannot be liable for requiring actual knowledge of a loan-specific breach before acting.  This independently requires summary judgment in BANA's favor.  *See CFIP*, 738 F. Supp. 2d at 473 (granting summary judgment for an RMBS trustee where its conduct was not negligent or in bad faith).

### (c)  Even under a relaxed standard for discovery of R&W breaches, BANA is entitled to summary judgment on the overwhelming majority of the loans

Judge Caproni held in *Phoenix v. BNYM*, 2017 WL 3973951, at *8, that under any possible standard for "discovery," Plaintiffs largely had failed to adduce evidence of the trustee's "knowledge of any *specific* breach of any [R&W] relative to any *particular loan*."  She went on

---

[75] *See* Sep. Stmt. ¶¶ 43-44.

[76] Ex. 43 (Tr. of Depo. of Susan Franklin) at 90-91.

[77] *Id.* at 90.

[78] Ex. 40 (WaMu 2006-AR17 PSA) § 8.02(iii); *see also* Ex. 3 (chart quoting PSA provisions concerning good faith actions).

to hold, however, that Plaintiffs had created a triable issue as to a small number of loans identified in investor letters to the trustee. *See id.* at *8-11.[79]  BANA respectfully disagrees with this aspect of her decision for the reasons stated above, but even if the Court were to follow that approach here, the result would be a dramatic narrowing of the claims against BANA.

Because BANA resigned as trustee so early, it received only a handful of letters alleging R&W breaches—letters that collectively identified only 101 loans.[80]  At a minimum, BANA is entitled to judgment on Plaintiffs' pre-EOD R&W-related claims as to all other loans in the case.

### 3.  Plaintiffs' Post-EOD Claims Fail

Plaintiffs' post-EOD claims fail because they have no evidence (i) that an EOD occurred in any trust while BANA was trustee; or (ii) that a contractually defined "Responsible Officer" of BANA had "written notice" or "actual knowledge" that an EOD had occurred.

#### (a)  Plaintiffs have no evidence that an EOD occurred while BANA was trustee

An EOD is a specifically defined concept that is integral to the structure and economics of the trusts.  It demarcates (i) the pre-EOD world, in which "none of the powers conferred on the trustee implies a duty to exercise those powers," *Nat. Credit Union Admin. Bd. v. U.S. Bank N.A.*, 2015 WL 2359295, at *3 (S.D.N.Y. May 18, 2015) (Forrest, J.); from (ii) the post-EOD world, in which, in certain circumstances, "the Trustee must exercise the rights vested in it by the PSA and . . . act under a prudent person standard."  *Phoenix II*, 2016 WL 1169515, at *2.

The PSAs generally define an EOD, insofar as relevant here, to have three mandatory elements: (i) "[f]ailure on the part of the Servicer[81] duly to observe or perform in any material

---

[79] Judge Caproni subsequently reiterated in a ruling from the bench that she had granted summary judgment on *all* loans not specifically identified in the letters—including loans in the same trusts as loans that *were* identified.  (*See* Ex. 44 (Tr. of Oct. 20, 2017 Hr'g in *Phoenix v. BNYM*) at 3.)

[80] *See* Sep. Stmt. ¶¶ 45-46.

respect any of [its contractual] duties," (ii) "which continues unremedied for a [specified number of] days after the date on which" (iii) "written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer."[82]   The PSAs variously authorize a multitude of deal parties to give the written notice that comprises the third element, including, depending on the trust, one or more of the depositor, the "NIMS insurer," the trustee, the securities administrator, and, in *all* trusts, a specified percentage of investors.[83]

---

[81] The PSAs for the MSM trusts provide that the failure must be on the part of the master servicer, not the servicer.  The distinction is immaterial here.

