**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

PHOENIX LIGHT SF DAC, BLUE HERON FUNDING
VI LTD., BLUE HERON FUNDING VII LTD.,
KLEROS PREFERRED FUNDING V PLC, SILVER
ELMS CDO PLC, SILVER ELMS CDO II LIMITED,     Index No. 14-cv-10116 (VSB)
C-BASS CBO XIV LTD., and C-BASS CBO XVII
LTD.,

              Plaintiffs,

    -against-

U.S. BANK NATIONAL ASSOCIATION and BANK
OF AMERICA, NA,

             Defendants.

------------------------------------------------------------

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**BANK OF AMERICA, N.A.'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

ARGUMENT ........................................................................................................................3

I.      Plaintiffs have standing to pursue their claims ..................................................3

      A.  The assignments from Plaintiffs' CDO indenture trustees are not champertous..........6

      B.  Defendants have no basis to argue the assignments are void under the CDOs ............7

II.     Plaintiffs' claims are timely ..............................................................................11

      A.  Plaintiffs' first amended complaint "relates back" to its original complaint...............11

      B.  BANA's resignation is not a basis for dismissal in the MLMI and OWNIT Trusts ...13

      C.  Delaware procedural law does not apply to the WAMU Trusts .................................13

III.    The evidence demonstrates that BANA breached its duties .............................16

      A.  BANA's pre-EOD breaches...................................................................................16

            1.  The MLMI Trusts ....................................................................................16

            2.  The MSM Trusts ......................................................................................19

            3.  The OWNIT Trusts ..................................................................................20

            4.  Plaintiffs' claims for BANA's failure to enforce uncured document defects are timely ...........................................................................................................20

            5.  BANA had the requisite notice that the seller had failed to cure document defects in the MSM Trusts ...............................................................................22

            6.  BANA's R&W discovery-related defenses are unavailing ..................................22

            7.  BANA is liable for its negligent actions or failure to act ......................................25

      B.  BANA failed to exercise rights and remedies prudently .............................................27

            1.  Officer's Certificates..................................................................................27

            2.  EODs arising out of servicer-led modifications and foreclosures .........................29

3.  BANA should have provided notice of the breaches ............................................. 31

4.  BANA cannot disclaim its awareness of EODs ..................................................... 34

CONCLUSION ................................................................................................................................ 35

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
    731 F.2d 112 (2d Cir. 1984) ......................................................................................4

*American Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ...............................................................................................15

*Aretakis v. Caesars Entertainment*,
    2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018) .......................................................7

*Argonaut P'Ship L.P. v. Bankers Trusts Co.*,
    2001 WL 585519 (S.D.N.Y. May 30, 2001) ......................................................34

*Bank of New York Melon v. Gales*,
    116 A.D.3d 723 (2d Dep't 2014) ...........................................................................9

*Bensinger v. Denbury Resources, Inc.*,
    2013 WL 3353975 (E.D.N.Y. July 3, 2013) .......................................................12

*BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,
    247 F. Supp. 3d 377 (S.D.N.Y. 2017) ...........................................................23, 24

*Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,
    2017 WL 3610511 (S.D.N.Y. Aug. 18, 2017) ....................................................23

*Borghese Trademarks Inc. v. Borghese*,
    2013 WL 143807 (S.D.N.Y. Jan 14, 2013) .........................................................25

*Center v. Hampton Affiliates, Inc.*,
    66 N.Y.2d 782 (1985) ...........................................................................................22

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
    738 F. Supp. 2d 450 (S.D.N.Y. 2010) ................................................................25

*Commerce Bank v. Bank of N.Y. Mellon*,
    141 A.D.3d 413 (1st Dep't 2016) ..................................................................24, 34

*Commerzbank AG v. Bank of N.Y. Mellon*,
    2017 WL 1157278 (S.D.N.Y. Mar. 21, 2017) ....................................................24

*Commerzbank AG v. U.S. Bank Nat'l Ass'n*,
    2017 WL 4318065 (Sept. 27, 2017) ..............................................................23, 24

*Cortlandt St. Recovery Corp. v. Hellas Telecommunications*,
  790 F.3d 411 (2d Cir. 2015) .............................................................................. 12

*CreditSights, Inc. v. Ciasullo*,
  2017 WL 943352 (S.D.N.Y. Mar. 29, 2007) .................................................... 9

*Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*,
  156 A.D.3d 401 (1st Dep't 2017) .................................................................... 15

*Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*,
  2015 WL 7625829 (N.Y. Sup. Ct. 2015) ........................................................ 16

*Dietrich v. Bauer*,
  126 F. Supp. 2d 759 (S.D.N.Y. 2001) .............................................................. 26

*Eastman Kodak Co. v. Bostic*,
  1991 WL 243378 (S.D.N.Y. Nov. 14, 1991) .................................................... 32

*FDIC v. Bank of New York Mellon*,
  15-cv-065560-ALC (S.D.N.Y. July 10, 2017) ................................................... 5

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ................................................................................. 2

*Fixed Income Shares: Series M v. Citibank, N.A.*,
  157 A.D.3d. 541 (1st Dep't 2018) .................................................................... 32

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,
  2016 WL 4059155 (S.D.N.Y. July 28, 2016) .................................................... 24

*Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*,
  843 F.3d 120 (2d Cir. 2016) .............................................................................. 25

*GSI Commerce Solutions v. BabyCenter, L.L.C.*,
  618 F.3d 204 (2d Cir. 2010) ............................................................................... 9

*Guilbert v. Gardner*,
  480 F.3d 140 (2d Cir. 2007) .............................................................................. 21

*Haddad Bros. Inc. v. Little Things Mean A Lot, Inc.*,
  2000 WL 1099866 (S.D.N.Y. Aug. 4, 2000) .................................................... 12

*Hildene Capital Mgmt., LLC v. Bank of New York Mellon*,
  963 N.Y.S.2d 38 (1st Dep't 2013) ..................................................................... 5

iv

*Hogan v. Fischer*,
    738 F.3d 509 (2d Cir. 2013)...................................................................................11

*House of Europe Funding I Ltd. v. Wells Fargo Bank*,
    2015 WL 5190432 (S.D.N.Y. Sept. 4, 2015).................................................4, 5

*House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*,
    2014 WL 1383703 (S.D.N.Y. Mar. 31, 2014) ...................................4, 5, 6, 14

*In re Bankers Trust Co.*,
    450 F.3d 121 (2d Cir. 2006).................................................................................31

*In re Barclays Bank PLC Sec. Litig.*,
    2016 WL 3235290 (S.D.N.Y. June 9, 2016) ..................................................12

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009).................................................18, 19, 21

*In re Trusteeship Created by American Home Mortg. Inv. Trust 2005-2*,
    2014 WL 3858506 (S.D.N.Y. July 24, 2014) ................................................15

*In re Vivendi Universal, S.A. Securities Litigation*,
    605 F. Supp. 2d 570 (S.D.N.Y. 2009).............................................................12

*Junior Gallery, Ltd. v. Neptune Orient Line, Ltd.*,
    1997 WL 26293 ....................................................................................................12

*Justinian Capital SPC v. WestLB AG, N.Y. Branch*,
    28 N.Y.3d 160, 167 (2016) ...........................................................................6, 7

*Kaung v. Bd. of Managers of Biltmore Towers Condo. Ass'n*,
    873 N.Y.S.2d 421 (N.Y. Sup. Ct. 2008). *aff'd* 70 A.D.3d 505 (2d Dep't 2010) ...........9, 10

*Lambrinos v. Exxon Mobil Corp.*,
    349 F. App'x 613 (2d Cir. 2009) ....................................................................12

*Lehman Brothers Holdings, Inc. v. Universal Am. Mortg. Co., LLC*,
    660 Fed. Appx. 554 (10th Cir. 2016)...............................................................15

*Lituchy v. Guinan Lithographic Co.*,
    60 A.D.2d 622 (2d Dep't 1977) .......................................................................21

*Love Funding in Justinian Capital SPC v. WestLB AG, N.Y. Branch*,
    28 N.Y.3d 160 (2016) ..........................................................................................6

*Marquinez v. Dow Chem. Co.*,
    2018 WL 1324178 (Del. Mar. 15, 2018) ........................................................................15

*Medina v. Seiling*,
    2018 WL 1603857 (S.D.N.Y. Mar. 29, 2018) ................................................................11

*Miranda v. Bennett*,
    322 F.3d 171 (2d Cir. 2003)...............................................................................1, 24, 25

*Mohsen v. Morgan Stanley & Co. Inc.*,
    2014 WL 4593919 (S.D.N.Y. Sept. 15, 2014)...............................................................16

*Nacional Financiera, S.N.C. v. Americom Airlease, Inc.*,
    803 F. Supp. 886 (S.D.N.Y. 1992) ...............................................................................4

*Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
    291 F.R.D. 47 (S.D.N.Y. 2013) ...................................................................................31

*Ontario, Inc. v. Samsung C&T Corp*,
    144 A.d.3d 122 (2016)...............................................................................................14

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
    2018 WL 1871174 (S.D.N.Y. Apr. 17, 2018)..........................................................32, 35

*Pacific Life Ins. Co. v. Bank of N.Y. Mellon*,
    2018 WL 1382105 (S.D.N.Y. Mar. 16, 2018) ....................................................... *passim*

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016)........................................................................21, 22

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
    2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) ....................................................... *passim*

*Phoenix Light v. BNYM*,
    2017 WL 3973951 ....................................................................................... *passim*

*Policemen's Annuity and Benefit Fund of Chicago v. Bank of America*,
    907 F.Supp.2d 536 (S.D.N.Y 2012)...............................................................................15

*Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
    291 F.R.D. 47.............................................................................................................33

*Popkin v. Security. Mut. Ins. Co. of N.Y.*,
    48 A.D.2d 46 (2003) ...................................................................................................14

*Portfolio Recovery Assoc., LLC v. King*,
  14 N.Y.3d 410 (2010) ................................................................14

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
  757 F.3d 79 (2d Cir. 2014).............................................................9

*Reinsurance Corp. of Am. v. Century Indem. Co.*,
  843 F.3d 120 (2d Cir. 2016)..........................................................27

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
  2016 WL 439020 (S.D.N.Y. Feb. 3, 2016).............................15, 18

*Trust For the Certificate Holders of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*,
  13 N.Y.3d 190 (2009) ..................................................................6

*U.S. Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*,
  2018 WL 2234877 (N.Y. Sup. Ct. May 16, 2018)....................17, 18

