# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                    :

PHOENIX LIGHT SF LIMITED, et al.,    :
                                      :
                         Plaintiffs,  :

                       - v -         :

U.S. BANK NATIONAL ASSOCIATION and :
BANK OF AMERICA, NA,        :
                                      :
                        Defendants.  :
                                      :
--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____3/18/2020_____

14-CV-10116 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

David H. Wollmuth
Randall R. Rainer
Lyndon M. Tretter
Michael C. Ledley
Steven S. Fitzgerald
Roselind F. Hallinan
Wollmuth Maher & Deutsch LLP
New York, NY

George A. Zelcs
John A. Libra
Matthew C. Davies
Max C. Gibbons
Korein Tillery LLC
Chicago, IL

Stephen M. Tillery
Korein Tillery LLC
St. Louis, MO

*Counsel for Plaintiffs*

David F. Adler
Louis A. Chaiten
Jones Day
Cleveland, OH

Michael T. Marcucci
Jones Day
Boston, MA

Albert J. Rota
Jones Day
Dallas, TX

Andrew S. Kleinfeld
Jones Day
New York. NY

*Counsel for Defendant U.S. Bank National Association*

<u>VERNON S. BRODERICK, United States District Judge</u>:

Before me is Defendant U.S. Bank National Association's ("U.S. Bank") motion for

partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c) as to a specific

subset of Plaintiffs' contract-based claims, namely, Plaintiffs' allegations that U.S. Bank, as a

Residential Mortgage Backed Securities ("RMBS") Trustee, breached its post-event of default

contractual duties.  (Doc. 139.)  Also before me is Defendant U.S. Bank's motion for summary

judgment pursuant to Federal Rule of Civil Procedure 56.  (Doc. 243.)[1]  Because I find that there

is no genuine material factual dispute that the assignments at issue are void under New York's

prohibition on champerty, and that Plaintiffs do not have standing to pursue these breach of

contract claims, Defendant U.S. Bank's motion for summary judgment is GRANTED, and its

motion for partial judgment on the pleadings is DENIED as moot.

## I.    <u>**Factual Background and Procedural History**</u>

### A.  *Preliminary Facts*

Plaintiffs Phoenix Light SF Limited ("Phoenix Light"), Blue Heron Funding VI Ltd.,

---

[1] After Bank of America had filed its motion for summary judgment, Plaintiffs and Bank of America reached a
settlement agreement and stipulated to the dismissal of Bank of America from the case.  (Doc. 386.)

Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-Bass CBO XIV Ltd., and C-Bass CBO XVII Ltd. (together "Plaintiffs"), are each issuers of collateralized debt obligations ("CDOs"). The CDOs issued by Plaintiffs took the form of notes, and were backed by RMBS certificates, as well as substantial holdings of securities other than RMBS certificates, that were held in trusts pursuant to CDO Indentures that Plaintiffs signed with their respective CDO Indenture Trustees. In addition to issuing CDO notes, Plaintiff Phoenix Light became the majority holder of the controlling class of CDO notes issued by the other Plaintiffs in this case.

The RMBS certificates that Plaintiffs resecuritized in the form of CDO notes were issued by fifty-three RMBS trusts (the "RMBS Trusts"), for which Defendants U.S. Bank and Bank of America, NA ("Bank of America"), at different points in time, served as RMBS Trustees. RMBS certificates are created through a mortgage loan securitization process, in which sponsors or sellers of mortgage loans sell loans to a depositor, who conveys a pool of loans to an appointed RMBS trustee through a pooling and servicing agreement ("PSA").[2] The right to receive trust income is parceled into RMBS certificates and sold to investors. A servicer is appointed to manage the collection of payments on the underlying loans in exchange for a monthly fee. The RMBS Trustee's duties are set forth in the PSA, which includes duties that arise upon an event of default ("EOD" or "Event of Default"). This action concerns Defendants' alleged breach of their RMBS Trustee duties as set forth in the relevant PSAs.

This action was originally assigned to Judge Katherine B. Forrest, and transferred to my docket on June 6, 2016. (*See* Dkt. Entry June 6, 2016.) I assume the parties' familiarity with the

---

[2] The Second Circuit has outlined in more detail the process by which RMBS Certificates are issued in *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 156 (2d Cir. 2014) (citing *BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp.*, 673 F.3d 169, 173 (2d Cir. 2012)).

background of this action, which is more fully set forth in the March 22, 2016 decision issued by Judge Forrest that addressed Defendants' motion to dismiss Plaintiffs' Second Amended Complaint for lack of standing, as well as Defendants' motion to dismiss the non-contract claims. *See Phoenix Light SF Ltd., et al. v. U.S. Bank Nat'l Ass'n*, No. 14-cv-10116 (KBF), 2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016) ("*Phoenix Light II*").

### B. *The First Amended Complaint*

Plaintiffs filed the First Amended Complaint in this case on February 2, 2015. (Doc. 36.) At that time, Plaintiffs alleged standing to bring direct claims based on their alleged ownership of RMBS certificates, and Plaintiff Phoenix Light further alleged standing to sue derivatively based on its ownership of a majority of the senior notes issued by the other Plaintiffs. *See Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, No. 14-CV-10116 KBF, 2015 WL 2359358, at *1 (S.D.N.Y. May 18, 2015) ("*Phoenix Light I*"). At the time, Plaintiffs were unable to produce the set of Asset Purchase Agreements through which they initially purchased the RMBS certificates at issue in this case. *Id.* at *1–2. Defendants moved to dismiss the First Amended Complaint on February 27, 2015, arguing in part that Plaintiffs failed to adequately demonstrate that they had standing to proceed with the litigation. (Docs. 49–51.)

On May 18, 2015, Judge Forrest granted Defendants' motion and dismissed Plaintiffs' Amended Complaint, rejecting Plaintiffs' contention that they had standing to bring either direct or derivative claims. *Id.* Judge Forrest's opinion focused on Plaintiffs' failure to demonstrate how they initially purchased the RMBS certificates, and what rights, if any, they were assigned in the Asset Purchase Agreements through which they obtained the RMBS certificates. *Id.* at *2. Finding "insufficient allegations to support a proper assignment of legal claims as to . . . the certificates at issue," Judge Forrest concluded that Plaintiffs failed to adequately "allege facts

that affirmatively and plausibly suggest[ed] that [they had] standing to sue." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam)).

In addition to finding that Plaintiffs failed to allege how they originally obtained the RMBS certificates at issue, Judge Forrest also concluded that the CDO Indentures Plaintiffs executed with their CDO Indenture Trustees constituted "[a] full assignment [that] divest[ed] [P]laintiffs of any rights they otherwise may have had to commence litigation on their own behalf." *Id.* Specifically, Judge Forrest concluded that the CDO Indentures constituted a "full assignment" of "all . . . right, title and interest in the [RMBS] certificates," as well as the "full power to file actions" regarding rights under the RMBS certificates. *Id.* (internal quotation marks omitted). As such, Judge Forrest concluded that Plaintiffs' right to bring this action directly could vest "only by way of assignment" from the CDO Indenture Trustees back to Plaintiffs, which had not occurred. *Id.* at *3.

Finally, Judge Forrest rejected Plaintiffs' argument that Phoenix Light could bring this action derivatively based on its ownership of a majority of the Senior Notes issued by the other Plaintiffs, and further found that Phoenix Light's failure to comply with Federal Rule of Civil Procedure 23.1 foreclosed Plaintiffs attempt to bring a derivative claim.[3] *Id.* at *3–4.

## C. *The Second Amended Complaint*

From April to July of 2015, Plaintiffs sought from the CDO Indenture Trustees assignments of the rights to bring these claims in light of Judge Forrest's Opinion & Order.[4] On

---

[3] Federal Rule of Civil Procedure 23.1 sets out, among other things, the prerequisites and pleading requirements for filing a derivative action.

[4] As Judge Forrest described in *Phoenix Light I*, and as discussed below, this was not Plaintiffs' first attempt to seek assignments from the CDO Indenture Trustees. Plaintiffs first sent the CDO Indenture Trustees letters requesting assignments on December 12, 2014, shortly before filing their initial complaint. *Phoenix Light I*, 2015 WL 2359358, at *3; *see also* Exhibits 22–25 to the Declaration of Adam P. Barry in Support of Bank of America, N.A.'s Motion for Summary Judgment ("Barry Decl."), (Doc. 249). These requests were unsuccessful.

July 2, 2015, Plaintiffs filed the Second Amended Complaint.  (Doc. 77.)  Plaintiffs' Second

Amended Complaint reasserted certain allegations and provided the documentation underlying

Plaintiffs original acquisition of the RMBS Certificates, and further provided documentation

demonstrating that certain Plaintiffs received assignments from the CDO Indenture Trustees.