[82] Ex. 40 (WaMu 2006-AR17 PSA) § 7.01(ii); *see also* Ex. 7 (chart quoting PSA provisions defining an EOD).  The WaMu, WMALT, and WMABS PSAs provide that an EOD can occur if a government agency enters an order placing the servicer (and/or, in the case of the WAMU and WMALT PSAs, placing the depositor) in bankruptcy or receivership "and such . . . order shall have remained in force undischarged or unstayed for a period of 60 days."  (Ex. 40 (WaMu 2006-AR17 PSA) at §§ 7.01(a)(iii), (b)(iii); *see also* Ex. 7 (chart quoting PSA provisions defining an EOD).)  Although the Washington Mutual entity that served as servicer for these trusts was placed into FDIC receivership in September 2008, JPMorgan contemporaneously succeeded to its servicing business and role as servicer under the PSAs, and thus, no EOD occurred.  (*See* Sep. Stmt. ¶ 55; *see also* Ex. 40 (WaMu 2006-AR17 PSA) at § 6.02 (providing that "any Corporation succeeding to the business of . . . the Servicer[] shall be the successor of the . . . Servicer . . . hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto"); Ex. 9 (chart quoting successor servicer provisions for Washington Mutual PSAs).)  There also is no evidence that the entities serving as depositor were placed into receivership or bankruptcy (let alone that the depositor remained there for 60 days).  In any event, even if Plaintiffs had any evidence of such a servicer or depositor EOD, they have no evidence that as a result a duty arose under the terms of the PSAs for BANA to take some action, that BANA failed to take that action, or that Plaintiffs suffered damage as a result.

[83] *See* Ex. 7 (chart quoting PSA provisions concerning definition of EOD).  The PSA for one trust, WMABS 2006-HE1, provides that an EOD can occur with or without written notice to the servicer if a contractually defined "Servicing Officer of the Servicer" obtains "actual knowledge" of a material breach by the servicer and the servicer does not cure within 45 days thereafter.  (WMABS 2006-HE1 PSA § 7.01(ii).)  This PSA charges the trustee with knowledge of such an EOD only when "a Responsible Officer of the Trustee assigned to and working in the Trustee's Corporate Trust Office" has "actual knowledge" that the "Servicing Officer of the Servicer" had actual knowledge of the servicer's material breach.  (*Id.* § 7.01.)  Plaintiffs have no evidence (i) that a "Servicing Officer of the Servicer" had "actual knowledge" of a material breach; or (ii) that a Responsible Officer of BANA had "actual knowledge" of such Servicing Officer's "actual knowledge."  (*See* Sep. Stmt. ¶¶ 47-52.)

Plaintiffs have no evidence that any authorized party, or certificateholders themselves, ever gave such written notice to the servicer.[84]  Plaintiffs thus cannot show that an EOD occurred.  That alone means that summary judgment on the post-EOD claims should be granted.

Plaintiffs contend, however, that an EOD should be *deemed* to have occurred under the "prevention doctrine," a state law principle holding that in certain circumstances "a party may not insist upon performance of a condition precedent [to the party's own contractual duties] when its nonperformance has been caused by the party itself."  *B2X Corp. v. Classic Closeouts LLC*, 2010 2230198, at *3 (S.D.N.Y. May 26, 2010) (Sweet, J.).  Plaintiffs' theory is that because the trustee *could have* given, but did not give, notice to the servicer, the trustee somehow is not entitled to have the Court uphold the contractual definition of an EOD.[85]  Unfortunately for Plaintiffs, the First Department explicitly held in January 2018 that, as a matter of controlling New York law, the prevention doctrine does *not* apply in precisely this context, and therefore cannot save post-EOD claims from dismissal:

> [The PSA] does not require [the trustee] to give [a] notice to cure; it merely defines "Event of Default."  We reject plaintiffs' apparent argument that, since section 8.01 of the PSA imposes additional duties on defendant after an Event of Default, defendant may not prevent an Event of Default from occurring by failing to give the notice to cure that would cause the servicers' failure to perform to ripen into an Event of Default.  First, as indicated, the PSA bars covenants from being implied in the PSA against defendant.  Second, application of the doctrine that a party cannot insist upon a condition precedent, when its nonperformance has been caused by himself requires the party's active conduct preventing or hindering the fulfillment of the condition.  Defendant's failure to send a notice to cure to the servicers is not "active conduct."  Plaintiffs seek to compel positive action by defendant, i.e., the sending of a notice to cure.  In any event, under the PSA, the Holders of Certificates entitled to at least 25% of the Voting Rights could have sent notice of the servicers' failure.