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec., Inc.*,
  2017 WL 2437290 (S.D.N.Y. Apr. 21, 2017)...............................23

*Velez v. Feinstein*,
  87 A.D.2d 309 (1st Dep't 1982) ....................................................13

*W&G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*,
  714 F. Supp. 1336 (D. Del. 1989)..................................................33

*WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*,
  2010 WL 3706624 (Del. Ch. Sept. 17, 2010) ................................33

*Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon*,
  2017 WL 3392856 (Ohio Com.Pl. Aug. 4, 2017).................1, 24, 25

*Westmoreland Coal Co. v. Entech, Inc.*,
  100 N.Y.2d 352 (2003) ................................................................15

*Woodling v. Garrett Corp.*,
  813 F.2d 543 (2d Cir. 1987)..........................................................14

*Zev v. Merman*,
  73 N.Y.2d 781 (1988) ..................................................................21

## OTHER AUTHORITIES

Fed. R. Civ. P. 17(a)(3)...................................................................5

Fed. R. Civ. P. 15 ................................................................................................11, 12, 13

Fed. R. Civ. P. 15(c) ...........................................................................................11, 12, 13

Fed. R. Civ. P. 17(c)(3) ..............................................................................................12

6A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1545 (3d ed.2014) .............................12

## **GLOSSARY**

| | |
|---|---|
| BANA: | Defendant Bank of America, N.A., including LaSalle Bank National Association as Bank of America's predecessor prior to merger |
| BANA Br. or Motion: | Memorandum of Law in Support of Bank of America, N.A.'s Motion for Summary Judgment |
| BANA SUF: | Bank of America, N.A's Separate Statement of Undisputed Facts in Support of Motion for Summary Judgment (ECF No. 245) |
| CSUF: | Plaintiffs' Counter-statement of Undisputed Facts Pursuant to Rule 56.1 of the Local Civil Rules for the Southern District of New York |
| CDO: | Collateralized debt obligation |
| Defendants: | BANA and U.S. Bank |
| EOD: | Event of Default (including the various terminology used in the PSAs such as Servicer Events of Default or Master Servicer Events of Default, except where expressly noted herein) |
| FAC: | First Amended Complaint |
| FRCP: | Federal Rule of Civil Procedure or "Rule" |
| MLMI Trusts: | MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, and MLMI 2006-WMC2 |
| MSM Trusts: | MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, and MSM 2006-9AR, MSM 2007-5AX |
| OWNIT Trusts: | OWNIT 2006-3 and OWNIT 2006-4 |
| RMBS: | Residential mortgage backed securities |
| PSA: | Pooling and servicing agreement |
| R&W: | Representation and warranty |
| TAC: | Plaintiffs' Third Amended Complaint (ECF No. 209) |
| Servicer: | Servicer includes any master servicer, except where expressly noted |
| Trusts: | MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006 WMC2, MSM 2006-13ARX, MSM 2006-16AX, MSM 2006-6AR, MSM 2006-9AR, MSM 2007-5AX, OWNIT 2006-3, OWNIT 2006-4, WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, WMALT 2006-AR9 |
| U.S. Bank: | Defendant U.S. Bank, National Association |

| | |
|---|---|
| WaMu Trusts: | WAMU 2006-AR17, WMABS 2006-HE1, WMALT 2005-6, WMALT 2005-9, WMALT 2006-AR8, and WMALT 2006-AR9 |
| WestLB: | WestLB AG |

# INTRODUCTION

In a transparent effort to prejudice this Court's view of the merits of the Motion, BANA claims "a court in this District recently granted summary judgment against Plaintiffs here on nearly all the claims." BANA Br. 1. But that is *not* true. In *Phoenix Light v. BNYM*, 2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017), Judge Caproni, on summary judgment, (i) refused to dismiss claims relating to five trusts where the evidence showed that EODs occurred, (ii) found that the trustee did, in fact, "discover" R&W violations in four additional trusts, and (iii) sustained claims under the Trust Indenture Act on two additional trusts. Indeed, BNYM did not even move to dismiss claims based on its false annual certification indicating that mortgage files were complete. And, in *W&S v. BNYM*, also cited extensively by BANA, the Ohio trial judge actually *denied* defendant's motion for summary judgment, which is why the case proceeded to trial.[1]

In each trustee case, summary judgment must be based upon the unique facts of each particular circumstance, as well as the provisions of the particular PSA at issue. As summarized in this brief, and in the CSUF, Plaintiffs have established that there are genuine issues of material fact requiring trial and that BANA's Motion must be dismissed.

# BACKGROUND

RMBS are created by pooling residential mortgage loans, typically thousands, into a trust that issues certificates – *i.e.*, a security that pays principal and interest based on the cash flows from the home loans held in the trusts. ¶¶ 259-260 (¶ citations are to the Plaintiffs' CSUF). The

---

[1] Following a bench trial, the trial judge adopted the findings of fact and conclusions *drafted by the defendant trustee*. *Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon*, 2017 WL 3392856, at *1 (adopting findings reported at *Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon*, 2017 WL 3392855, at *2, 11 (Ohio Com. Pl. Aug. 4, 2017)). Attorney-drafted findings are entitled to no weight because "attorneys are generally inclined to include every argument that has occurred to them as a possible reason for the court to rule in their client's favor, no matter how frail." *See Miranda v. Bennett*, 322 F.3d 171, 177 (2d Cir. 2003). In a letter, the court explained that its ruling was based on its conclusion that there was no evidence that the trustee's breaches of its duties "caused people [*i.e.*, borrowers] to miss their payments" on the underlying mortgage loans. *Western & Southern*, 2017 WL 3392856, at *2. This erroneous view of causation requirements in a breach of contract case, along with other matters, are currently the subject of an appeal. In this District, *every* trustee defendant has submitted the Ohio trial court's rulings as supplemental authority – *and not even one judge in this District has ever cited the W&S case, let alone followed its "reasoning."*

misconduct of the banks that organized, sold and administered RMBS and the resulting harm to investors, homeowners and the national economy is now well-known. As the Second Circuit recently observed, the "RMBS industry in the lead up to the financial crisis was a textbook example of a small set of market participants racing to the bottom to set the lowest possible standards for themselves." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 134 (2d Cir. 2017). This case addresses the failure of two RMBS trustees to take contractually required actions to protect the Trusts they oversaw when they learned that the sellers and servicers of the loans included in the Trusts breached important R&Ws and covenants in the Trusts' PSAs.

RMBS investors' returns depend on the performance of the underlying mortgage loans, but investors cannot confirm the creditworthiness of the borrowers or the sufficiency of the collateral because they do not have access to loan documentation. ¶¶ 292-293. It is, thus, critical that they receive enforceable promises that the loans were underwritten in conformance with appropriate underwriting guidelines and were properly documented so that, if a borrower defaulted, the trustee could foreclose on the property with as little cost and expense as possible. Accordingly, the bank that originated or acquired the loans included in RMBS trusts, the "seller," made representations concerning the loans' quality and its underwriting process, and agreed to repurchase loans that did not comply with R&Ws or have complete documentation. ¶¶ 263-264. The trustee was often the only party to the PSA independent of the seller with responsibility to ensure that the seller honored its obligations. ¶ 265.

For their parts, Plaintiffs, as RMBS investors, were contractually-bound by the PSAs to rely upon the trustees to vindicate their rights. The PSAs prohibit investor-directed action unless the investor controls 25% (or more) of the certificates, an insurmountable hurdle for most investors, and there is an ongoing EOD. ¶ 266. The evidence shows that the RMBS sellers failed

to deliver complete documentation for tens of thousands of mortgage loans and misrepresented key quality attributes of the loans. *Infra* Section III(A). The evidence further shows that BANA stood idly by while the servicers of the loans defaulted by mismanaging borrower defaults and subsequent foreclosures. The PSAs obligated BANA to exercise its rights as trustee to notify investors and to protect their contractual rights. BANA breached its obligations in Trust after Trust. *Infra* Section III(B).

Plaintiffs are a group of special purpose vehicles created under Irish or Cayman law with their principal place of business in Ireland or the Cayman Islands. ¶¶ 267-68. Seven of the Plaintiffs were created to issue their own securities in "CDO" transactions that closed from 2005-2007. ¶ 269. Such CDO Plaintiffs collateralized the issuance of their own CDO securities with the income and principal for the RMBS that they had purchased in deals for which Defendants were trustees. ¶ 270. One of the banks involved in the creation of those CDOs was a large German commercial bank called WestLB AG (n/k/a Portigon AG). WestLB acquired the CDO Plaintiffs' senior notes. ¶ 208. During the financial crisis, Phoenix Light was created and WestLB's structured finance assets, including the CDO notes and underlying RMBS were transferred to Phoenix Light as part of the winding up of WestLB. ¶ 272-273. All of the notes issued by Phoenix Light are held by an agency of the German government called Erste Abwicklungsanstalt, or EAA. ¶¶ 272-273.[2]

## ARGUMENT

## I.    Plaintiffs have standing to pursue their claims

All of Defendants' purported "standing" arguments rest on their false assertion that

---

[2] Plaintiffs have notified BANA that they are no longer pursuing their claims as against BANA for the following three trusts based on evidence obtained during discovery concerning the timing of its resignation as trustee: MSM 2006-12XS, MSM 2007-1XS, and MSM 2007-2AX. Accordingly, there are 17 remaining Trusts that are the subject of BANA's Motion.

"Plaintiffs themselves own nothing." BANA Br. 6.[3] Plaintiffs are all investment vehicles that hold securities, including RMBS. ¶ 270. Before they could hold these securities, they needed to acquire them. ¶¶ 269-270. Defendants admit that Plaintiffs financed their RMBS purchases by selling their own notes to their own investors. BANA Br. 4. Defendants' mistake lies in their erroneous assumption that Plaintiffs' issuance of their own notes to their own investors somehow transferred all interests in Plaintiffs' assets – the underlying RMBS that they purchased – to the CDO investors or to the CDO indenture trustees. In fact, while the Plaintiffs pledged their assets (*i.e.*, the RMBS) to their respective indenture trustees as collateral for their obligations under their own securities, the ownership of the RMBS remained with Plaintiffs. As this court has recognized, "[a] CDO issuer . . . owns the underlying assets and is therefore injured by actions that adversely affect the underlying assets." *House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, 2014 WL 1383703, at *11 (S.D.N.Y. Mar. 31, 2014).