*Phoenix Light II*, 2016 WL 1169515, at *4.  Based upon these modifications, Plaintiffs argued

that they now had standing to pursue these claims directly through the assignments.  *Id.*

Plaintiffs no longer asserted derivative standing to bring these claims based on Phoenix Light's

status as a noteholder.  *Id.*  Again, Defendants moved to dismiss the Second Amended Complaint

in part on standing grounds.  (Docs. 84–86.)  Defendants argued that the CDO Indenture

Trustees' assignments of the rights to pursue these claims were invalid based on the original

CDO Indentures themselves, and further argued that the assignments were void under New

York's prohibition on champerty,[5] thus negating the alleged basis for standing.  Judge Forrest

denied without prejudice Defendants' motion to dismiss the Second Amended Complaint for

lack of standing, concluding that the factual record was insufficiently developed to accept

Defendants' arguments at the pleadings stage and were more appropriate for consideration on

summary judgment after discovery.  *Id.* at *6–8.

### D.  *Relevant Facts Developed During Discovery*[6]

#### 1.     Plaintiffs' Formation and the CDO Indentures

WestLB AG ("WestLB") is a German bank that created entities to issue CDOs, including

---

[5] As discussed in greater detail below, champerty is a common law doctrine designed to "prevent or curtail the commercialization or trading in litigation."  In New York, the prohibition against champerty is codified in Judiciary Law § 489.

[6] I make these factual findings in light of the parties' Local Rule 56.1 statements and the declarations and exhibits submitted in connection with summary judgment.  For the sake of convenience, my citations to the parties' Local Rule 56.1 statements refer to Defendants' respective reply 56.1 statements containing, in consolidated form organized by paragraph number, Defendants' initial 56.1 statements, Plaintiffs' counterstatements and objections, and Defendants' final reply statements and objections.  *See* Bank of America, N.A.'s Reply, Responses, and

Plaintiffs Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, Silver Elms CDO II Limited, C-Bass CBO XIV Ltd., and C-Bass CBO XVII Ltd. (together the "CDO Plaintiffs"). (U.S. Bank 56.1 ¶ 16). As Judge Forrest outlined in *Phoenix Light II*, it is undisputed that the CDO Plaintiffs acquired the RMBS certificates at issue from third-parties, including WestLB, and that certain CDO Plaintiffs acquired some RMBS certificates directly in the RMBS market. *Phoenix Light II*, 2016 WL 1169515, at *3; (U.S. Bank 56.1 ¶ 16). The CDO notes issued by the CDO Plaintiffs were backed primarily by the RMBS certificates acquired by the CDO Plaintiffs, but were also backed by substantial holdings of non-RMBS that the CDO Plaintiffs acquired, including Commercial Mortgage-Backed Securities, Monoline Guaranteed Securities, Small Business Loan Securities, Student Loan Securities, and other Asset-Backed Securities. (U.S. Bank 56.1 ¶ 17; *see also* Fitzgerald Decl. Ex. 207, at 676.)[7]

Although WestLB divided the CDOs into tranches and sold, through the CDO Plaintiffs, its interest in the CDOs to investors in the form of notes, WestLB did not sell all of the CDO tranches; it kept the unsold interests on its books until it transferred those interests to Plaintiff Phoenix Light. (U.S. Bank 56.1 ¶ 18.) In fact, Phoenix Light was created in part to hold certain of WestLB's distressed assets. (*Id.* ¶ 19.) Among the assets that WestLB transferred to Phoenix Light were certain RMBS certificates at issue in this case, as well as notes issued by the CDO Plaintiffs, which gave Phoenix Light a majority of the controlling class of notes issued by the CDO Plaintiffs. (*See* U.S. Bank 56.1 ¶¶ 19–20; *see also* Letter to the Court from Steven S.

Objections to Plaintiffs' Counter-Statement of Undisputed Facts ("BOA 56.1"), (Doc. 339); Defendant U.S. Bank National Association's Reply and Response to Plaintiffs' Counter-Statement of Undisputed Facts Pursuant to Rule 56.1 of the Local Civil Rules for the Southern District of New York ("U.S. Bank 56.1"), (Doc. 344).

[7] "Fitzgerald Decl." refers to the Corrected Declaration of Steven S. Fitzgerald in Support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment, (Doc. 324).

Fitzgerald dated February 17, 2016, (Doc. 104, at 2–3).)  To finance its purchase of these assets from WestLB, Plaintiff Phoenix Light issued and sold its own CDO notes to WestLB.  (U.S. Bank 56.1 ¶ 19.)  As Plaintiffs previously represented, "no [CDO P]laintiff owns notes issued by Phoenix Light SF Limited" and "[a]ll of the notes issued by Phoenix Light SF Limited are owned by Erste Abwicklungsanstalt ("EAA"), a winding up agency created by the German government in connection with the failure of WestLB []."  (Letter to the Court from Steven S. Fitzgerald dated February 17, 2016, (Doc. 104, at 2–3); *see also* U.S. Bank 56.1 ¶¶ 20–21.)  Plaintiffs do not dispute that EAA is tasked with winding down WestLB's business and assets.  (U.S. Bank 56.1 ¶ 21.)[8]

It is also undisputed that when Plaintiffs were formed, all of the Plaintiffs, with the exception of Phoenix Light, entered into CDO Indentures with their respective CDO Indenture Trustees.  (*Id.* ¶ 25.)  The CDO Indenture Trustees included:  (i) Deutsche Bank Trust Company Americas ("Deutsche Bank"), for the Kleros and Silver Elms CDO Indentures; (ii) Bank of New York Trust Company, National Association ("BNY"), for the Blue Heron VI, C-BASS XIV and C-BASS XVII CDO Indentures; and (iii) Wells Fargo Bank, N.A. ("Wells Fargo"), for the Silver Elms II and Blue Heron VII CDO Indentures.  (*Id.*; s*ee also* Barry Decl. Exs. 31–37.)  As for Phoenix Light, it entered into a Trust Agreement on March 31, 2008 with Deutsche Bank, (U.S. Bank 56.1 ¶ 27), and on December 29, 2009 entered into an Amended and Restated U.S. Security Agreement with Deutsche Bank, (U.S. Bank 56.1 ¶ 29).  As discussed below, these agreements transferred all of Plaintiffs' rights in the underlying RMBS Certificates, and other securities backing the CDO notes, to their respective CDO Indenture Trustees.

---

[8] Enno Balz's deposition testimony states that "Erste Abwicklungsanstalt [is] an acronym for first wind down agency," and further explains that EAA is a German government agency that was formed in late 2009 for the purpose of winding down certain assets formally held by WestLB.  (Fitzgerald Decl. Ex. 208, at 20:3-18.)

## 2.     The Assignments

It is undisputed that Plaintiffs first sent the CDO Indenture Trustees letters requesting assignments of these claims on December 12, 2014, twelve days before filing their initial complaint. *See Phoenix Light I*, 2015 WL 2359358, at *3; (Barry Decl. Exs. 22–25).  The letters enclosed Assignment of Claims Agreements, and asked the Plaintiffs' respective CDO Indenture Trustees to "execute and return" the agreements assigning the "right to commence litigation on behalf of the CDO[] [Issuers] against the [RMBS trustees] of certain [RMBS] trusts that issued certificates purchased by the CDO[] [Issuers]."  (*See, e.g.*, Doc. 249 Ex. 22, at 6.)  Although the CDO Indenture Trustees did not immediately assign their claims to Plaintiffs, after the dismissal of Plaintiffs' First Amended Complaint, and before the filing of Plaintiffs' Second Amended Complaint, Plaintiffs obtained the assignments in question.  Specifically, on April 16, 2015, Deutsche Bank and Phoenix Light entered into a written assignment agreement whereby Deutsche Bank assigned to Phoenix Light "any and all rights that the Trustee may have to pursue and enforce the claims as set forth [in this action]" that Deutsche Bank may have had as CDO Indenture Trustee under the Silver Elms and Kleros CDO Indentures.  (U.S. Bank 56.1 ¶¶ 35–36, 38; Barry Decl. Ex. 27.)  On June 17, 2016, Deutsche Bank and Phoenix Light entered into a second assignment agreement, whereby Deutsche Bank—as Trustee pursuant to the Phoenix Light Trust Agreement and U.S. Security Agreement—also assigned to Phoenix Light "any and all rights that the Trustee may have to pursue and enforce the claims as set forth [in this action]" that Deutsche Bank may have had under those instruments.  (U.S. Bank 56.1 ¶ 39; Barry Decl. Ex. 28.)  On June 19, 2015, BNY assigned to C-BASS XIV and XVII and Blue Heron VI "all right, title, and interest in, to, and under, . . . that the Trustee may have with respect to the claims asserted or which may hereafter be asserted . . . in [this action]," the C-Bass XIV and XVII and

the Blue Heron VI CDO Indentures.  (U.S. Bank 56.1 ¶ 37; Barry Decl. Ex. 26.)  Finally, on June 26, 2015, Wells Fargo assigned to Silver Elms II and Blue Heron VII "all right, title and interest that each of the Blue Heron Trustee and the Silver Elms Trustee may have, if any, with respect to the claims asserted [in this action]," over the Silver Elms II and Blue Heron VII CDO Indentures. (U.S. Bank 56.1 ¶ 40; Barry Decl. Ex. 29.)  Each of these assignment agreements specifically referenced the instant litigation—in addition to related RMBS cases brought by Plaintiffs—by caption, and assigned the respective CDO Indenture Trustees' rights to pursue the claims raised in the cases identified by caption.  (Barry Decl. Exs. 26–29.)  The assignment agreements did not include an assignment of any rights beyond the rights to pursue the claims in the identified lawsuits.  In fact, the June 26, 2015 agreement states that the assignment was sought "[i]n response to the *Opinion & Order* in *Phoenix Light SF Limited, et al. v. U.S. Bank National Association, et al.*, 14-cv-10116 (KBF) (decided May 18, 2015)."  (Barry Decl. Ex. 29, at 2.)  In addition to the Plaintiffs and their respective CDO Indenture Trustees, EAA is a party to three of these assignment agreements in its capacity as the controlling owner of Phoenix Light notes. (Barry Decl. Ex. 26, at 3; Ex. 29, at 2; Ex. 28, at 2.)