---

[84] *See* Sep. Stmt. ¶ 54.
[85] *See* TAC (ECF No. 209) at ¶¶ 71-78.

*Fixed Income*, 157 A.D.3d at 542-43.[86]

*Fixed Income* is binding as to all trusts governed by New York law: "[A federal court is] bound to apply the law [of New York] as interpreted by New York's intermediate appellate courts . . . unless [it] find[s] persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion." *Cornejo v. Bell*, 592 F.3d 121, 130 (2d Cir. 2010). And *Fixed Income* is highly persuasive as to the trusts governed by Delaware law, because both New York and Delaware "strive to give indenture provisions a consistent and uniform meaning [inasmuch as] uniformity in interpretation is important to the efficiency of capital markets." *Concord Real Estate CDO 2006-1, Ltd. v. Bank of Am. N.A.*, 996 A.2d 324, 331 (Del. Ch. 2010) (quoting *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982)).[87]

*Fixed Income* is correct in any event. The Second Circuit squarely held in *Bankers Trust*, 450 F.3d at 128, that under New York law, where an indenture trustee "has no duty to bring about the condition precedent to [its] promise"—*e.g.*, no duty to provide the notice that is a condition precedent to an EOD—"only *active conduct* by the [trustee] to frustrate the occurrence of the condition precedent constitutes waiver of that condition." The PSAs for the non-MSM trusts here do not impose any express duty on the trustee to give notice to the servicer.[88] Rather,

---

[86] *Fixed Income* makes explicit that which was only implicit in the First Department's earlier decision in *Commerce Bank*, 141 A.D.3d 413, the decision that is the subject of Defendants' pending Motion for Partial Judgment on the Pleadings (ECF No. 139).

[87] *Accord RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 119 (Del. 2012) ("The efficient operation of capital markets is dependent upon the uniform interpretation and application of the same language in contracts . . . ."); *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at *34 (Del. Ch. Apr. 29, 2005) ("Although [a prior case] involved application of New York law, I see no reason why the law of Delaware should prescribe a different perspective.").

[88] *See* Sep. Stmt. ¶¶ 47, 49-52. Although the MSM trusts uniquely obligate the trustee to provide notice to the servicer of material breaches that could ripen into an EOD, *Fixed Income*'s holding that the prevention doctrine did not apply because "Holders of Certificates entitled to at least 25% of the Voting Rights could have sent notice of the servicers' failure" applies to the MSM trusts regardless. *Fixed Income*, 157 A.D.3d at 542-43. That holding has nothing to do with whether there was a duty to give notice, and recognized that the failure of the condition precedent to the defendant's duties must have

they provide in language materially identical to that in *Fixed Income*[89] that an EOD occurs if the servicer fails to timely cure its material breach after "written notice of such failure . . . shall have been given to the Servicer."[90]  The contractual  phrase "shall have been given" is not in the imperative, but rather is in the present perfect tense, and therefore connotes not a duty, but a condition; in other words, "it merely defines 'Event of Default.'"  *Fixed Income*, 157 A.D.3d at 542; *see also Bedden-Hurley v. N.Y. City Bd. of Educ.*, 385 F. Supp. 2d 274, 277 (S.D.N.Y. 2005) (the phrase "notice of claim shall have been made" imposes a "condition precedent").

Nor do the PSAs impose an implied duty to give notice; "the PSA[s] bar[]covenants from being implied in the PSA[s] against defendant."  *Fixed Income*, 157 A.D.3d at 542.  Because the PSAs did not require notice, Plaintiffs must show that BANA engaged in "active conduct" to frustrate the giving of notice by another deal party—and Plaintiffs have no evidence of that.  *See Western & Southern*, 2017 WL 3392855, at *21 ("[T]he Trustee's 'passive acquiescence was not an act of prevention or hindrance' . . . .") (quoting *Bankers Trust*, 450 F.3d at 129).