The "Granting Clauses" of Plaintiffs' indentures that Defendants claim resulted in an outright sale of the notes to Plaintiffs' CDO indenture trustees expressly state instead that "[s]uch Grants are made in trust, to secure the [CDO] Notes" and that the indenture itself "shall constitute a security agreement." ¶ 274 (underlining added). "[A]n assignment for security does not completely extinguish the assignor's rights in the subject of the assignment." *Nacional Financiera, S.N.C. v. Americom Airlease, Inc.*, 803 F. Supp. 886, 890 (S.D.N.Y. 1992); *see also Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984) ("assignment as security for an antecedent debt" does not extinguish the assignor's right to sue the obligor).

While granting clauses, such as those at issue here, may *contractually* delegate to an indenture trustee all legal rights to prosecute legal claims relating to the collateral (and thus bar

---

[3] Because U.S. Bank adopts and incorporates many of BANA's arguments by reference to BANA's summary judgment motion, this opposition brief often refers to "Defendants" (plural).

4

the issuer itself from bringing a claim), this bar exists only because "a party who assigns its rights is 'no longer the real party in interest' . . . *not* because it [has] not suffered an injury-in-fact sufficient to satisfy Article III." *House of Europe Funding I Ltd. v. Wells Fargo Bank*, 2015 WL 5190432, at *7 (S.D.N.Y. Sept. 4, 2015) ("[T]he issuer of a collateralized debt obligation, can be 'injured by actions that adversely affect the underlying assets'") (citation omitted) (emphasis in original); *see also FDIC v. Bank of New York Mellon*, 15-cv-065560-ALC, ECF No. 68 at 6 (S.D.N.Y. July 10, 2017) (holding an assignment of claims does not divest assignor of Article III standing).

Contrary to Defendants' mischaracterization of Judge Forrest's initial motion to dismiss ruling, the Court did not dismiss Plaintiffs' direct claims due to a lack of constitutional standing. The Court held instead that Plaintiffs were "contractually barred." Judge Forrest wrote:

> The Court found that plaintiffs had failed to clearly plead what rights they have as Certificateholders under the initial [assignments], and that in any event, plaintiffs are contractually barred from bringing a direct suit because the CDO Indentures appear to give the CDO Indenture Trustees the right to commence any action.

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 1169515, at *4 (S.D.N.Y. Mar. 22, 2016) ("*Phoenix Light v. U.S. Bank*"); *see also House of Europe Funding I*, 2014 WL 1383703, at *11 (even if a contractual bar applies, "a CDO issuer . . . owns the underlying assets").[4] Thus, Plaintiffs had constitutional standing from "Day 1" of this action on December 24, 2014.

Recognizing the futility of their constitutional standing argument, Defendants' objections quickly morph into arguments that the assignments violate New York's champerty law and the terms of Plaintiffs' own CDO indentures. These arguments are similarly without merit.

---

[4] Under Fed. R. Civ. P. 17(a)(3), a court may not dismiss an action for failure to prosecute in the name of the real party in interest; instead, it must allow the original plaintiff to (among other options) have the real party in interest "ratify" the former's  initiation of the suit – which is akin to what happened in this case when the CDO indenture trustees contractually assigned-back to Plaintiffs' their right to sue. *Phoenix Light v. U.S. Bank*, 2016 WL 1169515, at *7 ("[t]he assignments effectively reverse the[] grants with regard to the specific legal claims at issue").

### A.  The assignments from Plaintiffs' CDO indenture trustees are not champertous

The proprietary interest of Plaintiffs in the RMBS at issue and the fact that the RMBS act as the collateral for their obligations under their own securities puts the lie to Defendants' champerty arguments. "[A] corporation or association that takes an assignment of a claim does not violate Judiciary Law § 489(1) if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument in which it holds a preexisting proprietary interest." *Trust For the Certificate Holders of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 195 (2009) ("*Love Funding*").

In *Love Funding*, the defendant, Love Funding, provided R&Ws to Paine Webber pursuant to a mortgage loan purchase agreement referred to as the "Love MLPA." *Id*. at 195. Paine Webber, in turn, sold the loan to Merrill Lynch, which then securitized the loan in a trust. Paine Webber's title to a claim to sue Love Funding under the Love MLPA was however, not initially transferred to the trust. *Id.* at 195-196. The loan in question defaulted and the trust did not obtain an assignment of Paine Webber's claim until after the trust settled separate litigation with Paine Webber. *Id.* at 197. The court held the later assignment of the claim was not barred by the champerty statute reasoning that, as the holder of the underlying loan, the plaintiff trust was "the party that would directly suffer the damages of any default on that loan [and, thus,] had a preexisting proprietary interest in the loan." *Id.* at 201–202. Like the trust in *Love Funding*, Plaintiffs have property interests in the RMBS certificates at issue and "would directly suffer the damages" caused by the Defendants' breaches. *House of Europe I,* 2014 WL 1383703, at *11.

Defendants do not point to any material difference between this case and *Love Funding*. The New York Court of Appeals reaffirmed the rule in *Love Funding* in *Justinian Capital SPC v. WestLB AG, N.Y. Branch*, noting that an assignment is not champertous if it is made 'in order to protect an independent right of the assignee.'" 28 N.Y.3d 160, 167 (2016) (quoting *Love*

6

*Funding*). *Justinian* does not remotely support Defendants herein. The plaintiff in that case acquired worthless notes from a party that did not want to be "named as the plaintiff in the lawsuit." *Id.* Because the plaintiff did not stand to obtain any recovery with respect to the notes through litigation, and because the plaintiff's "business plan" was solely to pursue litigation on notes, in which it had no pre-existing interest, the court found the assignment violated the champerty statute. *Id.* By contrast, Plaintiffs here entered into the assignments to protect their pre-existing interests in the certificates – interests Plaintiffs' indenture trustees (who, like BANA here, have all been sued in their capacity as RMBS trustees) could not adequately protect because they are hopelessly conflicted. ¶¶ 279-283.[5]

For all these reasons, Defendants' champerty defense is totally devoid of merit.

### B. Defendants have no basis to argue the assignments are void under the CDOs

Defendants argue that the assignments the Plaintiffs received from their respective trustees "contravene the CDO indentures" and are "self-voiding in that circumstance." BANA Br. 14. Judge Forrest already considered Defendants' previous argument that the assignments were an "impermissibl[e] release [of] collateral" and rejected it noting "[i]t is not at all clear that the highly contingent claims constitute a collateral release." *Phoenix Light v. U.S. Bank*, 2016 WL 1169515, at *7.

Although the Court noted that Defendants' argument required further "development of the factual record and additional understanding of the various transactions," (*id.*), Defendants have not provided any new facts in support of this part of their summary judgment motions. They merely point to testimony from an EAA representative agreeing that the claims could fall

---

[5] Similarly, *Aretakis v. Caesars Entertainment*, is inapposite as the plaintiff had no pre-existing proprietary interest. 2018 WL 1069450 (S.D.N.Y. Feb. 23, 2018). That case involved an assignment of a claim to pursue the organizers of a "hole-in-one" contest that failed to pay a golfer $1 million. The plaintiff there had no pre-existing interest in that prize money as he did not make the fateful shot. *Id.* at *10. Plaintiff argued the golfer's prior verbal agreement to give the plaintiff half the prize money created a pre-existing interest, but that agreement lacked consideration.

within the definition of "Collateral" under the C-BASS XIV and XVIII Indentures. *See* BANA Br. 15 n.42. But Defendants do not cite any testimony from that witness or any other witness suggesting that any party to the relevant transactions ever expressed the view that the assignments at issue constituted a release of the lien of the indenture in the C-BASS transactions or any other transaction. The uncontroverted evidence demonstrates no party believed that to be the case because the transaction documents do not support such a reading. ¶ 285.

Even if the legal claims associated with the RMBS are a separate, additional form of CDO collateral in addition to the RMBS themselves, the assignments do not release this form of collateral because the proceeds of the claims (called "net recoveries") must be turned over to the CDO indenture trustees. The assignment agreements provide that "any net recoveries obtained by the CDO Issuers [Plaintiffs] . . . in or in connection with the Lawsuits or the Assigned Rights [shall] be distributed by the Indenture Trustee pursuant to the terms of the Indentures." ¶ 284. For the same reason, Plaintiffs' prosecution of this lawsuit – with the CDO indenture trustees' consent – in no way violates the CDO indentures' provisions that require the trustees to "retain the Collateral securing the Notes intact, [and] collect and cause the collection of the proceeds." ¶ 285. The only change affected here is the Plaintiffs are doing the work for the CDO indenture trustees because the latter (who also happen to be RMBS trustees being sued on similar claims) are themselves conflicted. ¶ 286.

As Judge Forrest noted, the assignments reversed the CDO Plaintiffs' appointment of "'the [CDO] Indenture Trustee [as] the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral.'" *Phoenix Light v. U.S. Bank*, 2016 WL 1169515, at *7 (quoting Blue Heron VII CDO Indenture). And for Plaintiff Phoenix Light itself, the Court recognized that this reversal was not even required because "the Trust Agreement for Phoenix Light expressly authorizes the

Issuer [*i.e.*, Phoenix Light] to 'collect or have collected in the ordinary course of business or otherwise exercise or deal with (which terms shall, for the avoidance of doubt, include the enforcement of any security) the rights pledged.'" *Id.* at *4 (citing Phoenix Light Trust Agreement § 3.7).[6]

Even if Defendants' tortured interpretation of the CDO indentures were correct, Defendants cite no authority that would permit them to challenge the validity of the assignments as they are not parties to those indentures. In *Bank of New York Mellon v. Gales*, the Second Department held that a defendant borrower could not object to the trustee's acting as the proper party under the PSA to enforce the note (rather than some other PSA signatory) since the borrower, as a non-party to the PSA, "did not have standing to assert noncompliance with the . . . pooling service agreement." 116 A.D.3d 723, 725 (2d Dep't 2014) ("*BNYM v. Gales*"). In *Rajamin v. Deutsche Bank Nat'l Trust Co.*, the Second Circuit approved of and adopted the rule in *BNYM v. Gales*, noting that a party cannot "enforce the agreements to which they were not parties and of which they were not intended beneficiaries," because "[i]f a stranger to the trust also had such standing, the stranger would have the power to interfere with the beneficiaries' right of ratification." 757 F.3d 79, 87–89 (2d Cir. 2014); *see also Kaung v. Bd. of Managers of Biltmore Towers Condo. Ass'n*, 873 N.Y.S.2d 421, 435–36 (N.Y. Sup. Ct. 2008), *aff'd*, 70 A.D.3d 505 (2d Dep't 2010) ("[O]nly parties or third party beneficiaries to a contract have the capacity and standing to seek rescission of a contract").