The parties do not dispute that Plaintiffs paid nothing in exchange for these assignments. (BOA 56.1 ¶ 14.)  However, the agreements do provide for indemnification of the CDO Indenture Trustees.  (*See* Barry Decl. Ex. 26, at 3–4; Ex. 27, at 3; Ex. 28, at 2–3; Ex. 29, at 4.) Lastly, the parties do not dispute that Plaintiffs, through the assignments, agreed to fund any litigation arising out of the assignments, and that Plaintiffs are not entitled to the proceeds of this litigation, but may be reimbursed for costs and expenses based on any recovery.  (BOA 56.1 ¶ 15.)

### 3.  Plaintiffs' Purpose in Seeking the Assignments

Various materials in the record are relevant to determining Plaintiffs' purpose behind

seeking the assignments in question.  For example, Plaintiffs' 30(b)(6) representative, Peter J.

Collins, testified during his deposition, in relevant part, as follows:

> Q. Why did [] Plaintiffs seek assignments from the CDO trustees?  []
>
> A. They were being instructed or EAA was voicing their opinion as to how these CDOs would benefit from litigation and they were trying to have litigation pursued.
>
> Q. Did EAA instruct Plaintiffs' directors to seek assignments from Plaintiffs' CDO trustees?
>
> A. It would ultimately have been Phoenix asking or directing the various CDO Plaintiffs other than Phoenix to pursue claims or assignments . . . .
>
> Q: Who would be directing Phoenix to ask or direct the various CDO Plaintiffs to pursue assignment from the CDO trustees for the purpose of litigation?  []
>
> A. That would be EAA.
>
> Q. So just so I'm clear, EAA instructed or asked Phoenix Light to instruct or ask the other Plaintiff CDOs to obtain the CDO trustees['] assignments, right?
>
> A. Yes.
>
> Q. The Plaintiff CDOs sought those CDO trustee assignments for the purpose of bringing this litigation?
>
> A. Yes.
>
> Q. Did they seek those assignments for any other purpose?
>
> A. Not to my knowledge.

(Barry Decl. Ex. 30, at 323:1–324:9.)  The parties also presented portions of Collins's 30(b)(6)

testimony outlining that Plaintiffs sought assignments from the CDO Indenture Trustees because

"they viewed the CDO [Indenture T]rustees as suffering conflicts of interests," and "because of

those alleged conflicts of interests, absent [the assignments], these claims would not be brought

against the RMBS trustees." (Fitzgerald Decl. Ex. 210, at 325:21-25; 326:1-7.)[9]

In addition to the above 30(b)(6) deposition testimony, the deposition testimony of Alan Geraghty—one of Phoenix Light's directors—corroborated Collins's 30(b)(6) testimony that the assignments were designed to allow Plaintiffs to bring the instant legal claims:

> Q. What was the purpose of asking the CDO trustees to reassign the claims back to the SPVs?
>
> A. I believe it was then that the—then the SPVs could make the claims.
>
> Q. So the purpose of reassignment agreements was to allow the SPVs to bring legal claims relating to RMBS?
>
> A. I believe so. []
>
> Q. Aside from bringing legal claims, was there any other purpose motivating the SPVs to instruct the CDO trustees to reassign back the claims?
>
> A. I don't know. I don't think so.

(Barry Decl. Ex. 19, at 243:7–244:2.) Geraghty further testified:

> Q. The Plaintiff CDOs entered into these reassignment agreements with the CDO trustees for the purpose of furthering the U.S. RMBS litigation, right?
>
> A. Yes.
>
> Q. Was there any other purpose for which the Plaintiff CDOs entered into the CDO trustee agreements?
>
> A. I don't believe so, no.

(*Id.* at 250:4-17.)[10]

---

[9] Plaintiffs also cited Collins's 30(b)(6) testimony in a related case, *Phoenix Light SF Ltd. v. Wells Fargo*, No. 14-cv-10102: "Q. Why were the assignments from the CDO Indenture Trustees to the various plaintiffs executed? A. The trustees were conflicted and it was known that they weren't going to take action against these claims." (Fitzgerald Decl. Ex. 214, at 173:18-23.).

[10] Plaintiffs do not attempt to rebut Geraghty's testimony with contrary evidence, but instead argue that Geraghty was not that involved in negotiating the assignments, and was involved primarily in the execution of the assignments. (*See* BOA 56.1 ¶ 12.) In other words, Plaintiffs seem to be suggesting that Geraghty was not in a position to know the purpose behind the assignments.

Finally, given EAA's substantial involvement in the assignments, and ownership of the Phoenix Light notes, the parties presented additional evidence regarding the reason for EAA's involvement in the assignments.  When deposed by Defendants, Enno Balz—an employee of EAA who corresponded with Phoenix Light regarding these claims—gave the following testimony:

> Q. [] Is part of EAA's mandate to wind down EAA's portfolio in a way that minimizes losses to EAA's stakeholders?
>
> A. Yes, that's correct.
>
> Q. And one component of that strategy is to bring litigation claims to try to extract value from the underlying assets?[11]
>
> A. I would say whenever we see that something has gone wrong and there has been damage caused by third-parties or unlawfully to EAA's portfolio, then of course it is part of our mandate to make sure that these damages are being recovered.
>
> Q. And if there are losses and there is an entity to be sued, it is, as long as it makes economic sense, that is going to be done, correct? []
>
> A. Correct, yes.
>
> Q. Were you involved in the decision to bring this case against Bank Of America and U.S. Bank at some level? []
>
> A. Yes.

(Marcucci Decl.[12] Ex. 18, at 34:6–35:6; Fitzgerald Decl. Ex. 208, at 34:6–35:6.)[13]  Balz further

---

[11] Balz's deposition testimony also elaborated on EAA's financial interest in this case:  "Q. Would you characterize Phoenix as a corporation?  A. Yes.  Q. And when Phoenix suffers losses in its portfolio, those losses ultimately are felt by EAA as its noteholder, yes?  A. Losses are always suffered—like any corporation that loses part of their assets the corporation suffers losses and it makes it harder for the corporation to honor its obligation to its creditors or even to its equity holders.  Q. So there is some negative effect felt by the stakeholders in the corporation, is that what you're saying?  A. As always, yes."  (Fitzgerald Decl. Ex. 208, at 182:19–183:9.)

[12] "Marcucci Decl." refers to the Corrected Declaration of Michael T. Marcucci in Support of U.S. Bank National Association's Motion for Summary Judgment, (Doc. 267).

[13] Plaintiffs also offered Balz's deposition testimony in *Phoenix Light SF Ltd. v. Wells Fargo*, No. 14-cv-10102: "Q. Part of the EAA's strategy is to actively pursue legal claims and to look for opportunities to make claims, correct?  A. Yes.  Definitely.  If there are losses in our portfolio where we think that they occurred in relation to legal claims and therefore can potentially be recovered through litigation then we have to pursue.  Q.  If there is an entity to be sued and there are losses then as long as it makes economic sense that is going to be done, correct? . . . [A.]  Well,

testified as follows:

> Q. [] You were involved in discussions about whether Plaintiffs should file this lawsuit, correct?  Just yes or no.
>
> A. Yes.
>
> . . .
>
> Q. Were you the one that suggested to Phoenix that it file the case?
>
> A. Officially, yes, EAA would do the propos[al], but I would be the one communicating with the directors of Phoenix Light.
>
> Q. Do you recall if EAA gave a formal direction to Phoenix to file the lawsuit?
>
> A. I don't recall specifically, but that would not surprise me if that has happened.
>
> Q. Did you also put the Plaintiffs in touch with the Wollmuth firm?
>
> A. Yes.
>
> Q. Have Plaintiffs ever filed an RMBS-related lawsuit without consulting with EAA first, to your knowledge?
>
> A. I don't recall.
>
> Q. You don't recall that ever happening?
>
> A. Yes.
>
> Q. You would know if that had happened?
>
> A. I think so.