Because Plaintiffs have no evidence that an EOD occurred, and because the prevention does not excuse them from proving all the elements of an EOD, their post-EOD claims fail.

---

"been *caused* by the [defendant] itself."  *B2X*, 2010 WL 2230198.  BANA could not have caused the failure of the condition, because other parties were free to give the notice that could trigger an EOD.  *See Western & Southern*, 2017 WL 3392855, at *21 (declining to apply the prevention doctrine because "investors remained able to notify the Master Servicer themselves"); *see also Eastman Kodak Co. v. Bostic*, 1991 WL 243378, at *3 (S.D.N.Y. Nov. 14, 1991) (declining to apply the prevention doctrine where the plaintiff itself "had the power to cause" the occurrence of the condition).

[89] *See Fixed Income Shares: Series M v. Citibank, N.A.*, 61 N.Y.S.3d 190, 190 (N.Y. Sup. Ct. 2017) (lower court decision citing language from PSA).

[90] WMALT 2006-AR8 PSA § 7.01(ii); *see also* Ex. 7 (chart quoting PSA provisions defining an EOD).

  **(b)**  **In any event, Plaintiffs have no evidence that a "Responsible Officer"**
      **of BANA had "written notice" or "actual knowledge" of an EOD**

    *(1)*  *The MLMI and OWNIT trusts*

    The PSAs for the MLMI and OWNIT trusts provide that "the Trustee shall not be

deemed to have knowledge of an Event of Default until a Responsible Officer of the Trustee

shall have received written notice thereof."[91]  This requirement is designed to "specify" when the

trustee can be "charged with knowledge of the default [and of its] oblig[ation] to exercise any

remedies, rather than leaving questions of the timing and amount of its knowledge (and hence its

obligation to act) to the uncertainties of later litigation."  *Argonaut P'Ship L.P. v. Bankers Trust

Co.*, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001) (Stanton, J.).

    Courts vigorously enforce such written notice requirements.  For example, in *Commerce

Bank*, the First Department affirmed dismissal of post-EOD claims where the plaintiff alleged

written notice to the trustee of *master servicer breaches*, but not of the *other* required elements

of an EOD (including written notice to the master servicer of its breach).  The court held that the

notice to the trustee "was not a notice of Event of Default; rather, it was a notice of events that,

with time, might ripen into Events of Default."  141 A.D.3d at 415.  Similarly, in Plaintiffs' case

before Judge Caproni, she held, contrary to their argument, that when a PSA requires written

notice, it means what it says: "[I]n the absence of written notice of an Event of Default, the

Trustee lacks 'knowledge' and is not subject to a prudent person duty. . . . [The trustee's] actual

knowledge is irrelevant."  *Phoenix v. BNYM*, 2017 WL 3973951, at *16-17.  She accordingly

granted summary judgment on every trust for which the trustee contended Plaintiffs had failed to

---

[91] *E.g.*, Ex. 41 (MLMI 2006-HE6 PSA) at § 8.02(a)(viii); *see also* Ex. 8 (chart quoting PSA provisions
concerning knowledge of an EOD).

show written notice.  *See id.*  The same result follows here, because Plaintiffs likewise have no evidence that BANA ever received written notice of an EOD.[92]

### (2)   *The WaMu, WMABS, WMALT, and MSM Trusts*

The PSAs for the WaMu, WMABS, WMALT, and MSM Trusts provide that "the Trustee . . . shall [not] be deemed to have knowledge or notice of . . . an Event of Default[] unless *actually known* by a Responsible Officer, or unless *written notice* referencing this Agreement or the Certificates . . . is received."[93]  Plaintiffs presented no evidence of "actual knowledge" or "written notice" of an EOD, with all its elements, in their case before Judge Caproni, and they have no such evidence here, either.[94]  "Because there is no evidence that [the trustee] received written notice or had actual knowledge of any Event of Default relative to these . . . trusts, [the trustee] was not subject to a prudent person duty," and its "motion relative to these [t]rusts [should be] granted."  *Phoenix v. BNYM*, 2017 WL 3973951, at *18 (capitalization removed).