---

[6] Defendants also point to a provision in Phoenix Light's Amended and Restated U.S. Security Agreement that says the parties will not assign their rights in that agreement. BANA SUF ¶ 21. But that agreement merely governs the security interest provided with respect to cash deposited in specifically defined bank accounts not at issue here. Further, the term "Collateral" in that agreement does not include contingent claims such as those in this case. ¶ 274. The pledge of "contingent claims" is governed in Section 3 of the Trust Agreement, which again expressly authorizes Phoenix Light to pursue such claims. ¶ 274. This type of specific language controls over more general language, particularly where the more general language appears in an ancillary agreement. *GSI Commerce Solutions v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010) ("specific language in a contract will prevail over general language where there is an inconstancy between two provisions") (citation omitted); *CreditSights, Inc. v. Ciasullo*, 2017 WL 943352, at *9 (S.D.N.Y. Mar. 29, 2007) (finding a subsequent agreement did not revoke an earlier agreement and the agreements' provisions addressed different rights and served dissimilar purposes).

The fact that Defendants are strangers to the CDO indentures without any right to enforce the alleged collateral-release violations they have confected for this litigation is presumably the reason they wish to argue that the assignments are "void" as opposed to merely "voidable." BANA Br. 16. Here too, Defendants have no legal or factual support for their position. Defendants point to language in the assignments stating that "[n]othing in this Letter shall be construed to require the Indenture Trustee to take any action in conflict with . . . the Indentures or any related transaction document . . . ." *Id*. But, such language only speaks to what action the CDO indenture trustee can be required to take after the assignments were made. Because the assignments are the very subject matter of the letters, this provision can only make sense as referring to "taking action" other than the assignments themselves. Manifestly, the parties to the assignments understood them to be fully consistent with the CDO indentures and related transaction documents. ¶ 273. The quoted language actually confirms that they understood nothing in the letter conflicted with the indentures.

Also, the CDO indentures provide that Phoenix Light, as holder of the requisite percentage of the "Controlling Class [of each CDO Issuer] shall have the right to cause the institution of and direct the time, method and place of . . . exercising any trust, right, remedy or power conferred on the Indenture Trustee." ¶ 275. One of the "power[s] conferred" on the CDO indenture trustees is the "full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties." ¶ 276. Accordingly, Phoenix Light, as Controlling Class holder of each of the Plaintiff CDOs, could direct each indenture trustee to assign its rights to the appropriate Plaintiff to pursue claims "in the name of the Issuer or otherwise." ¶ 277. There is no way that the assignments would ever be void.

10

## II.   Plaintiffs' claims are timely

### A.   Plaintiffs' first amended complaint "relates back" to its original complaint

The Court gave Plaintiffs leave to document the CDO indenture trustees' acquiescence to Plaintiffs' prosecution of this suit and thereafter sustained Plaintiffs' FAC. *Phoenix Light v. U.S. Bank*, 2016 WL 1169515, at *1. The FAC relates back to the initial filing of this action on December 24, 2014 because leave to amend was granted under Federal Rule of Civil Procedure 15.[7] Rule 15(c)(1) provides in relevant part that:

(1) An amendment to a pleading relates back to the date of the original pleading when: . . .

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Because there is no dispute that "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading," relation back is required under FRCP 15(c)(1).

Defendants argue that the FAC cannot relate back because Plaintiffs purportedly lacked constitutional standing when they filed the complaint. BANA Br. 10–11. However, as set forth

---

[7] BANA relies exclusively on cases from New York state courts. But these cases are irrelevant because federal courts apply state law relation back principles only when state "'law affords a more forgiving principle of relation back'" than the federal rules. *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013) (citation omitted); *Medina v. Seiling*, 2018 WL 1603857, at *7 (S.D.N.Y. Mar. 29, 2018); Fed. R. Civ. P. 15 advisory committee's note on 1991 Amendment ("Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relations back than the one provided in this rule, it should be available to save the claim.").

above in Section I, Judge Forrest did not conclude that Plaintiffs lacked *constitutional* or *Article III* standing, and, in fact, Plaintiffs *did* have such standing. The only defect identified by the Court was that Plaintiffs were not the real parties in interest. The CDO indenture trustees effectively ratified the suit in the subsequent assignments and relation back of such amendments are fully permitted under both Rule 15(c) and Rule 17(c)(3).

In any event, even in cases where the plaintiff had a constitutional standing defect at the commencement of the action, courts in this district often have applied FRCP 15(c) where the Plaintiff obtained the assignment of legal claims post-commencement. For example, in *In re Vivendi Universal, S.A. Securities Litigation*, fund managers lacked constitutional standing to bring claims held by the funds they managed because they did not suffer an injury-in-fact. 605 F. Supp. 2d 570, 574 (S.D.N.Y. 2009). The court allowed the plaintiffs to cure the standing defects by obtaining assignments of title to the legal claims and filing an amended complaint, noting the "[a]mendments will relate back to the original filing of the complaints." *Id.* at 585; *see also Haddad Bros. Inc. v. Little Things Mean A Lot, Inc.*, 2000 WL 1099866, at *9 (S.D.N.Y. Aug. 4, 2000) ("Where an amendment cures a standing defect, nothing in the nature of that amendment would prohibit it from relating back to the initial complaint").[8]

*Cortlandt Street* (relied upon by Defendants) is distinguishable for two separate reasons: (i) unlike the Plaintiffs here, the plaintiff did not have constitutional standing when it filed the action; and (ii) because the plaintiff did not seek leave to amend under Rule 15. The Second Circuit in *Cortlandt Street* recognized that the plaintiff there might have been entitled to relation back if it had sought leave to amend under Rule 15, as Plaintiffs did here, citing authority holding "'that even when [a] claim is not assigned until after [an] action has been instituted, the

---

[8] *See also, e.g., In re Barclays Bank PLC Sec. Litig.*, 2016 WL 3235290, at *3 (S.D.N.Y. June 9, 2016) ("[P]laintiffs [can] use Fed R. Civ. P. 15(c) to add Spindel as an additional named plaintiff and relate back his claims for timeliness purposes"); *Bensinger v. Denbury Resources, Inc.*, 2013 WL 3353975, at *4–5 (E.D.N.Y. July 3, 2013) (allowing relation back for amendment to add new plaintiff in view of lack of prejudice to defendant).

assignee is the real party in interest and can maintain the action.'"*Cortlandt St. Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 424–25 n.8 (2d Cir. 2015) (quoting 6A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1545 (3d ed. 2014) and collecting cases); *see also Lambrinos v. Exxon Mobil Corp.*, 349 F. App'x 613, 614 (2d Cir. 2009) ("assignment was sufficient to render Lambrinos the real party in interest").[9] All of Plaintiffs' claims should thus be viewed as having been filed by December 24, 2014, the date of the initial complaint.

### B.  BANA's resignation is not a basis for dismissal in the MLMI and OWNIT Trusts

BANA asserts that it is entitled to summary judgment in six Trusts[10] because discovery has shown that it resigned as trustee for these Trusts prior to July 2, 2009. BANA Br. 9. But, as established above, the relevant bar date is December 24, 2014 when Plaintiffs filed their first complaint, and six years prior to that date is December 24, 2008.[11] BANA did not resign for these Trusts until 2009, and thus Plaintiffs' claims against it on those Trusts are timely.[12]

### C.  Delaware procedural law does not apply to the WAMU Trusts

BANA argues that the three-year Delaware statute of limitations applies to Plaintiffs' claims against BANA on the WAMU Trusts as a result of the Delaware choice of law clauses for

---

[9] BANA's contention that FRCP 15(c) should not apply because Plaintiffs cannot be said to have made a "mistake," BANA Br. 11 n.32, ignores the fact that Plaintiffs understood that their CDO trustees suffered from disabling conflicts of interest and, thus, Plaintiffs were entitled to bring the claims. ¶ 279. *See Velez v. Feinstein*, 87 A.D.2d 309, 315 (1st Dep't 1982) (beneficiaries have an absolute right to bring claims to benefit trust fund "because of the trustees' conflict of interest"). More to the point, there has been no change in the identity of the Plaintiffs; rather, the only change was to make Plaintiffs the real parties in interest. Thus, relation back is required simply because the amendment arises out of the same transaction or occurrence.

[10] BANA asserted this argument as to nine Trusts. BANA Br. 9. As discussed above, Plaintiffs are not pursuing their claims as against BANA for three of those trusts. The remaining six Trusts at issue that are subject to BANA's argument are the following: MLMI 2006-AR1, MLMI 2006-HE6, MLMI 2006-RM4, MLMI 2006-WMC2, OWNIT 2006-3, and OWNIT 2006-4.

[11] Plaintiffs do not agree that the governing law provision under the PSAs incorporates the statute of limitations. BANA Br. 8–9. However, for the reasons stated in Section II(C), under New York's choice of law analysis, the statute of limitations would be six years under New York, Ireland or Cayman Islands law.

[12] Even if the Court nevertheless finds relation back does not apply, Plaintiffs claims are timely under equitable tolling, particularly for MLMI 2006-RM4 and the Trusts where BANA had a conflicted role. As discussed further in Section III(A)(1), BANA released Merrill Lynch's repurchase obligation under the MLMI 2006-RM4 in a bankruptcy settlement after it had acquired Merrill Lynch. BANA concealed this release from certificateholders. ¶¶ 87-88, 319.

those PSAs. BANA is wrong on choice of law for statute of limitations purposes. New York law governs the statute of limitations and there is no dispute that under New York law the applicable period is six years.[13] Under New York law, a "contractual choice of law provision is deemed to import only substantive law, however, not procedural law" unless the parties expressly contract otherwise. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987). The provisions at-issue here state that the PSAs "shall be construed in accordance with the laws of the State of Delaware without giving effect to its conflict of laws provisions and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws without giving effect to conflict of laws provisions." ¶ 202 (citing WAMU 2006-AR17 PSA).