(Fitzgerald Decl. Ex. 208, at 221:18–223:4.)  Notably, Balz also testified that the June 19, 2015 assignment agreement "allowed the Plaintiffs to assert standing in the complaints that they filed against the RMBS trustees."  (*Id.* at 220:3-6.)[14]

---

yes, if it makes economic sense, it is also a variation between risk and potential reward, yes." (Marcucci Decl. Ex. 19, at 206:7-24.)

[14] Plaintiffs represented in their Local Rule 56.1 counterstatement of facts that Plaintiffs sought the assignments to "effectively manage their ownership in certificates."  (BOA 56.1 ¶ 11.)  As an initial matter, it is not clear what this statement means in practical terms.  Not surprisingly, therefore, Plaintiffs do not support this contention with any

E.  *The Instant Motions*

Following Judge Forrest's 2016 opinion granting in part and denying in part Defendants'

motion to dismiss, (Doc. 105), Defendants, on May 13, 2016, submitted their answers to the

Second Amended Complaint, (Docs. 117, 118).  The case was thereafter transferred to my

docket, (Dkt. Entry June 6, 2016), and on October 3, 2016, the parties submitted a joint status

letter in which Defendants outlined their intent to submit a pre-motion letter requesting leave to

file a Rule 12(c) motion for judgment on the pleadings, (Doc. 132).  At the status conference

held on October 6, 2016, I set a briefing schedule for Defendants' anticipated motion, and in

accordance with that briefing schedule, Defendants filed their motion on October 14, 2016.

(Docs. 139–42.)  Plaintiffs filed their opposition on November 14, 2016, (Docs. 147–48), and

Defendants filed their reply on December 9, 2016, (Docs. 149–50).  Additionally, on February

15, 2017, I received a notice of supplemental authority from Plaintiffs, (Doc. 153), to which

Defendants replied on February 23, 2017, (Doc. 154).  Defendants filed their own notice of

supplemental authority on August 7, 2017, (Doc. 182), to which Plaintiffs responded on August

11, 2017, (Doc. 184).  Defendants filed a reply to Plaintiffs' response on August 14, 2017.  (Doc.

185).  Defendants filed an additional notice of supplemental authority on September 18, 2017,

(Doc. 187), to which Plaintiffs responded on September 25, 2017, (Doc. 189)  Plaintiffs filed a

final notice of supplemental authority on October 2, 2017, (Doc. 190), to which Defendants

---

evidence in the record, and I accordingly disregard Plaintiffs' contention as being improper on summary judgment.
*See* Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each
statement controverting any statement of material fact, must be followed by citation to evidence which would be
admissible, set forth as required by Fed. R. Civ. P. 56(c)."); *see also* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting
that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials
in the record, including depositions, documents, electronically stored information, affidavits or declarations,
stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other
materials."); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly
address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for
purposes of the motion.").

responded on October 12, 2017, (Doc. 191).  On October 25, 2017, Defendants requested that, in

light of the then-forthcoming motions for summary judgment, I defer ruling on the motion for

judgment on the pleadings, and address the motions at the same time.  (Doc. 192.)  I granted that

request on November 15, 2017.  (Doc. 193.)

On January 2, 2018, Plaintiffs filed their Third Amended Complaint, (Doc. 209)

(hereinafter "TAC"), and Defendants filed their Answers on January 16, 2018.  (Docs. 213–14.)

On March 30, 2018, Defendant Bank of America filed a motion for summary judgment, (Doc.

241), with a memorandum of law, (Doc. 242), Local Rule 56.1 Statement, (Doc. 245), and a

declaration in support of its motion, (Doc. 249).  Plaintiffs filed their opposition and supporting

documents from June 18–21, 2018, (Docs. 301–305, 308, 309, 314), and they filed corrected

versions of those documents on July 3–5, 2018, (Docs. 320, 321, 324).  Defendant Bank of

America filed its reply, additional declarations, and its response to Plaintiffs' Local Rule 56.1

Counterstatement from August 6–9, 2018.  (Docs. 338–40.)  On March 30, 2018, U.S. Bank filed

a motion for summary judgment, (Doc. 243), with a memorandum of law, (Doc. 244), Local

Rule 56.1 Statement, (Doc. 250), and a declaration in support of its motion, (Doc. 246), and it

subsequently filed an additional declaration in support of its motion, (Doc. 267).  Plaintiffs filed

their opposition and supporting documents on June 19–21, 2018, (Docs. 310, 311, 314), and they

filed corrected versions of those documents on July 3–5, 2018, (Docs. 322–24).  Defendant U.S.

Bank filed its reply, additional declarations, and its response to Plaintiffs' Local Rule 56.1

Counterstatement from August 6–9, 2018.  (Docs. 337, 343–45.)  I held oral argument on

Defendants' summary judgment motions on October 26, 2018.  (*See* Oral Arg. Tr., (Doc. 380).)

On October 25, 2018, Plaintiffs and Defendant Bank of America notified me that they

had reached a settlement in principle, and asked that I hold Bank of America's then-pending

motion for summary judgment in abeyance.  (Doc. 373.)  Plaintiffs and Bank of America filed a

stipulation of voluntary dismissal as to Bank of America on December 7, 2018, (Doc. 386),

which I signed on December 10, 2018, terminating Bank of America from the case, (Doc. 388).[15]

On December 14, 2018, Plaintiff filed a Fourth Amended Complaint consistent with the

stipulation of voluntary dismissal as to Bank of America.  (Doc. 390; *see also* Doc. 385 (granting

Plaintiffs' request for leave to file a Fourth Amended Complaint).)  Defendant U.S. Bank filed an

answer to the Fourth Amended Complaint on January 18, 2019.  (Doc. 396.)

## II.   **Legal Standard**

Summary judgment is appropriate when "the parties' submissions show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P.

56(a).  A "dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the

governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."

*Id.*

On a motion for summary judgment, the moving party bears the initial burden of

establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the

nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at

---

[15] On December 3, 2018, at the request of Defendant U.S. Bank and without objection by Plaintiffs, I entered an
order preserving, insofar as they are applicable, any arguments presented in Defendant Bank of America's summary
judgment papers that Defendant U.S. Bank joined.  (Doc. 385.)  Therefore, I consider the procedural history
involving Defendant Bank of America and any corresponding summary judgment arguments and related Local Rule
56.1 statements that Defendant U.S. Bank adopted in its own summary judgment papers.  These arguments and
Local Rule 56.1 statements primarily involve Plaintiffs' standing to bring this case, which Defendant U.S. Bank
explicitly incorporated into its own motion for summary judgment.  (*See* Doc. 244, at 8 (citing Bank of America's
memorandum in support of its motion for summary judgment, Document 242, at pages 12 to 16).)

256 (internal quotation marks omitted), and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted).  Rather, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein."  *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in

favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal

citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any

evidence in the record that could reasonably support a jury's verdict for the non-moving party,"

summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d

Cir. 2002).

### III.   Discussion

Defendant U.S. Bank argues that the CDO Indenture Trustees' assignments of the rights

to pursue these breach of contract claims are void under New York's prohibition on champerty,[16]

thus negating Plaintiffs' alleged basis for standing in the instant suit.[17]   I agree.   I first outline the

relevant legal standards applicable to Plaintiffs' standing in this case, and then proceed to apply

New York champerty law to the assignments at issue for purposes of determining whether

Plaintiffs have standing under relevant Second Circuit law.   Because I conclude that there is no

genuine material factual dispute that the assignments at issue are void under New York's

prohibition on champerty, and because as a matter of law Plaintiffs do not have standing to

pursue these breach of contract claims in the absence of a valid assignment, I grant Defendant's

motion for summary judgment on the issue of standing and dismiss this case.

---

[16] As noted above and discussed in greater detail below, champerty is a common law doctrine to "prevent or curtail the commercialization or trading in litigation," and is codified in New York's Judiciary Law § 489.  Defendant's argument is not unprecedented, and was raised but not considered in another relevant case. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 680 (S.D.N.Y. 2019) (mentioning a defendant's champerty defense but rejecting application of the defense because the case involved a trustee agreement, not an agreement to assign a claim).

[17] Defendant also argues that the assignments are invalid based on the language in the original CDO Indentures themselves.  I do not consider this argument, as Defendant, who is neither a party nor third-party beneficiary to the CDO Indentures, does not have standing to challenge the validity of the assignments in light of such agreements. *Nat'l Credit Union Admin. Bd.*, 410 F. Supp. 3d at 679 (stating that a non-party to a contract "does not have standing to challenge the validity of [an] assignment by arguing that the terms of the contract or assignment were not abided by"); *see also Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, Nat. Ass'n*, 747 F.3d 44, 50 (2d Cir. 2014) ("[W]e hold that Hillside lacks prudential standing to litigate whether WaMu's liabilities were assigned to Chase under the PAA because it was neither a contracting party nor a third-party beneficiary under the Agreement.").