### 4.   Plaintiffs' Claims Also Fail on Additional Grounds

U.S. Bank shows in its motion that (i) the claims relating to WMALT 2005-6 must be dismissed because Plaintiffs have no evidence that they (or their trustees) owned certificates from that trust; (ii) the claims of Plaintiff C-BASS XVII as to WMALT 2005-9 were released in a prior settlement; and (iii) for the MSM and OWNIT trusts, Plaintiffs cannot recover the damages they seek.  BANA joins those arguments, and urges summary judgment on those bases.

### CONCLUSION

For the reasons stated above, summary judgment should be granted for BANA.

---

[92] *See* Sep. Stmt. ¶ 62.

[93] *E.g.*, Ex. 40 (WaMu 2006-AR17 PSA) § 8.02(vi); *see also* Ex. 8 (chart quoting PSA provisions concerning knowledge of an EOD).

[94] *See* Sep. Stmt. ¶¶ 62-63.

Respectfully submitted,

Dated: March 30, 2018

By:    */s/ James C. Rutten*

MUNGER, TOLLES & OLSON LLP
James C. Rutten
Jacob S. Kreilkamp
Wesley T.L. Burrell
Adam P. Barry
Matthew K. Donohue
350 South Grand Avenue, 50th Floor
Los Angeles, California  90071-3426
(213) 683-9100; (213) 687-3702 (fax)
james.rutten@mto.com
jacob.kreilkamp@mto.com
wesley.burrell@mto.com
adam.barry@mto.com
matthew.donohue@mto.com

SIDLEY AUSTIN LLP
David F. Graham
Mark C. Brown
One South Dearborn Street
Chicago, Illinois  60603
(312) 853-7000; (312) 853-7036 (fax)
dgraham@sidley.com
mark.brown@sidley.com

SIDLEY AUSTIN LLP
Isaac S. Greaney
Daniel Gimmel
Jon W. Muenz
787 Seventh Avenue
New York, New York  10019
(212) 839-5300; (212) 853-5599 (fax)
igreaney@sidley.com
dgimmel@sidley.com
jmuenz@sidley.com

*Attorneys for Defendant Bank of America, N.A.*

## APPENDIX

## GROUNDS FOR SUMMARY JUDGMENT IN FAVOR OF BANK OF AMERICA, N.A.

| ARGUMENT | SECTIONS OF BRIEF | RESULT |
|---|---|---|
| Plaintiffs' claims are barred by New York's six-year statute of limitations in their entirety as to nine trusts, and in part as to five trusts. | A.1<br>C.1.b<br>C.2.a | Dismissal of all claims as to MSM 2007-2AX, MSM 2007-1XS, MSM 2006-12XS, MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006-WMC2, OWNIT 2006-3, and OWNIT 2006-4.<br><br>Dismissal of all claims as to MSM 2007-5AX, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, and MSM 2006-9AR for alleged breaches occurring prior to July 2, 2009, including all alleged breaches of custodial duties during the Post-Closing Review Period. |
| Plaintiffs' claims are barred by Delaware's three-year statute of limitations as to six trusts. | A.2<br>C.2.a | Dismissal of all claims as to WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, and WMALT 2006-AR9. |
| Even if Plaintiffs' purportedly assigned claims relate back to the filing of their original Complaint, their claims still are time-barred in their entirety as to three trusts (because BANA resigned from those trusts more than six years earlier), and in part as to 11 trusts. | A.1<br>C.1.b<br>C.2.a | Dismissal of all claims as to MSM 2007-2AX, MSM 2007-1XS, and MSM 2006-12XS.<br><br>Dismissal of all claims as to MSM 2007-5AX, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006-WMC2, OWNIT 2006-3, and OWNIT 2006-4 for alleged breaches occurring prior to December 24, 2008. |
| Plaintiffs' assignments from their indenture trustees are champertous. | B.1 | Dismissal of all claims. |
| Plaintiffs' assignments from their indenture trustees are contrary to the indentures and therefore self-defeating by their terms. | B.2 | Dismissal of all claims. |