There is no express reference to importation of Delaware procedural or enforcement law. Instead, BANA attempts to imply such a reference from the word "remedies" – which (BANA claims) implies an intent to elect Delaware statutes of limitations. BANA Br. 11 (citing *Portfolio Recovery Assoc., LLC v. King*, 14 N.Y.3d 410, 416 (2010) for the proposition that "statutes of limitations . . . 'are deemed as pertaining to the remedy'") (citation omitted). However, BANA rips word the word "remedies" from its context by ignoring the words that precede it – "obligations, rights and remedies." Read in context with the preceding words (as a contract must, *Popkin v. Security. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48 (2003)), the provision logically refers to substantive contract "remedies" – *i.e.,* damages, quantum meruit, specific performance – that follow substantive contract "obligations" and "rights." *See also Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) ("The meaning of a writing may be distorted where undue force is given to single words or phrase"). By contrast, BANA's broad interpretation of

---

[13] Under New York's "borrowing statute" the claims of Plaintiffs (as non-residents of the State) are subject to the limitations periods under their home jurisdictions (Ireland and the Cayman Islands) or that of New York, whichever is shorter. ¶¶ 267-268; C.I. Limitation Law (1996 Revision), s. 7 (six years under Cayman Island law); Ireland Statute of Limitations, 1957 § 11(1)(a), 2(a) (six years under Irish law). *See also House of Europe Funding I, Ltd. v. Wells Fargo, NA*, 2014 WL 1383703, at *14–15 (S.D.N.Y. Jan. 28, 2016). Here, all relevant jurisdictions provide for six years, so the applicable limitations period under New York law is in any event six years.

the word "remedies" as incorporating Delaware procedural law would create nonsensical results by importing not only Delaware statutes of limitations, but also pre-judgment procedural or provisional "remedies" – like attachment or garnishment – into a case filed in New York.[14]

In *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, the court construed language in an RMBS PSA similar to that cited here by BANA and held that it did not import another state's limitations period, noting that "[u]nder New York law, 'a choice of law clause is construed as choosing only the applicable substantive law, not the applicable limitation period,' which is considered procedural.'" 2018 WL 1750595, at *17 (S.D.N.Y. Apr. 11, 2018) (quotation citation omitted). Other courts have reached the same conclusion. *See Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 156 A.D.3d 401, 402 (1st Dep't 2017) (finding choice-of-law provision stating that the "obligations, rights and remedies" shall be determined by New York law "cannot be read to encompass the limitations period") (citation omitted)[15]; *In re Trusteeship Created by American Home Mortg. Inv. Trust 2005-2*, 2014 WL 3858506, at *11–12 (S.D.N.Y. July 24, 2014) (same).

Finally, even under Delaware's statute of limitations, Plaintiffs' claims on those trusts for WAMU 2006-AR17 and WMALT 2005-9 are also timely based on class action tolling. Under the *American Pipe* doctrine, "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties." *American*

---

[14] *Portfolio Recovery Assoc., LLC v. King* in fact supports Plaintiffs as the court held that the choice of law provision did not govern the applicable statute of limitations and that New York's borrowing statute governed the applicable limitations period. 14 N.Y.3d at 415–16. *2138747 Ontario, Inc. v. Samsung C&T Corp.*, cited by BANA and recently affirmed by the New York Court of Appeals, is not on point because the provision at issue stated the agreement would be "enforced in accordance" with New York law – language that does not appear in the WAMU PSAs and that more clearly incorporates procedural law. 144 A.d.3d 122, 126–27 (2016). One Tenth Circuit case, construing a choice of law clause for New York law, does construe "remedies" in the phrase "obligations, rights and remedies" to include New York statute of limitations law. *Lehman Brothers Holdings, Inc. v. Universal Am. Mortg. Co., LLC*, 660 Fed. Appx. 554, 558–59 (10th Cir. 2016). Plaintiffs believe that the decisions in New York and in this Circuit discussed above are better reasoned.

[15] The relevant provision considered in the Appellate Division, can be found in the Supreme Court's decision, *Deutsche Bank Nat'l Tr. Co. v. Barclays Bank PLC*, 2015 WL 7625829, at *1 (N.Y. Sup. Ct. 2015).

*Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974). Delaware recognizes cross-jurisdictional tolling based on the *American Pipe* doctrine. *Marquinez v. Dow Chem. Co.*, 2018 WL 1324178, at *4 (Del. Mar. 15, 2018). As WAMU 2006-AR17 and WMALT 2005-9 were at issue in the class action *Policemen's Annuity and Benefit Fund of Chicago v. Bank of America*, Plaintiffs' claims on those trusts are tolled at least until the filing of the FAC. 907 F.Supp.2d 536 (S.D.N.Y. 2012). Fitzgerald Decl. Ex. 553.[16]Accordingly, Plaintiffs' claims for WAMU 2006-AR17 and WMALT 2005-9 are timely under Delaware law.[17]

## III. The evidence demonstrates that BANA breached its duties

### A. BANA's pre-EOD breaches

Plaintiffs assert pre-EOD claims based on BANA's failure to enforce repurchase obligations in the MLMI, MSM, and OWNIT Trusts. The evidence shows BANA discovered that many loans were eligible for repurchase due to missing or materially defective documents that were supposed to be included in the Mortgage File and that the sellers also had breached numerous R&Ws relating to loan quality. BANA took no action although it was contractually required to do so. It did not even flag issues for U.S. Bank to ensure that U.S. Bank addressed them when it succeeded to BANA as trustee. ¶¶ 321.

#### 1. The MLMI Trusts

Merrill Lynch sponsored the MLMI trusts, meaning that it structured the investments, originated or acquired all of the loans and deposited them into the MLMI Trusts, and underwrote

---

[16] And even though WAMU 2006-AR17 initially was dismissed from *Policemen's Annuity*, the most recent court to consider this issue in an RMBS context held that *American Pipe* tolling applies "to putative class members even where the class representative was found to lack standing." *Pacific Life Ins. Co. v. Bank of N.Y. Mellon*, 2018 WL 1382105, at *8 (S.D.N.Y. Mar. 16, 2018). In any event, the *Policemen's Annuity* plaintiffs were granted leave to replead and subsequently corrected any standing defects. ¶¶ 324-332.

[17] WMALT 2006-AR8 and WMALT 2006-AR9 were also at issue in *Policemen's Annuity*. ¶¶ 323; 338. Under New York law, all of the claims are timely as of Plaintiffs' FAC. ¶ 323. Although BANA resigned as trustee for WMALT 2006-AR8 and WMALT 2006-AR9 more than three years before *Policemen's Annuity* was filed, BANA did not assert that claims for these trusts were time barred by Delaware law and both trusts were included in the settlement. ¶ 338. BANA now argues that claims for these trusts are untimely, but as set forth in Section II(C), New York's limitations period applies.

the RMBS certificates to investors. ¶¶ 64-70. Merrill Lynch was ultimately responsible for repurchasing loans that materially breached R&W provisions, or for which documents required to be included in the Mortgage Files were missing or materially defective. ¶ 94. In MLMI 2006-RM4, Merrill Lynch's obligation to repurchase was not triggered until the originator, ResMae, failed to repurchase. ¶ 94. BANA was the initial Trustee for the MLMI Trusts: U.S. Bank became the successor after BANA developed a conflict of interest. ¶ 322 (BANA memos stating that "the case law makes clear that trustees have a duty to avoid conflicts and [sic, of] interest and . . . may be subjected to heightened scrutiny in a conflicts of interest situation"); *see also U.S. Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, 2018 WL 2234877, at *20–21 (N.Y. Sup. Ct. May 16, 2018) ("*U.S. Bank v. Merrill Lynch*").

Specifically, in September 2008, Bank of America Corporation, BANA's parent, announced that it had entered into an agreement to acquire Merrill Lynch, with a January 1, 2009 closing date. ¶ 96. A party may not serve as an RMBS trustee if it is affiliated with the seller or the party that services the loans in the transaction. ¶ 322. Here, BANA had a binding agreement to acquire Merrill Lynch and one of the servicers (an affiliate of Merrill Lynch's called Wilshire) and should have resigned as trustee from all MLMI Trusts immediately; however, it did not do so until several months after the Merrill Lynch merger was announced and three months after it closed. ¶ 98. U.S. Bank, as successor Trustee, has itself sued BANA in a case where the court has credited evidence that BANA conspired with Merrill Lynch to evade liability in at least one trust at issue in this case: MLMI 2006-RM4. *See U.S. Bank v. Merrill Lynch*, 2018 WL 2234877, at *20. BANA secretly agreed to release Merrill Lynch's repurchase obligations in a bankruptcy settlement involving the originator, ResMAE. ¶¶ 97-99. The court concluded that BANA's conduct was "utterly incompatible with its obligations as trustee" and that the evidence suggested only a "delusional trustee" would have acted as BANA had. *U.S. Bank v. Merrill*

17

*Lynch*, 2018 WL 2234877, at *6, *12–13.

BANA's conflicted misconduct was not limited to the release of Merrill Lynch as to MLMI 2006-RM4 after the ResMae bankruptcy. For all of the MLMI Trusts, Merrill Lynch was also the seller and its affiliate Wilshire was the original servicer. ¶¶ 64-70. Yet, as discussed above, BANA did not resign when it became conflicted. ¶¶ 96-98.

In two of the MLMI Trusts where BANA also served as custodian, BANA had actual knowledge that Merrill Lynch had failed to repurchase defaulted loans with missing documents required to be delivered under Section 2.01 of the PSAs. ¶¶ 88, 102. The custodial records show that many document exceptions remained uncured as late as March 2009 when BANA resigned as trustee. *Id.* In the other two MLMI Trusts where BANA was not the custodian, BANA, at a minimum, turned a blind eye to discovery of these same facts in violation of Section 2.02 of the PSA when it learned of Merrill Lynch's widespread failure to deliver missing documentation. ¶ 82, 108.[18]

BANA also received written notice from third parties specifically identifying 87 loans, across three of the MLMI Trusts that had loan quality R&W violations that materially and adversely affected the interests of certificateholders in such loans. ¶¶ 81, 87, 107.[19] BANA does not argue that it took any action with respect to these breach notices. The evidence shows that

---

[18] BANA claims that the depositor (not it) had the duty to cause the seller to repurchase loans with document defects, but the language it points to refers only to the depositor's duty to ensure that any loans with missing notes on the initial exception report delivered at closing were cured or repurchased within 45 days of closing. Fitzgerald Decl. Exs. 28-31 § 2.02. The initial exception report expressly "does not acknowledge receipt of all documents required to be included in such Mortgage File." *Id.* Exs. 28-31 § 2.02. The breaches that Plaintiffs assert refer to the failure to cure exceptions listed on the final exception reports, which are due 70 days after the closing date and which were BANA's responsibility. ¶ 76. In any event, even if the depositor should have ensured repurchase, that did not relieve BANA since the trustee itself agreed to "exercise" repurchase rights. This was important because the depositor was a Merrill Lynch affiliate and could not be trusted to cause its corporate sibling, the seller, to repurchase loans.