## A.  *Applicable Law*

### 1.  **Standing**

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve

his grievance.  This inquiry involves 'both constitutional limitations on federal-court jurisdiction

and prudential limitations on its exercise.'"  *Hillside Metro Assocs., LLC v. JPMorgan Chase*

*Bank, Nat. Ass'n*, 747 F.3d 44, 48 (2d Cir. 2014) (quoting *Kowalski v. Tesmer*, 543 U.S. 125,

128–29 (2004).  Whether a plaintiff has standing must be resolved before turning to the merits.

*See Cortlandt St. Recovery Corp. v. Hellas Telecommunications*, *S.À.R.L.*, 790 F.3d 411, 417 (2d

Cir. 2015); *see also Raines v. Byrd*, 521 U.S. 811, 820 (1997) (stating that courts must "put aside

the natural urge to proceed directly to the merits of . . . [a] dispute [] to 'settle' it for the sake of

convenience and efficiency," and must first inquire as to whether a plaintiff has "met [its] burden

of establishing that [its] claimed injury is personal, particularized, concrete, and otherwise

judicially cognizable.").

"In its constitutional dimension, standing imports justiciability:  whether the plaintiff has

made out a 'case or controversy' between himself and the defendant within the meaning of Art.

III."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  "To have such Article III standing, 'the

plaintiff [must have] alleged such a personal stake in the outcome of the controversy' as to

warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's

remedial powers on [its] behalf."  *Cortlandt St. Recovery Corp.*, 790 F.3d at 417 (alterations in

original) (quoting *Warth*, 422 U.S. at 498–99).  A plaintiff claiming such a stake must establish,

"(1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2)

causation in the form of a fairly traceable connection between the asserted injury-in-fact and the

alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the

injury can be remedied by the requested relief." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte &
Touche LLP*, 549 F.3d 100, 106–07 (2d Cir. 2008) (internal quotations marks omitted).

Importantly, "the minimum requirement for an injury-in-fact is that the plaintiff have
legal title to, or a proprietary interest in, the claim [at issue]." *Cortlandt St. Recovery Corp.*, 790
F.3d at 420 (citing *W.R. Huff Asset Management Co., LLC*, 549 F.3d at 108). "[A]n interest that
is merely a 'byproduct' of the suit itself cannot give rise to a cognizable injury in fact for Article
III standing purposes." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772–73
(2000) (internal quotations marks omitted). However, when a plaintiff has an interest in the
outcome of a suit but no legally protected right to vindicate, Article III's injury requirement can
be satisfied by the valid assignment to the plaintiff of the right at issue, thus allowing the plaintiff
to "'stand in the place of the injured party' and satisfy constitutional standing requirements."
*Cortlandt St. Recovery Corp.*, 790 F.3d at 418 (quoting *W.R. Huff Asset Mgmt. Co., LLC*, 549
F.3d at 107); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008)
("Lawsuits by assignees . . . are 'cases and controversies of the sort traditionally amenable to,
and resolved by, the judicial process.'" (quoting *Vt. Agency of Nat. Res.*, 529 U.S. at 777–78)).

"Unlike constitutional standing, which focuses on whether a litigant sustained a
cognizable injury-in-fact, '[t]he prudential standing rule . . . bars litigants from asserting the
rights or legal interests of others in order to obtain relief from injury to themselves.'" *United
States v. Suarez*, 791 F.3d 363, 366 (2d Cir. 2015) (alterations in original) (quoting *Rajamin v.
Deutsche Bank Nat. Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014)). When both standing doctrines
are at issue, a court "may assume Article III standing and address 'the alternative threshold
question' of whether a party has prudential standing." *Hillside Metro Assocs., LLC*, 747 F.3d at
48 (quoting *Kowalski*, 543 U.S. at 129).

Plaintiffs bear the burden of establishing both constitutional and prudential standing, *Rajamin*, 757 F.3d at 84, and "must demonstrate standing for each claim [they] seek[] to press and for each form of relief that is sought," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotation marks omitted). Although "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, . . . [i]n response to a summary judgment motion . . . the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotations and citations omitted).

In the Second Circuit, breach of contract claims brought by non-parties to a contract have raised both constitutional, *see Cortlandt Street Recovery Corp.*, 790 F.3d at 418–20, and prudential standing barriers, *see Hillside Metro Associates, LLC*, 747 F.3d at 48, as such cases involve a plaintiff's attempt to seek recovery on a contract in which the plaintiff has no legally protected interest, and also involve the rights or legal interests of third parties (the actual parties to the contract). In both *Cortland Street Recovery* and *Hillside Metro Associates*, the Second Circuit's jurisdictional decisions turned on whether the respective plaintiffs in those actions were validly assigned the rights to the contracts underlying their breach of contract claims. Because the Second Circuit has relied on both constitutional standing requirements and the prudential standing doctrine under such circumstances, I consider both doctrines in the instant Opinion & Order.[18]

---

[18] The Supreme Court has stated, with respect to prudential standing doctrines, that "[t]he limitations on third-party standing are harder to classify[,] [and has] observed that third-party standing is closely related to the question whether a person in the litigant's position will have a right of action on the claim, but [that] most of [its] cases have not framed the inquiry in that way." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 n.3 (2014) (internal quotation marks and citations omitted). "Although characterized as 'prudential,' [third party standing] relate[s] to the elements of Article III standing." *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016).

Both Supreme Court and Second Circuit precedent indicate that the lack of valid assignments from the CDO Indenture Trustees would in fact deprive Plaintiffs of both Article III and prudential standing. *See Sprint Commc'ns Co., L.P.*, 554 U.S. at 285–87; *Cortlandt St. Recovery Corp.*, 790 F.3d at 420 ("Although *Sprint* confirms that an assignee need not possess more than title to a claim to bring suit upon that claim, nothing in that case suggests that an assignee may proceed with less."); *Hillside Metro Assocs., LLC*, 747 F.3d at 48–49 ("We conclude that Hillside does not have prudential standing in this case because it cannot enforce the terms of the PAA, as to which it is neither a party nor a third-party beneficiary, but the enforcement of which is a necessary component of its claim."); *W.R. Huff Asset Mgmt. Co.*, 549 F.3d at 108 ("In our view, *Sprint* makes clear that the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim."). This conclusion follows from the fact that Plaintiffs' breach of contract claim is based on Plaintiffs' alleged status as holders of RMBS Certificates, and thus as third-party beneficiaries of the PSAs they seek to enforce. Plaintiffs' standing to sue as third-party beneficiaries, therefore, is premised on the assignment back to Plaintiffs of the RMBS certificates issued in connection with the PSAs. In the absence of such assignments, Plaintiffs would have no legally cognizable contract rights on which to rest their breach of contract claims.[19] *See House of Europe Funding I, Ltd. v. Wells Fargo Bank, N.A.*, No. 13 CIV. 519 RJS, 2014 WL 1383703, at *16 (S.D.N.Y. Mar. 31, 2014) ("A party that has assigned away its rights under a contract lacks standing to sue for breach of that contract." (citing *Nat'l Fin. Co. v. Uh*, 720 N.Y.S.2d 17, 18 (App. Div. 2001) ("Having

---

[19] Under New York law, "[a]bsent a contractual relationship there can be no contractual remedy." *Hillside Metro Assocs., LLC*, 747 F.3d at 49 (quoting *Suffolk Cnty. v. Long Island Lighting Co*., 728 F.2d 52, 63 (2d Cir. 1984). Indeed, "it is ancient law in New York[] . . . that to succeed on a third[-]party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *Id.* (quoting *Suffolk Cnty.*, 728 F.2d at 63); *see also Subaru Distribs. Corp. v. Subaru of Am., Inc*., 425 F.3d 119, 124 (2d Cir. 2005).

assigned the note, [plaintiff] was no longer the real party in interest with respect to an action upon the instrument and retained no right to pursue a claim against defendant.")).  This is the exact conclusion that Judge Forrest recognized in *Phoenix Light II* where, contrary to Plaintiffs' continued assertion that the assignments of these claims from the CDO Indenture Trustees were unnecessary, she concluded that "[s]uch assignments were necessary" for Plaintiffs to pursue breach of contract claims.  *Phoenix Light II*, 2016 WL 1169515, at *7.[20]