| | | |
|---|---|---|
| Plaintiffs have no evidence that exception reports were not provided as to the WaMu, WMABS, and WMALT trusts. | C.1.a | Dismissal of all pre-EOD claims for alleged breaches of custodial duties as to WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, and WMALT 2006-AR9. |
| Plaintiffs (or their indenture trustees) did not acquire certificates in 16 of the 20 trusts until after the Post-Closing Review Period. | C.1.b | Dismissal of all pre-EOD claims for alleged breaches of custodial duties as to MLMI 2006-RM4, MLMI 2006-WMC2, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MSM 2007-2AX, MSM 2007-5AX, OWNIT 2006-3, OWNIT 2006-4, WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, and WMALT 2006-AR9. |
| Plaintiffs have no evidence that BANA received written notice of material document exceptions in the MSM trusts. | C.1.b | Dismissal of all pre-EOD claims for alleged breaches of custodial duties as to MSM 2006-12XS, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MSM 2007-1XS, MSM 2007-2AX, and MSM 2007-5AX. |
| Plaintiffs' pre-EOD claims premised on the theory that collateral exception reports constitute discovery of R&W breaches are time-barred. | C.2.a | Dismissal of all pre-EOD claims relating to R&W breaches to the extent the claims are premised on the theory that collateral exception reports constitute discovery of R&W breaches. |
| Plaintiffs' pre-EOD claims premised on the theory that investor notices constitute discovery of R&W breaches fails because such notices do not impart "actual knowledge" of R&W breaches—as explicitly required by the WaMu and WMABS PSAs, and the WMALT 2006-AR8 and WMALT 2006-AR9 PSAs, and as also required by the other PSAs. | C.2.b | Dismissal of all pre-EOD claims relating to R&W breaches. |
| BANA believed in good faith that its pre-EOD duties relating to R&W breaches were triggered only upon actual knowledge of a specific loan-level breach. | C.2.b | Dismissal of all pre-EOD claims relating to R&W breaches. |

A-2

| | | |
|---|---|---|
| Even if investor notices could constitute discovery of loan-level R&W breaches, BANA still would be entitled to summary judgment on Plaintiffs' pre-EOD R&W-related claims as to all but 101 loans. | C.2.c | Dismissal of all pre-EOD claims relating to R&W breaches, except as to 101 loans. |
| Plaintiffs have no evidence that a contractually defined EOD occurred while BANA was trustee, and cannot use the prevention doctrine to relieve themselves of the burden of proving all the elements of an EOD. | C.3.a | Dismissal of all post-EOD claims. |
| Plaintiffs have no evidence that a "Responsible Officer" of BANA received "written notice" of an EOD in the MLMI or OWNIT trusts, as required for BANA's post-EOD duties to arise. | C.3.b.1 | Dismissal of all post-EOD claims as to MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006-WMC2, OWNIT 2006-3, and OWNIT 2006-4. |
| Plaintiffs have no evidence that a "Responsible Officer" of BANA received "written notice" or had "actual knowledge" of an EOD in the WaMu, WMABS, WMALT, or MSM trusts, as required for BANA's post-EOD duties to arise. | C.3.b.2 | Dismissal of all post-EOD claims as to WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, WMALT 2006-AR9 MSM 2006-12XS, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MSM 2007-1XS, MSM 2007-2AX, and MSM 2007-5AX. |
| Plaintiffs have no evidence that they (or their indenture trustees) ever owned certificates from WMALT 2005-6. | C.4 | Dismissal of all claims on WMALT 2005-6. |
| Plaintiff C-BASS CBO XVII Ltd.'s claims relating to WMALT 2005-9 were released in a prior class action settlement. | C.4 | Dismissal of all claims of Plaintiff C-BASS CBO XVII Ltd. on WMALT 2005-9. |
| Plaintiffs are contractually barred from recovering the damages they seek on their claims relating to the MSM and OWNIT trusts. | C.4 | Dismissal of all claims on MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MSM 2007-1XS, MSM 2007-2AX, MSM 2007-5AX, OWNIT 2006-3, and OWNIT 2006-4. |

A-3