[19] In Section 2.06 of the MLMI Trust PSAs, BANA "agree[d] . . . to exercise the rights referred to above for the benefit of all present and future Holders of the Certificates." ¶ 74. The "rights referred to above" include the right to enforce repurchase obligations. ¶ 75. Judge Nathan concluded that a substantively similar PSA provision imposes an obligation upon the RMBS trustee to enforce the repurchase obligations. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020, at *4 (S.D.N.Y. Feb. 3, 2016).

18

BANA and Merrill Lynch conspired to limit Merrill Lynch's RMBS liability, and thus, the knowledge Merrill Lynch had concerning the MLMI Trusts should be imputed upon BANA. *See In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 452–53 (S.D.N.Y. 2009) (affiliates involvement in each other's "legal and risk management affairs" created a genuine issue of fact as cross-imputation to defendant). There is an issue of fact of BANA's awareness in 2009 of the sky-high loan quality breach rates for Merrill Lynch loans in the MLMI Trusts that would become apparent to other parties only later. Plaintiffs' evidence is sufficient to create an issue of fact as to whether BANA breached its pre-EOD enforcement duties in early 2009.

### 2.  The MSM Trusts

Section 2.05(a) of the MSM PSAs states that the trustee "shall enforce" the seller's or originator's obligation to repurchase loans: (i) if a document that was required to be part of the Mortgage File was missing or materially defective; or (ii) either party had committed R&W breaches that materially and adversely affected the interests of certificateholders. ¶ 125.

BANA delivered final exception reports that showed thousands of loans were missing required documentation or were otherwise not in proper form and thus materially defective. ¶¶ 131-135. If the seller or originator failed to cure the defect "within a period of time specified in the related Purchase and Servicing Agreement," the seller or originator was required to repurchase the affected loan. ¶ 136. On the other hand, if the responsible party "commenced to cure such breach within such specified period, the related Originator or the Seller shall be permitted to proceed thereafter diligently and expeditiously to cure the same within such additional time as is reasonably necessary to cure such breach." *Id.* While BANA could reasonably hold off on enforcing repurchase obligations for document defects that could be cured, by 2009, when borrowers had defaulted and the documentation defects still were not cured, BANA breached the PSAs by failing to enforce the seller's or originator's obligation to

19

repurchase the mortgage loans. ¶¶ 128-147.

BANA also received notices from third parties identifying more than 466 loans, across two MSM Trusts with loan quality R&W breaches that materially and adversely affected the interests of certificateholders in the affected loans. ¶¶ 149-150,152-153. BANA did not enforce the sellers' obligation to repurchase these loans. ¶¶ 151, 154.

### 3.   The OWNIT Trusts

Ownit was the seller of the loans to the OWNIT Trusts. ¶¶ 159-160. It also provided the R&Ws to the OWNIT Trusts concerning loan quality and covenanted with the Trusts to repurchase loans with Mortgage File documents missing or materially defective. ¶ 163. If Ownit failed to repurchase a breaching loan, Merrill Lynch was required to do so. ¶ 175. After Ownit filed for bankruptcy, in February of 2009 BANA filed proofs of claims for each of the Ownit Trusts stating that the trusts had "been damaged by the virtue of Ownit's defaults and breaches with respect to the covenants, R&Ws and certifications made under the" PSA. ¶ 174. BANA asserted $44 million in damages on behalf of OWNIT 2006-3 and $69 million in damages on behalf of OWNIT 2006-4. *Id.* BANA failed to include the claims relating to loans with missing or materially defective documents and never prosecuted the true extent of loan quality R&W defects. *Id.* Most importantly, BANA failed to take action against solvent Merrill Lynch to ensure that it repurchased breaching loans when Ownit itself failed to do so. ¶ 178.

### 4.   Plaintiffs' claims for BANA's failure to enforce repurchase obligations triggered by uncured document defects are timely

BANA raises a special limitations defense specific to Plaintiffs' claims relating to its mishandling of document defects. According to BANA, even if it breached "custodial" duties relating to a "post-closing review" of the Mortgage File and the preparation of exception reports, such claims accrued so early in the Trusts' existence that they would be time-barred under New York's six-year statute of limitations as applied to the date of the original complaint. BANA Br.

18–19. However, BANA's argument is a "straw man" that mischaracterizes Plaintiffs' claims. Plaintiffs do not allege a PSA breach by BANA in connection with  any early custodial duties or the post-closing review; rather, Plaintiffs claim that BANA breached a different and separate duty to prosecute the Trusts' repurchase rights – a breach that did not occur (and claims that did not accrue) until years later.[20] Those claims are timely.

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co*., 172 F. Supp. 3d 700, 709–10 (S.D.N.Y. 2016), cited by BANA, actually supports Plaintiffs on this issue. The court made clear that "the majority of claims [we]re not barred" and that it was merely dismissing those claims based on the trustee's failure to "object *initially* to document delivery failures." *Id*. (emphasis added). The claims for the trustee's failure to enforce repurchase obligations when servicers reported trouble foreclosing on defaulted loans with uncured defects were still timely. *Id.*

The PSA provisions upon which Plaintiffs rely state the trustee "shall enforce" or has committed "to exercise" the right to enforce the seller's obligation to repurchase loans. ¶¶ 125, 163. Those enforcement provisions do not fix a time for performance. When a "contract specifies no date or time of performance, the parties have a reasonable time to perform and . . . the cause of action accrues and the statute begins to run as soon as such reasonable time has expired." *Lituchy v. Guinan Lithographic Co.*, 60 A.D.2d 622, 622 (2d Dep't 1977); *accord Guilbert v. Gardner*, 480 F.3d 140, 149–150 (2d Cir. 2007). "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case." *Zev v. Merman*, 73 N.Y.2d 781, 783 (1988).

For the OWNIT Trusts, Merrill Lynch's obligation to repurchase (as back-stop to Ownit itself) did not even get triggered before BANA submitted its amended proof of claim in the

---

[20] Similarly, BANA argues that in some cases Plaintiffs acquired certificates before the final exception report was delivered. But again, Plaintiffs are not asserting any claims based on the preparation or delivery of the final exception report.

Ownit bankruptcy on February 25, 2009. ¶ 174. For the MSM trusts, the PSAs provided the seller with an extension of time to cure if the seller would show that it was "diligently and expeditiously to cure the same." ¶ 136. Under such circumstances the breaches occurred in 2009, or later, when the seller was given a sufficient opportunity to cure but failed to cure defects with respect to defaulted loans. ¶ 146. For the MLMI Trusts, the evidence shows that BANA's conduct was unreasonable because in 2009 it was conflicted and made no attempt to enforce its new affiliate's obligation to repurchase despite knowing it had no intention to cure. ¶ 101.

### 5. BANA had the requisite notice that the seller had failed to cure document defects in the MSM Trusts

BANA argues that in the MSM Trusts, BANA was not required to enforce the seller's obligation unless it "received written notice" of the seller's failure to cure. BANA Br. 23. But BANA had written notice that the seller failed to cure because BANA was the custodian. ¶ 120. BANA admits that when it was trustee and custodian it maintained a database where it tracked whether the outstanding exceptions were cured. ¶ 145.

It is unclear to Plaintiffs whether BANA is arguing that it is entitled, as trustee, to disregard what it discovers when it serves as custodian. If it is, BANA does not cite any supporting law. Even when the trustee and the custodian are different entities, the custodian acts "on the trustee's behalf." *See e.g.*, Fitzgerald Decl. Ex. 29 § 2.02 (MLMI 2006-AR1) ("the Trustee acknowledges receipt of the Mortgage Note. . . and declares that it (or the Custodian, on its behalf) holds and will hold such documents"). The knowledge of the agent is attributable to the principal. *See Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985) (agent's knowledge imputed on principal). At a minimum, Plaintiffs have established a genuine issue of material fact as to BANA's knowledge of uncured document exceptions in the MSM Trusts.

### 6. BANA's R&W discovery-related defenses are unavailing

Plaintiffs have collected notices that BANA received from third parties identifying 578

22

loans underlying the Trusts with breaches of R&Ws that materially and adversely affected the interests of certificateholders in the loans. ¶¶ 309-310. BANA does not appear to dispute that it received many of these notices. BANA Br. 28–29; BANA SUF ¶ 46. It nevertheless argues that it did not "discover" the R&W violations and, thus, was not required to enforce the sellers' obligation to repurchase breaching loans.[21]

BANA's position cannot be squared with the case BANA quotes in the first sentence of its brief, *Phoenix Light v. BNYM*, wherein the court held that similar notices were sufficient to create genuine issues of material fact as to whether the trustee had actual, constructive or implied actual knowledge of R&W breaches that materially and adversely affected the interests of certificateholders in the loans. 2017 WL 3973951, at *10-12; *see also Blackrock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 3610511, at *10 (S.D.N.Y. Aug. 18, 2017) ("Plaintiffs could demonstrate 'discovery' through a showing of conscious avoidance or implied actual knowledge."). Implied actual knowledge means "[k]nowledge of information that would lead a reasonable person to inquire further." *Id.* (quoting Black's Law Dictionary (10th ed. 2014)).

Where, as here, there is record evidence that the trustee has access to information concerning widespread R&W breaches, poor loan performance, and reports of industry-wide conduct, it is for the trier of fact to determine whether "the Trustee[] at the very least should have been prompted to look more closely at the loans underlying the trusts." *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 2017 WL 4318065, at *6 (Sept. 27, 2017). "Thus, while '[l]earning of facts merely suggestive of a breach would not require the Trustee[s] to immediately raise a claim, upon receipt of such notice, it becomes incumbent upon the Trustee[s] to pick up the scent and

---

[21] To the extent BANA argues that these notices are insufficient because they identify only "potential" breaches, that is a determination for the factfinder rather than at summary judgment. *Phoenix Light v. BNYM*, 2017 WL 3973951, at *10–11.

nose to the source.'" *Id.* at 494 (quotation omitted) (alterations in original). As set forth above in Sections III(A)(1)-(3), Plaintiffs have marshalled ample evidence showing that BANA should have performed an inquiry when it learned of facts suggestive of a breach, but failed to do so.[22]

*Commerce Bank v. Bank of N.Y. Mellon*, 141 A.D.3d 413, 415–16 (2016), cited by BANA, contains no discussion of the meaning of "discovery" and BANA's interpretation of that case has been rejected by every court to consider it. *See e.g.*, *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 391–93 (S.D.N.Y. 2017); *Commerzbank AG v. U.S. Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 491–493 (S.D.N.Y. 2017); *Commerzbank AG v. Bank of N.Y. Mellon*, 2017 WL 1157278, at *5 (S.D.N.Y. Mar. 21, 2017). *Commerce Bank v. BNYM* dismissed an independent tort for failure to "nose to the source" 141 A.D.3 at 415. No such claim is at issue here.