---

[20] The parties dispute whether *Phoenix Light I* dismissed Plaintiffs' claims for lack of Article III standing.  For the reasons stated throughout this Opinion & Order, I read *Phoenix Light I* as providing a ruling with regard to both constitutional standing and the Second Circuit's prudential standing doctrine.  First, *Phoenix Light I* rejected Plaintiffs' conclusory allegations of third-party beneficiary status, *see Phoenix Light I*, 2015 WL 2359358, at *2, negating prudential standing, *see Hillside Metro Assocs., LLC*, 747 F.3d at 48–49 ("We conclude that Hillside does not have prudential standing in this case because it cannot enforce the terms of the PAA, as to which it is neither a party nor a third-party beneficiary, but the enforcement of which is a necessary component of its claim.").  Second, because *Phoenix Light I* concluded that the CDO Indentures constituted full assignments of Plaintiffs' rights regarding the RMBS certificates, *see Phoenix Light I*, 2015 WL 2359358, at *2, Plaintiffs also had no basis to establish constitutional standing in the absence of assignments from the CDO Indenture Trustees so as to "'stand in the place of the injured party' and satisfy constitutional standing requirements," *Cortlandt St. Recovery Corp.*, 790 F.3d at 418 (quoting *W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 107).  For, "[i]t is still true that 'the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim [at issue].'"  *Id.* at 420 (quoting *W.R. Huff Asset Mgmt. Co., LLC*, 549 F.3d at 108).  This conclusion is buttressed by the fact that Plaintiffs' only remaining claim is a third-party beneficiary breach of contract claim because, in the absence of the assignments, Plaintiffs would lack any "legally protected interest," *W.R. Huff Asset Mgmt. Co.*, 549 F.3d at 106, in the contract rights on which they base their breach of contract claim.  *Cf. Cortlandt St. Recovery Corp.*, 790 F.3d at 422 ("[A]bsent a complete assignment of the only claims on which the lawsuit was based, there was no valid lawsuit pending before the district court in which to permit an amended complaint.").  Another court in this district has reached the same conclusion.  *See Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, No. 16 CIV. 1597 (NRB), 2018 WL 1417850, at *4 (S.D.N.Y. Mar. 8, 2018) ("Each CDO Issuer's 'Grant' of 'all of its right, title and interest' in 'any and all . . . property' is broad enough to include the transfer of the right to bring contract claims relating to any 'instruments [and] securities . . . including . . . the Collateral Debt Securities. . . .' These plaintiffs therefore lack standing to bring these contract claims." (internal quotation marks and citation omitted)), *aff'd sub nom. Triaxx Prime CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n*, 741 F. App'x 857 (2d Cir. 2018); *but see House of Europe Funding I Ltd. v. Wells Fargo Bank*, No. 13-CV-519 RJS, 2015 WL 5190432, at *7 (S.D.N.Y. Sept. 4, 2015) ("[W]hen the Court found that HOE I lacked standing to sue Collineo under the CAA, the Court did so on the grounds that a party who assigns its rights is no longer the real party in interest with respect to an action upon the instrument and retained no right to pursue a claim, not because it had not suffered an injury-in-fact sufficient to satisfy Article III." (internal quotation marks and citations omitted)).

During oral argument, Defendants also stated that, to the extent *Phoenix Light I* found a lack of Article III standing, such a conclusion would be incorrect in light of *National Credit Union Administration Board v. U.S. Bank National Association*, 898 F.3d 243 (2d Cir. 2018).  (*See* Oral Arg. Tr. 6:7-21.)  In *National Credit Union Administration Board*, a related case, the Second Circuit concluded that in her decision below, Judge Forrest conflated a lack of Article III standing, which is jurisdictional, with a lack of derivative standing, which is not jurisdictional.  *Id.* at 252 n.57 (citing *In re Facebook, Inc., Initial Pub. Offering Litig.*, 797 F.3d 148, 156–57 (2d Cir. 2015) (distinguishing Article III and derivative standing)).  Pursuant to *National Credit Union Administration Board*, I do not interpret *Phoenix Light I*'s dismissal of Plaintiffs' derivative claims as premised on a lack of constitutional standing under Article III.  However, Plaintiffs gave up their derivative claims and only bring direct claims based on

In light of the above constitutional and prudential standing doctrines, I assess, as a threshold matter regarding Plaintiffs' standing to bring this breach of contract claim, whether the assignments to Plaintiffs of the right to bring this suit were valid.  Because the assignments in question were made under New York law, I assess the validity of the assignments under New York law.  Defendant argues that the assignments are void under New York's champerty doctrine.

### 2.        New York Champerty Law

In general, claims or choses in action may be freely transferred or assigned to others.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc*., 106 F.3d 11, 17 (2d Cir. 1997).  However, an assignment governed by New York law must comply with New York's statutory prohibition against champerty.  Judiciary Law § 489 is New York's champerty statute, and states in pertinent part:

> [N]o corporation or association, directly or indirectly, itself or by or through its officers, agents or employees, shall solicit, buy or take an assignment of, or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon . . . .

N.Y. Judiciary Law § 489(1); *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp*., 591 F.3d 116, 121 (2d Cir. 2010).  "Section 489(1) restricts individuals and companies from purchasing or taking an assignment of notes or other securities with the intent and for the purpose of bringing an action or proceeding thereon."  *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 166 (2016) (internal quotation marks omitted).  "[T]o constitute the offense [of champerty] the *primary purpose* of the purchase must be to enable [one] to bring a

---

their alleged ownership of RMBS certificates, which *National Credit Union Administration Board* did not address.

suit, and the intent to bring a suit must not be merely incidental and contingent." *Id.* (alterations and emphasis in original) (quoting *Moses v. McDivitt*, 88 N.Y. 62, 65 (1882)).  Accordingly, New York's champerty law draws a distinction "between 'acquiring a thing in action in order to obtain costs,' which constitutes champerty, 'and acquiring it in order to protect an independent right of the assignee,' which does not." *Love Funding Corp.*, 591 F.3d at 120 (quoting *Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 13 N.Y.3d 190, 199 (2009)).  Indeed, "'[t]he purpose behind [the plaintiffs'] acquisition of rights' is the critical issue in assessing whether such acquisition is champertous." *Justinian Capital SPC*, 28 N.Y.3d at 167 (quoting *Love Funding Corp.*, 13 N.Y.3d at 198–199).  When a "lawsuit [is] not merely an incidental or secondary purpose of [an] assignment, but its very essence," the assignment is void. *Id.* at 168.  An assignment of rights is not champertous, however, "if its purpose is to collect damages, by means of a lawsuit, for losses on a debt instrument in which [the plaintiff] holds a preexisting proprietary interest." *Love Funding Corp.*, 13 N.Y.3d at 195; *see also Love Funding Corp.*, 591 F.3d at 120–21.

Champerty is an affirmative defense for which the defendant bears the burden of proof. *Love Funding Corp.*, 591 F.3d at 119.  Although the intent and purpose of an assignee is usually a factual question that cannot be decided on summary judgement, where a plaintiff fails to rebut evidence that its purpose in seeking an assignment was to commence suit, a court may grant summary judgment in favor of a defendant. *See Justinian Capital SPC*, 28 N.Y.3d at 167; *Love Funding Corp.*, 13 N.Y.3d at 201 & n.6 (granting summary judgment and stating that although "[t]he inquiry into purpose is a factual one," [t]hat is not to say [] that the issue may not be amenable to summary judgment in an appropriate case").

## B.  *Analysis*

### 1.  The Purpose Behind the Assignments

The parties' papers, supporting declarations, and exhibits demonstrate that there is no genuine material factual dispute as to Plaintiffs' purpose in seeking the assignments in question. The assignment agreements themselves and the deposition testimony cited by the parties demonstrate that Plaintiffs sought these assignments for the sole purpose of pursuing this litigation, and for no other reason.  Indeed, this lawsuit—identified by caption in the assignment agreements—"[is] not merely an incidental or secondary purpose of the assignment[s], but [their] very essence." *Justinian Capital SPC*, 28 N.Y.3d at 168.

The facts and procedural history of this case demonstrate that the genesis of the assignment agreements was the desire to litigate this case.  When deposed, Plaintiffs' 30(b)(6) witness—Peter J. Collins—testified that it was EAA who first "voic[ed] [its] opinion as to how [the CDO Plaintiffs] would benefit from litigation and [Plaintiffs] were trying to have litigation pursued."  (*See* Barry Decl. Ex. 30, at 323:1–324:9.)  EAA employee Enno Balz himself testified that he was personally involved in discussions with Plaintiffs about filing this lawsuit, and that he himself suggested to Phoenix Light, on behalf of EAA, that Phoenix Light should file the lawsuit.  (Fitzgerald Decl. Ex. 208, at 221:18–223:4.)  In fact, it was EAA who "instructed or asked Phoenix Light to pursue assignment[s] from the CDO trustees for the purpose of litigation."  (*See* Barry Decl. Ex. 30, at 323:1–324:9.)  When asked if Plaintiffs sought the assignments for any purpose other than litigation, Collins answered "[n]ot to my knowledge." (*Id.*)  Defendants identified testimony from the deposition of Alan Geraghty, a Phoenix Light director, that corroborated Collins's 30(b)(6) testimony, again demonstrating that Plaintiffs' purpose in obtaining the assignments "was to allow the [Plaintiffs] to bring legal claims relating

to RMBS." (Barry Decl. Ex. 19, at 243:7–244:2.) When Geraghty was asked if the assignments

were for any other purpose, Geraghty also answered "I don't know. I don't think so." (*Id.*; *see*

*also id.* at 250:4-17.) Plaintiffs have identified no materials in the record to dispute this

testimony.[21]

    The evidence presented by the parties also demonstrates that EAA's motives for

encouraging Plaintiffs to seek assignments from the CDO Indenture Trustees were rooted in a

desire for Plaintiffs to litigate this case. The evidence demonstrates that EAA was created with

the mandate of winding down its portfolio to minimize losses to EAA stakeholders, and that one

component of this mandate is to litigate in order to recover possible damages. (Marcucci Decl.