BANA also states, without citation to any authority or evidence, that absent direction and indemnity from investors, it did not have to any duty to perform an inquiry when it learned of facts indicating breaches had occurred. BANA Br. 24. BANA is entitled to indemnity and reimbursement under multiple PSA provisions and from the trust fund itself. ¶¶ 294-295. New York courts interpreting similar provisions have rejected the argument that such issuer indemnities are inadequate and allow a trustee to await some other form of indemnification. *See, e.g., FMS Bonds, Inc. v. Bank of N.Y. Mellon*, 2016 WL 4059155, at *14 (S.D.N.Y. July 28, 2016). The burden is on BANA to show "that there is no genuine dispute that, at the time, it had reasonable grounds for believing indemnity was not reasonably assured." *Phoenix Light v. BNYM*, 2017 WL 3973951, at *14. BANA has not offered any evidence showing such indemnity

---

[22] BANA completely misreads *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec., Inc.*, which is a report and recommendation from a special master, not a ruling from Judge Castel as BANA contends. 2017 WL 2437290, at *3 (S.D.N.Y. Apr. 21, 2017). Contrary to BANA assertion, the special master did not hold that collateral file breaches were immaterial. She was considering claims based on documents missing from loan origination file (which is distinct from the Mortgage File) and held that "[a]n established breach based on a missing document may have a material and adverse effect based on the totality of the evidence relating to that loan, or such a breach may contribute to a finding of a material and adverse effect based on the concept of layered risk." *Id.*

was inadequate.

### 7.   BANA is liable for its negligent actions or failure to act

BANA moves for summary judgment on the ground that it can never be charged with "discovering" R&W or covenant breaches because the PSAs "are explicit that" the trustee is not liable for "any action taken or omitted by it in good faith." But a trustee's good faith is only a necessary condition of its defense to liability, it is not sufficient unless the trustee shows that it was not negligent. For example, Section 8.01 of the OWNIT 2006-3 PSA states:

> No provision of this Agreement shall be construed to relieve the Trustee from liability for its own *negligent* action, its own negligent failure to act or its own misconduct, its negligent failure to perform its obligations in compliance with this Agreement, or any liability that would be imposed by reason of its willful misfeasance or bad faith; provided, however, that: . . .

> (ii) the Trustee shall not, individually or as Trustee, be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee unless the Trustee was *negligent* or acted in bad faith or with willful misfeasance; . . . .

Fitzgerald Decl. Ex. 41 (italics added, underscore in original); ¶ 79. BANA has not even attempted to disprove its negligence; thus, its motion fails on that ground alone.

BANA also relies on exculpatory language in Section 8.02 (or the equivalent) that "the Trustee shall not be liable for any action taken, suffered or omitted by it in good faith," but all of Section 8.02 is prefaced by the phrase "except as otherwise provided in Section 8.01" and is, thus, subject to the same rule of non-negligence in Section 8.01. ¶ 80. *See Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 843 F.3d 120, 125 (2d Cir. 2016) (limiting words "except as otherwise provided" mean the provision is "subject to" another provision). BANA acknowledges *CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 474–73 (S.D.N.Y. 2010) recognized that that negligence is the standard. BANA Br. 28.

Even on the good faith prong alone, however, BANA cannot carry its burden on summary judgment of its good faith defense. *See Borghese Trademarks Inc. v. Borghese*, 2013

WL 143807, at *9 (S.D.N.Y. Jan. 14, 2013) ("burden for establishing good faith falls upon the party invoking the affirmative defense") (citation omitted). "It is not enough on a motion for summary judgment to demonstrate that plaintiffs fall short of producing evidence of culpable conduct; rather, the defendant must put forth [his] own evidence of [the good faith] defense sufficient to direct a conclusion of law that [he] is entitled to the defense." *See Dietrich v. Bauer*, 126 F. Supp. 2d 759, 768 (S.D.N.Y. 2001) (internal quotations omitted) (alterations in original). This defense is especially ill-suited for those Trusts in which BANA had a conflict of interest after its agreement to acquire Merrill.

BANA relies exclusively on the testimony of a single witness, Susan Franklin, for its alleged good faith interpretation of when a trustee has notice of or has discovered a pre-EOD breach by a seller so as to require the trustee to act. After being directed not to divulge any advice from attorneys, Ms. Franklin testified that, in her own "lay opinion,"[23] a breach would need to be "proven" before the trustee was required to take action, but she could not "hypothesize generally how [a] specific breach would be proven." BANA SUF ¶ 44. The cited testimony says nothing about why or how Ms. Franklin – much less BANA – reached this "proven"-breach standard and it cannot therefore be evidence of acting in good faith or non-negligently. Moreover, the evidence also rebuts Ms. Franklin's understanding because BANA, on its own initiative, regularly filed proofs of claim for R&W breaches when its PSA counter-party filed bankruptcy proceedings and it did so regardless of the level of evidence of breach then in BANA's possession. ¶ 95, 174. In short, summary judgment must be denied on BANA's good faith defense because Plaintiffs have adduced evidence that BANA was at least negligent in

---

[23] And BANA concedes that its good faith defense is not based on any advice it received from counsel and there is no evidence in the record suggesting any attorney ever told BANA that its interpretation of its duties was correct. ¶ 296.

ascertaining – and potentially acting in bad faith by turning a "blind eye" to – the pertinent facts about the loans in the Trusts so as to avoid its obligations.

**B. BANA failed to exercise rights and remedies prudently**

Under all the PSAs, when an EOD occurs, and while it continues, BANA must exercise all rights and remedies available to it in the same manner a prudent person would in the exercise of his own affairs. ¶ 77, 126, 165, 203. BANA argues that Plaintiffs' post-EOD claims should be dismissed because there is inadequate evidence that the EODs occurred. BANA is wrong.

In all of the Trusts, an EOD occurs if the servicer or master servicer materially breaches the PSA and fails to cure that defect within a specified period of time after written notice "shall have been given by the Trustee" or other identified parties or, for one trust (WMABS 2006-HE1), after the servicer has actual knowledge of the breach. ¶ 113, 155, 180, 226. For five WAMU Trusts, EODs will also occur if the "Company" (*i.e.*, the WAMU-affiliated depositor) breaches its duties in any material respect and such failure "continues unremedied for a period of 60 days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to" the depositor. ¶ 207.

By 2010, 

¶¶ 297-308. The two areas involved (1) servicer "Officer Certificates" and (2) servicer-led loan modifications, foreclosures and management of post-foreclosure, or "REO" properties.

**1. Officer's Certificates**

PSAs generally require servicers (a) annually to certify to the trustee its compliance or non-compliance with guidelines for good servicing practices, such as collections from borrowers

and managing foreclosures upon borrowers' defaults. ¶ 297-308. In addition, verification obligations arise upon (i) any determination that the servicer will no longer "advance" its own funds to make up for a late payment by a borrower on the ground that the advance would be "non-recoverable" by the servicer and/or (ii) if the servicer reimburses itself out of current collections for prior advances subsequently deemed by the servicer to be "non-recoverable" instead of sending those current collections to the trustee for distribution to certificateholders. ¶ 2299.[24]



problem every time a servicer stopped advancing on a loan and did not explain why.

---

[24] While a loan is "performing" the servicer must generally advance its own funds to the trust if the borrower is merely late in an interest or principal payment." ¶ 299. If the servicer is unlikely to be able to recover an advance out of the value of the property, the servicer may decline to advance but must provide a certification confirming that it has determined the advance to be "non-recoverable." ¶ 299.

### 2. EODs arising out of servicer-led modifications and foreclosures



The problems with foreclosures were even more acute, particularly for the Trusts involved in this action because it was clear to BANA the Mortgage Files for the loans upon which the servicers were foreclosing had missing or materially defective documentation that gave rise to servicer EODs. ¶¶ 311-320.

The fundamental premise of every RMBS transaction is that the securities will be backed by mortgage loans. This is accomplished by depositing loans into a trust. ¶ 260. The RMBS prospectus supplements explained in detail how this process worked. ¶ 261. An essential step in this process was the delivery of the "Mortgage File," with the original note endorsed to the trust or "in blank," the mortgage, any assignments, and the lender's title policy. ¶ 264. These are the documents necessary to prove and protect title in the Mortgage Loans in foreclosure or other proceeding relating to the Trust collateral. Without them, RMBS cannot be fairly called "mortgage-backed."

As discussed in connection with Plaintiffs' pre-EOD claims, the PSAs require the depositor to deliver the Mortgage File to the trustee or a custodian "on behalf" of the trustee.  For 14 of the 17 Trusts, BANA served as both trustee and custodian. ¶¶ 64-70, 120, 159-160, 187-189. The trustee is responsible for ensuring that it, or its designated custodian, identifies any

documents that are missing from the Mortgage File or that are in the File but are materially defective. ¶ 208. Any missing or materially defective documents need to be noted on the final certification on an exception report. ¶ 210. The seller is given additional time to cure the exceptions, but if it fails to do so, it must repurchase the loan. ¶ 215.

The evidence shows that pre-EOD, the depositors failed to deliver conforming documents for 22, 680 loans in all 17 Trusts. ¶ 315. BANA maintained a database that tracked the seller's failure to cure document defects. ¶ 318. The database shows the sellers failed to cure its failure to deliver required documents or cure its delivery of materially defective documents for 22, 680 loans. ¶ 315. These pre-EOD document defects led to EODs in all of the related Trusts. The servicers in each of the Trusts liquidated many of these loans at a loss to investors, going out of their way to file foreclosure cases even though they were missing key documentation. ¶ 312-321. This required fabrication and falsification of many documents and constituted EODs. The servicers were severely sanctioned for this misconduct when it was discovered by regulators in 2010. From the perspective of this contract litigation, the failure of the servicer to tender the defective loan to the seller for repurchase (or to ask the trustee to do so) was a breach by the servicer of the servicers' obligations.