Ex. 18, at 34:6–35:6; Ex. 19, at 206:7-24; Fitzgerald Decl. Ex. 208, at 34:6–35:6.) The parties

do not dispute that EAA owns all of the notes issued by Phoenix Light, which in turn owns notes

issued by the CDO Plaintiffs. EAA thus stands to gain from any recovery in this litigation.

These facts, in conjunction with the undisputed fact that Plaintiffs agreed to fund any litigation

arising out of the assignments, despite not being entitled to its proceeds, (BOA 56.1 ¶ 15), leave

no genuine dispute that Plaintiffs obtained these assignments "in order to obtain costs" as

opposed to "protect[ing] [their] independent right[s]." *Love Funding Corp.*, 591 F.3d at 120

(quoting *Love Funding Corp.*, 13 N.Y.3d at 199).

    In addition to the above, other evidence supports the conclusion that the assignments in

question are void under New York's champerty doctrine. First, nothing in the assignments

---

[21] Plaintiffs argue that the assignments were sought because of the CDO Indenture Trustees' conflicts of interest.
That the CDO Indenture Trustees may have been conflicted does not foreclose the fact that Plaintiffs' purpose in
seeking the assignments was to pursue litigation. Plaintiffs understood that "because of those alleged conflicts of
interests, absent [the assignments], these claims would not be brought against the RMBS trustees." (Fitzgerald Decl.
Ex. 210, at 325:21-25; 326:1-7.) In any case, assigning a claim to avoid a conflict of interest does not mean the
assignment is not champertous. *Cf. Justinian Capital SPC*, 28 N.Y.3d at 164 (finding an assignment void for
champerty despite fact that assignment was made due to "fear of repercussions" associated with bringing a lawsuit
against an entity owned by a government that granted assignor substantial financial support).

effects a transfer of title back to Plaintiffs of the RMBS certificates at issue. Other courts considering New York champerty defenses have stated that "receiv[ing] [a] cause of action . . . absent any related obligations or assets," which is precisely what Plaintiffs were assigned here, is evidence of champerty. *BSC Assocs., LLC v. Leidos, Inc*., 91 F. Supp. 3d 319, 329 (N.D.N.Y. 2015); *see also Koro Co. v. Bristol-Myers Co*., 568 F. Supp. 280, 287–88 (D.D.C. 1983) (finding, under New York law, that assignment was champertous in part because "the claim [] was not assigned along with all the other assets"). Second, the assignment agreements themselves specifically identify that the purpose of the assignments was to allow Plaintiffs to bring the claims alleged in the RMBS cases identified in the agreements by caption, which include the claims in this case. For example, the June 26, 2015 assignment agreement states that the assignment was sought "[i]n response to the *Opinion & Order* in *Phoenix Light SF Limited, et al. v. U.S. Bank National Association, et al.*, 14-cv-10116 (KBF) (decided May 18, 2015)." (Barry Decl. Ex. 29, at 2.) The presence of such language within the four corners of the assignment is further evidence of champerty. *See Aretakis v. Caesars Entertainment*, No. 16-cv-8751, 2018 WL 1069450, at *10 (S.D.N.Y. 2018) (holding assignment was void as champertous where "portions of the purported assignment make plain that the purpose of the assignment was to allow Plaintiff to prepare and file a lawsuit seeking to obtain the funds to which Plaintiff claims [assignor] is entitled").

## 2. The *Love Funding Corporation* Exception

Plaintiffs make one argument in opposition to Defendant's champerty defense: that the assignments are not void because Plaintiffs had a preexisting proprietary interest in the RMBS certificates underlying this suit. (*See* Pls. Mem. 6–7 (citing *Love Funding Corp.*, 13 N.Y.3d at

195).)[22]  Plaintiffs' sole attempt to identify this alleged proprietary interest, however, is
Plaintiffs' incorrect assertion that they merely pledged the RMBS certificates to the CDO
Indenture Trustees in the form of security agreements, and thus still retain title to the RMBS
certificates at issue.  (*See* Pls. Mem. 3–7.)  This assertion is inconsistent with *Phoenix Light I*,
where Judge Forrest concluded that the CDO Indentures constituted "a full assignment" of  "'all .
. . right, title and interest' in the [RMBS] [C]ertificates," as well as the "'full power' to file
actions" regarding rights under the RMBS Certificates.  *Phoenix Light I*, 2015 WL 2359358, at
*2.  This conclusion constitutes law of the case, which I adopt in this Opinion & Order.

      Even if I did not construe Judge Forrest's prior conclusion as law of the case, the
language in the CDO Indentures amounts to more than the pledge of a security interest.  When
Plaintiffs resecuritized the RMBS certificates in order to issue new securities in the form of CDO
notes, they assigned title to the underlying RMBS certificates—and all associated litigation
rights—to the CDO Indenture Trustees; they did not "pledge" the certificates, and there is no
indication that Plaintiffs retained any interest in the RMBS certificates.  This conclusion follows
from the language of the granting clauses in the CDO Indentures.  For example, the granting
clause in the Blue Heron CDO Indenture states:

> The Issuer hereby Grants to the Indenture Trustee for the benefit of the Secured
> Parties, all of its right, title and interest in, to and under, in each case, whether now
> owned or existing, or hereafter acquired or arising:
>
> (a) all Underlying Assets and all payments thereon or with respect thereto, (b) all
>     Accounts and the trust accounts . . . , all Eligible Investments and other property
>     deposited therein or credited thereto, and all income from the investment of
>     funds therein, . . . (e) all accounts, general intangibles, chattel papers,
>     instruments, documents, goods, money, investment property, letters of credit,
>     letter-of-credit rights, deposit accounts and oil, gas and other minerals related
>     to the foregoing, (f) all other property of the Issuer, including any money,

---

[22] "Pls. Mem." refers to Plaintiffs' Memorandum of Law in Opposition to Bank of America, N.A.'s Motion for
Summary Judgment.  (Doc. 320.)

> instruments, investment property, and other property delivered by the Co-
> Issuers to the Indenture Trustee, and
>
> (b) all proceeds, accessions, profits, income, benefits, substitutions and
> replacements, whether voluntary or involuntary, of and to any of the property
> of the Issuer described in the preceding clauses . . .

(Barry Decl. Ex. 31, at -540–541.)  The other agreements contain similar if not identical

language.  (*See* Barry Decl. Exs. 32–38.)

The Second Circuit has stated in analogous circumstances that "a trust indenture transfers

legal title in securities to a trustee for the benefit of individual bondholders and other creditors."

*Nat'l Credit Union Admin. Bd.*, 898 F.3d at 248 n.25, 253 (describing the transfer of "all [] right,

title and interest in and to" the underlying securities as a "complete transfer").[23]  Even Plaintiffs'

primary authority, *House of Europe Funding I Limited*, concluded that a grant in a similar

indenture "was complete and not one for security."  *House of Europe Funding I Ltd. v. Wells*

*Fargo Bank, N.A.*, No. 13-CV-519 RJS, 2015 WL 1472301, at *7 (S.D.N.Y. Mar. 30, 2015); *see*

*also Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, No. 16 CIV. 1597 (NRB),

2018 WL 1417850, at *4 (S.D.N.Y. Mar. 8, 2018) ("Each CDO Issuer's 'Grant' of 'all of its

right, title and interest' in 'any and all . . . property' is broad enough to include the transfer of the

right to bring contract claims relating to any 'instruments [and] securities . . . including . . . the

Collateral Debt Securities. . . .'  These plaintiffs therefore lack standing to bring these contract

claims."), *aff'd sub nom. Triaxx Prime CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n*, 741 F. App'x

---

[23] The Second Circuit has indicated that such a transfer of title is in fact necessary to effectuate an issuer's goals, as the indenture "is used to settle the security interests on a single entity when it would be impractical to have the security run to the group of [note]holders directly or to have a separate security instrument for each [note]holder." *Nat'l Credit Union Admin. Bd.*, 898 F.3d at 248 n.25 (internal quotations and citation omitted).  This is especially true when entities, like Plaintiffs, are created to acquire and then resecuritize various distressed assets like the RMBS certificates.  (*See* U.S. Bank 56.1 ¶ 19.)  After all, "[s]ecuritization is the process of converting assets into negotiable securities for resale in the financial market, allowing the issuing financial institution *to remove* assets from its books, and thereby improve its capital ratio and liquidity."  *Nat'l Credit Union Admin. Bd.*, 898 F.3d at 247 n.10 (emphasis added).  Judge Forrest's prior description of Plaintiffs' resecuritization of the RMBS certificates is consistent with this conclusion.  *See Phoenix Light II*, 2016 WL 1169515, at *2.