BANA knew (or at least recklessly disregarded) that servicers were in default under the PSAs by foreclosing based on Mortgage Files with missing or materially defective documents. In all 17 Trusts, BANA was aware of EODs or, at a minimum, aware of servicer defaults that were tantamount to EODs if BANA had given notice to the servicers:

- In all 14 Trusts where BANA also served as custodian, BANA was aware that the seller had not cured Mortgage File defects because it tracked the seller's failure to cure. ¶ 319. BANA also was aware that the servicers were foreclosing on loans with uncured document exceptions because it published monthly reports disclosing which loans were placed into

foreclosure. ¶ 319. This data shows that across the 14 Trusts, 8,204 loans were placed into foreclosure or otherwise liquidated while BANA was the trustee. BANA should have taken action to ensure the servicers stopped liquidating loans at a loss to investors, and instead ensured loans were repurchased, but BANA failed to do so. ¶ 311-320. This data should have prompted BANA to ask the custodian for the three Trusts where it was not custodian whether exceptions remained outstanding.

- In the five WAMU Trusts where EODs also can be triggered by breaches by the depositor, the depositor covenanted to deliver complete Mortgage Files to the trustee or the custodian, on the trustee's behalf. *Id.* ¶ 208. And in two of these (WMALT 2005-6 and WMALT 2005-9), the depositor was also the party required to repurchase breaching loans. BANA knew the depositors breached these covenants because it delivered the final certifications and exception reports and tracked the depositors' failure to cure. ¶ 210-213. BANA should have ensured that the loans were repurchased by JPMorgan as successor to WMMSC, the responsible seller. ¶ 195.

- In four of the WAMU Trusts,[25] the servicer, originally a WaMu affiliate and, subsequently, JPMorgan, was required to enforce the seller's obligation to repurchase mortgage loans. ¶ 236. BANA was aware that in each of these Trusts, the servicers took no action despite knowing that key documents were never delivered to the Trusts that the servicers were aware of. ¶¶ 227-234.

- In WAMU 2006-AR17, BANA failed to take action after its claim against the servicer in the WaMu Bank receivership was denied. ¶ 245-258.

### 3. BANA should have provided notice of the breaches

BANA argues that no EOD technically occurred because no one gave the depositors or

---

[25] WAMU 2006-R17, WMABS 2006-HE1, WMALT 2006-AR8, and WMALT 2006-AR9

servicers formal written notice of their defaults. But it was BANA's job to give that notice.

BANA "cannot rely on its own failure to give notice to escape its own liability." *See, e.g.*, *Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 70–71 (S.D.N.Y. 2013)(citing *In re Bankers Trust Co.*, 450 F.3d 121, 129 (2d Cir. 2006)); *see, e.g.*, *Pacific Life Ins. Co.*, 2018 WL 1382105, at *10 (discussing "numerous" decisions applying the prevention doctrine and "adher[ing] to the standards that its sister courts have consistently upheld").

BANA's reliance on *Fixed Income Shares: Series M*, 157 A.D.3d. 541 (1st Dep't 2018) is misplaced because Plaintiffs have offered evidence showing that U.S. Bank had an affirmative duty to provide notice of a default by the servicer or that its action prevented such notice. *Pac. Life Ins. Co. v. Bank of New York Mellon*, 2018 WL 1871174, at *1 (S.D.N.Y. Apr. 17, 2018) (distinguishing *Fixed Income* on this basis).

BANA had a duty to provide notice of defaults that otherwise qualified as an EOD:

- The MSM Trusts expressly provide the trustee must provide notice of servicer breaches that "would become" EODs: "In the event that a Responsible Officer of the Trustee shall have actual knowledge or written notice of any action or inaction of the Master Servicer that would become an Event of Default upon the Master Servicer's failure to remedy the same after notice, the Trustee shall give notice thereof to the Master Servicer." Fitzgerald Decl. Exs. 32-33, 35-36, 39 § 6.19 (MSM PSAs). BANA claims that *Fixed Income* holds that a trustee is excused from giving the servicer an EOD notice so long as there was some other party authorized to give notice. BANA Br. 32 & 32n.88. But *Fixed Income* does not say that. The court found the plaintiff did not plead a notice duty upon the trustee at all and thus did not have to reach the question of whether the trustee itself frustrated the condition precedent. *Fixed Income*, 157 A.D.3d at 542–43.[26] Here, Plaintiffs have shown that BANA had a notice

---

[26] *Eastman Kodak Co. v. Bostic* cited by BANA is inapplicable because it involved an option contract where both parties were required to use their best efforts to cause a final balance sheet to be certified and the plaintiff in that

duty.

- For six Trusts, BANA was required to provide a report on SEC Form 10-D. ¶ 117. Form 10-D requires the disclosure of all covenant breaches. ¶ 117. Even though BANA had actual knowledge of breaches, it failed to disclose any. ¶ 118.

- Sixteen of the PSAs provide that written notice of breaches by the servicer "shall have been given by the trustee." Barry Decl. Ex. 7 (all trusts other than WMABS 2006-HE1).[27] In *Pacific Life Ins. Co. v. Bank of New York Mellon*, after considering both *Bankers Trust* and *Fixed Income*, the court held that Plaintiffs' interpretation of this provision as requiring notice is a plausible reading of the PSA because "the use of the word 'shall' clearly imports a mandatory obligation." 2018 WL 1382105, at *10.

- For one trust, WMABS 2006-HE1, an EOD arose notwithstanding BANA's failure to formally notify the servicer because the EOD is triggered by the earlier of written notice that shall have been given to the servicer or actual knowledge of such failure by the servicer. Barry Decl. Ex. 7 § 7.01 (Provision Text of WMABS 2006-HE1). Since the servicer was aware of its own conduct, ¶¶ 227-244, 250, notice would not have been necessary.

Moreover, Delaware substantive law governs the WAMU Trusts, and Delaware courts apply the prevention doctrine when a party's breach contributes materially to the non-occurrence, without a requirement of "but for" causation. *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., L.L.C.*, 2010 WL 3706624, at *1 (Del. Ch. Sept. 17, 2010) ("[w]here a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused") (internal quotations omitted);

---

case admitted it had the power to cause the condition precedent. 1991 WL 243378, at *3 (S.D.N.Y. Nov. 14, 1991). Plaintiffs here could not have provided notice as they did not have the requisite holdings.

[27] While discussed in terms of a servicer EOD, a depositor EOD for the WAMU PSAs also contains the language that notice to the depositor "shall have been given to the Company by the Trustee." *See, e.g.*, Fitzgerald Decl. Exs. 47-52 § 7.01(c) (WMALT 2006-AR8 PSA). The remaining WAMU PSAs have substantially similar or identical provisions. Fitzgerald Decl. Exs. 47-52 § 7.01. Thus, Plaintiffs' arguments concerning notice to the depositor of EODs applies equally to those EODs.

*W&G Seaford Assocs., L.P. v. E. Shore Mkts., Inc*., 714 F. Supp. 1336, 1341–42 (D. Del. 1989)
(Delaware law is in accord with Restatement).

### 4. BANA cannot disclaim its awareness of EODs

BANA argues that even if it knew of EODs, it was entitled to disregard them under
Section 8.02 of the MLMI and OWNIT PSAs, which provide that "the Trustee is not deemed to
have knowledge of an Event of Default until a Responsible Officer of the Trustee shall have
received written notice thereof." ¶ 80; BANA Br. 34. U.S. Bank, citing *Phoenix Light v. BNYM*,
made a similar argument. BANA's argument fails for the same reasons set forth in Plaintiffs'
opposition to U.S. Bank's Motion: Section 8.02 is subject to Section 8.01 and Section 8.01 does
not require written notice to a "Responsible Officer." Pltfs' Mem. of Law in Opp. to U.S. Bank's
Mot. Section II.B.

BANA's disclaimer of knowledge of an EOD fails for an additional reason. Unlike some
PSAs, Section 8.01 of the MLMI and OWNIT PSAs does not condition BANA's duties to
exercise rights and remedies prudently upon BANA's knowledge of the EODs' occurrence. ¶ 79.
Section 8.01 states: "In case an Event of Default has occurred and remains uncured, the Trustee
shall exercise such of the rights and powers vested in it by this Agreement and use the same
degree of care and skill in its exercise as a prudent person would exercise or use under the
circumstances in the conduct of such person's own affairs." Fitzgerald Decl. Ex. 30 § 8.01
(MLMI 2006-RM4 PSA); *see also id.* Exs. 28-29, 31 § 8.01. This does not say anything about
the trustee's knowledge. Thus, for these Trusts, EODs existed regardless of BANA's professed
ignorance.

*Phoenix Light v. BNYM* considered a PSA that stated in Section 8.01 that the trustee was
required to exercise rights and remedies prudently if there were EODs "known to the trustee."

2017 WL 3973951, at *16–17.[28] The court reasoned that Section 8.02 could under such circumstances define knowledge and, thus, concluded that "actual knowledge is irrelevant." *Id.* at *17. Of course, for the reasons stated in opposition to U.S. Bank's motion, Plaintiffs do not believe that reasoning is persuasive, but the case has absolutely no application where the duty is not triggered upon knowledge. *Argonaut P'Ship L.P. v. Bankers Trusts Co.*, 2001 WL 585519, at *2 (S.D.N.Y. May 30, 2001), cited by BANA, supports Plaintiffs' position as the relevant provision in that case was in Section 8.01 and stated:

> the Trustee shall not be deemed to have knowledge of an Event of Default or Potential Event of Default, nor shall it be obligated to exercise any remedies with respect thereto, unless a Responsible Officer of the Trustee shall have received written notice of such Event of Default or Potential Event of Default . . . .

Rather than place this provision in Section 8.02, the parties in *Argonaut* placed it in Section 8.01, and made it clear that the trustee's Section 8.01 duties would not kick in until it received written notice. BANA could have inserted similar language to the PSAs, ¶ 289, but did not.

## CONCLUSION

For the reasons stated above, there are material issues of fact and BANA's motion for summary judgment should be denied.

Dated: June 18, 2018

By: /s/ Lyndon M. Tretter

David H. Wollmuth
Lyndon M. Tretter
Steven S. Fitzgerald
Roselind F. Hallinan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300

---

[28] *Commerce Bank v. BNYM* considered the same form Countrywide PSA that stated in 8.01 that the duty to exercise rights and remedies was only triggered when there were EODs "known to the trustee." 141 A.D.3d at 414-15. Moreover, the plaintiff there failed to allege that the trustee had actual knowledge of an EOD and, thus, the court considered only whether the trustee had constructive knowledge.

Fax: (212) 382-0050
dwollmuth@wmd-law.com
ltretter@wmd-law.com
sfitzgerald@wmd-law.com
rhallinan@wmd-law.com

*Attorneys for Plaintiffs*