857 (2d Cir. 2018); *Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, No. 9:17-
CV-80203-CIV, 2017 WL 3701251, at *2–3 (S.D. Fla. Aug. 21, 2017) ("Courts evaluating
similar language have concluded that it constitutes a complete assignment that leaves the
assignor without standing to sue the obligor."), *report and recommendation adopted*, No. 9:17-
CV-80203, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017); *FDIC v. Bank of New York Mellon*, 15-
cv-6570-ALC, ECF No. 68 at 5–6 (S.D.N.Y. July 10, 2017) (summarizing its opinion in *FDIC v.
Citibank, N.A.*, 1:15-cv-6574, 2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016), and stating, on a
motion for reconsideration, that its previous "holding that Plaintiff lacked standing was done on
grounds that 'a party who assigns rights is no longer the real party in interest with respect to an
action upon the instrument and retained no right to pursue a claim,'" *House of Europe*, 2015 WL
4190432 at *7, because Plaintiff's "claims for breach of the [PSAs] traveled to the
Resecuritization Trust as a result of its sale of the certificates");[24] *CRAFT EM CLO 2006-1, Ltd.
v. Deutsche Bank AG*, 34 N.Y.S.3d 7, 8 (N.Y. App. Div. 2016) ("However, in the indentures,
CRAFT granted nonparty HSBC Bank USA, as trustee, all of CRAFT's rights under the swap
agreements, including the right to bring actions and proceedings.  Therefore, the motion court, on
the record before it, properly found that CRAFT lacked standing to sue."); *cf. Powell v. Ocwen
Fin. Corp.*, No. 18-CV-1951 (VSB), 2019 WL 1227939, at **5–6 (S.D.N.Y. Mar. 15, 2019)
(collecting breach of contract standing cases).

      Plaintiffs further posit that "[a] CDO issuer . . . owns the underlying assets and is
therefore injured by action that adversely affect the underlying assets."  (Pls. Mem. 3–7 (citing

---

[24] Plaintiffs' citation to this case for the proposition that "an assignment of claims does not divest [an] assignor of
Article III standing," (Pls. Mem. at 5), is blatantly misleading.  First, the case actually stands for the opposite
proposition, as the opinion itself describes; and second, the opinion cited by Plaintiffs concluded that standing could
be satisfied only by means of a Federal Rule of Civil Procedure 17 ratification, which Plaintiffs have not pursued in
this case.  *See FDIC v. Bank of New York Mellon*, 15-cv-6570-ALC, ECF No. 68 at 6–8 (S.D.N.Y. July 10, 2017).

*House of Europe Funding I, Ltd.*, 2014 WL 1383703, at *11).)  However, Plaintiff's legal

authority for this proposition is inapposite.  The *House of Europe Funding I, Limited* opinion—

Plaintiff's only authority on this point—cites to a First Department case, *Hildene Capital*

*Management, LLC*, which concluded that a CDO issuer satisfied standing requirements based on

its ownership of the underlying collateral securities pledged to an indenture trustee.  *See House*

*of Europe Funding I, Ltd.*, 2014 WL 1383703, at *11 ("As a New York court has observed, a

CDO issuer like HOE I owns the underlying assets and is therefore injured by actions that

adversely affect the underlying assets.  *Hildene Capital Mgmt., LLC v. Bank of N.Y. Mellon*, 963

N.Y.S.2d 38, 40 (App. Div. 2013).").  However, in *Hildene Capital Management, LLC*, the CDO

issuer's indenture specified that the CDO issuer "own[ed] and ha[d] good and marketable title to

the Collateral free and clear of any lien claim or encumbrance of any person," and thus preserved

the issuer's ownership of the underlying securities.  *Hildene Capital Management, LLC v. The*

*Bank of New York Mellon*, No. 650980/2010, 2012 WL 12300406, at *3 (N.Y. Sup. Ct. Aug. 24,

2012).  For this reason, the New York Supreme Court concluded that the CDO issuer remained

"the owner of all the assets held as collateral" under the indenture, *id.* at *4, a conclusion that the

First Department adopted, *see Hildene Capital Mgmt., LLC*, 963 N.Y.S.2d at 40.  Plaintiffs have

identified no analogous language in their own indentures, which is fatal to their argument.  *See*

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, No. 16 CIV. 1597 (NRB), 2017

WL 1103033, at *4–5 (S.D.N.Y. Mar. 21, 2017) (rejecting an similar argument based on the

language from *House of Europe Funding I, Limited*, and stating that *Hildene Capital*

*Management, LLC* "did not create a rule that a CDO issuer retains the right to bring suit

regardless of what a governing indenture may say").

It is important to note that the unique facts in the Second Circuit's and New York Court

of Appeal's *Love Funding* opinions, which created the preexisting proprietary interest exception

to champerty doctrine, are readily distinguishable from the facts of the instant case.  As

Defendants point out, in *Love Funding Corporation*, the plaintiff was a trust created pursuant to

a pooling and service agreement, and was assigned all "rights, title and interest in, to and under"

various mortgage loans subject to securitization for the purposes of issuing mortgage-backed

securities.  *Love Funding Corp.*, 591 F.3d at 119.  The plaintiff received the loans from an entity,

Paine Webber Real Estate Securities, Inc. ("Paine Webber"), that acquired the loans through a

conduit-lending arrangement with the defendant, the originator of the defaulted mortgage loan at

issue in the litigation.  *Id.* at 118–19.  The plaintiff's standing to bring the suit was premised on

Paine Webber's successor's assignment to plaintiff of its rights under the conduit-lending

arrangement with defendant, which included representations and warranties regarding the

defaulted mortgage loan, and indemnification.  *Id*.  Because the plaintiff —as a trust with title to

the underlying mortgages—had title to the defaulted mortgage loan at issue, plaintiff's

"preexisting proprietary interest" in the debt instrument giving rise to the suit was obvious; the

loan was indeed plaintiff's loan.  *Id.* at 120–21.  In the instant case, however, Plaintiffs ceded any

such title to the instruments giving rise to these claims when they executed the CDO Indentures.

Given the conclusion that the CDO Indentures effected a full transfer of Plaintiffs' right

and title to the RMBS certificates at issue, and my adoption of that conclusion here, it follows

that Plaintiffs conveyed any preexisting proprietary interest in the RMBS certificates to the CDO

Indenture Trustees upon executing the CDO Indentures.  Thus, the reassignments back to

Plaintiffs of the CDO Indenture Trustees' rights to sue on the RMBS certificates do not fall

under the preexisting proprietary interest exception to the champerty doctrine articulated in *Love

Funding Corporation*, 13 N.Y.3d at 195.  To the extent Plaintiffs could identify other preexisting

proprietary interests in the RMBS certificates, they have not done so here. I note that Plaintiffs bring this action directly "in [their] own right as [] CDO Issuer[s] that hold[] Certificates that were issued by certain of the Covered Trusts . . . ." (TAC ¶¶ 10–17.) Although Plaintiff Phoenix Light originally attempted to sue derivatively in its capacity as controlling noteholder of the CDO Plaintiffs, Plaintiffs amended their complaint and now only sue directly. *See Phoenix Light II*, 2016 WL 1169515, at *4. Thus, any argument that Phoenix Light has a preexisting proprietary interest in the RMBS certificates based on Phoenix Light's status as a noteholder is not properly before me, and Plaintiffs have not made such an argument. Even if Plaintiffs did posit such an interest, *Love Funding* did not address whether a plaintiff's security interest in a CDO backed in part by RMBS certificates would qualify as a proprietary interest in the RMBS certificates sufficient to defeat a champerty defense under New York law, and I make no such finding here.

My rejection of Plaintiffs' preexisting proprietary interest argument, in conjunction with my conclusion that there is no genuine dispute that Plaintiffs' purpose in seeking the assignments was to initiate this litigation, renders the assignments at issue void under New York champerty law. Accordingly, following the Second Circuit precedent outlined in Section III.A.1, *supra*, I find that Plaintiffs lack both constitutional and prudential standing to bring this breach of contract action.

## IV. <u>Conclusion</u>

For the foregoing reasons, Defendant U.S. Bank's motion for summary judgment, (Doc. 243), is GRANTED, and Defendant U.S. Bank's motion for partial judgment on the pleadings, (Doc. 139), is DENIED as moot. The Clerk of Court is respectfully directed to terminate the open motions at Documents 139 and 243.

SO ORDERED.

Dated:  March 18, 2020
        New York, New York

Vernon S. Broderick
United States District Judge